UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANTHONY MEDINA,

Plaintiff,

-against-

NEW YORK STATE DEPARTMENT OF CORRECTION
AND COMMUNITY SUPERVISION; NEW YORK STATE
OFFICE OF MENTAL HEALTH; NANCY HEYWOOD, DEPUTY
COMMISSIONER AND COUNSEL, NEW YORK DEPARTMENT
OF CORRECTIONS AND COMMUNITY SUPERVISION;
WLADYSLAW SIDOROWICZ, M.D., FACILITY HEALTH
SERVICE DIRECTOR, SULLIVAN CORRECTIONAL
FACILITY; THOMAS R. GRIFFIN, SUPERINTENDENT,
EASTERN CORRECTIONAL FACILITY; KENNETH COLAO,
DEPUTY SUPERINTENDENT FOR PROGRAMS, EASTERN
CORRECTIONAL FACILITY; DONALD M. WILKINS,
CAPTAIN, EASTERN CORRECTIONAL FACILITY; GREGG
ESPOSITO, CAPTAIN, EASTERN CORRECTIONAL
FACILITY; BRYAN BRADT, AMERICANS' WITH
DISABILITIES ACT COORDINATOR, NEW YORK
DEPARTMENT OF CORRECTIONS AND COMMUNITY
SUPERVISION; MICHAEL SHEAHAN, SUPERINTENDENT,
FIVE POINTS CORRECTIONAL FACILITY; PATRICIA
JONES, DEPUTY SUPERINTENDENT FOR PROGRAMS, FIVE
POINTS CORRECTIONAL FACILITY; RAYMOND COVENY,
DEPUTY SUPERINTENDENT OF SECURITY, FIVE POINTS
CORRECTIONAL FACILITY; TRICIA MILLER, ASSISTANT
DEPUTY SUPERINTENDENT OF MENTAL HEALTH, FIVE
POINTS CORRECTIONAL FACILITY; KEVIN SIGNORE,
CAPTAIN, FIVE POINTS CORRECTIONAL FACILITY; M.
RANIERI, COMMISSIONER HEARING OFFICER, FIVE
POINTS CORRECTIONAL FACILITY; SEAN O'CONNOR,
SERGEANT, FIVE POINTS CORRECTIONAL FACILITY;
PATRICK BURNS, CORRECTION OFFICER, FIVE POINTS
CORRECTIONAL FACILITY; CHRISTOPHER M. ROBERTS,
CORRECTION OFFICER, FIVE POINTS CORRECTIONAL
FACILITY; DANIEL MCGUANE, CORRECTION OFFICER,
FIVE POINTS CORRECTIONAL FACILITY; JOHN DOE,
CORRECTION OFFICER, FIVE POINTS CORRECTIONAL
FACILITY,

Defendants.

15 Civ. 1955 (LAP)

PLAINTIFF'S FIRST
AMENDED COMPLAINT

ECF CASE

## PRELIMINARY STATEMENT

This is a civil and disability rights action filed by Anthony Medina ("Plaintiff"), a legally blind inmate of the New York State correctional system, for damages, injunctive and declaratory relief under 42 U.S.C. § 1983, Title II of the Americans' with Disabilities Act, 42 U.S.C. §§ 12101-12132 ("ADA"), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (a)("Rehabilitation Act") and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.  In April of 2011 Plaintiff and a number of similarly situated blind and visually-impaired inmates filed a class action suit against the DOCCS and others requesting injunctive relief for violations of the ADA and Rehabilitation Act.  The parties entered into a Private Settlement Agreement dated February 28, 2014 ("PSA") that contained agreements regarding the nature and processes for requesting reasonable accommodations for the blind and visually-impaired Plaintiffs at Sullivan and Wende Correctional Facilities.  The class action complaint did not allege nor address the fact that while incarcerated at Sullivan Correctional Facility ("Sullivan") individual DOCCS employees failed to treat and/or withdrew necessary treatment for Plaintiff's debilitating headaches and eye pain resulting from his vision disability and photosensitivity.  This withdrawal of medical treatment violated the prohibition against cruel and inhumane treatment of the

Eighth Amendment.   Before and after the execution of the PSA, Mr. Medina was repeatedly transferred in and out of Eastern Correctional Facility ("Eastern") and Five Points Correctional Facility ("Five Points") where he was subjected to denials of reasonable accommodations in violation of ADA and Rehabilitation Acts, as well as to conduct that deprived him of his constitutional rights under the Eighth Amendment prohibition against cruel and inhumane treatment and the Fourteenth Amendment's due process protections.   This lawsuit addresses Plaintiff's Eighth Amendment claims emanating from events at Sullivan, as well as § 1983, ADA and Rehabilitation Act claims for actions undertaken by Defendants at Eastern and Five Points prisons.   Plaintiff also seeks declaratory judgment under the Declaratory Judgment Act that 7 NYCRR § 251.4.1, 7 NYCRR § 253.2 and 7 NYCRR § 254.2 are unconstitutional as each violates the due process clause of the Fourteenth Amendment.   Exhibit 1, "7 NYCRR § 251.4.1, 7 NYCRR § 253.2 and 7 NYCRR § 254.2," ("Exhibit 1").   As promulgated, the rules, meant to address the procedural due process rights of "sensorially disabled inmates," afford no due process protections to blind or visually impaired inmates. The inadequate protection of these rules allows Defendants to deny Plaintiff due process protections at disciplinary hearings.

**JURISDICTION**

1.   This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1334 (a) (3), 1343 (a) (4).   The matters in controversy arise under 42 U.S.C. § 1983, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, Title II of the ADA, 42 U.S.C. § 12132 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

2.   Venue is proper in this district pursuant to 28 U.S.C. § 1391. (b) (1) and (2).

**THE PARTIES**

**Plaintiff**

3.   Plaintiff Anthony Medina ("Medina") at the time of the events for which this action is brought was incarcerated at Sullivan, Eastern or Five Points Correctional Facility.

4.   Mr. Medina is 37 years old and legally blind. He suffers from an irregular topographic stigmatism and advanced keratoconus, the latter a degenerative, bilateral (but usually asymetrical) ectatic eye disease of the cornea characterized by structural changes to the cornea that cause paraxial stromal thinning, weakening and change of the cornea to a conical shape, rather than the normal, more roundish curve. Vision loss occurs primarily from irregular astigmatism and myopis, and secondarily form corneal scarring.   Keratoconus is usually accompanied by

associated conditions, namely photophobia (i.e., sensitivity to light), monocular diplopia (i.e., ghost shadows) and vogt striae (i.e., horizontal lines). Mr. Medina has all three associated conditions. His sensitivity to artificial and natural light is so severe that pain medication is prescribed. He also suffers from amblyopia, a disorder where poor vision is caused by abnormal visual development where visual stimulation fails to transmit or poorly transmits via the optic nerve to the brain. He is also suspected of having glaucoma, which is abnormally high fluid pressure in the eye.

5.   Mr. Medina's disability substantially impairs his quality of life and he must rely on various accommodating devices, equipment, aids and auxiliary services to see, read, write and walk, four major life activities. He is also substantially limited in performing and/or enjoying the benefits of other major life functions and tasks. To read documents, Mr. Medina requires a device capable of 32X magnification.

6.   Under DOCCS regulations, a prisoner is "legally blind" if (a) his vision acuity is 20/200 or less in the stronger of his two eyes, measured with best possible correction, or (b) he has a visual field of no greater than 20 degrees in the stronger of his two eyes. Exhibit 2, "DOCCS Directive 2612" (hereafter "Exhibit 2"), ¶ II. E.   Legally blind inmates are deemed

"inmates with sensorial disabilities" and, under DOCCS Directive, "shall be referred for transfer to one of the designated facilities which can accommodate their needs." Exhibit 2 at ¶ III. C.

7.   Plaintiff, with or without reasonable accommodations, meets the eligibility requirements for receiving services and participating in programs and activities available to New York State prisoners through DOCCS.   He also meets the requirements for residing in and receiving the services, programs and activities, and appropriate accommodations of the Sensorially Disabled Units and Programs.

8.   As described above, Plaintiff is a "qualified individual with disabilities," as that term is defined in the Rehabilitation Act, 29 U.S.C. § 794, and the ADA 42 U.S.C. § 12131(2).   Because of his disability, Plaintiff has been and continues to be denied access to programs, services and activities provided and operated by Defendants.

**Defendants and State Actors**

9. Defendant Lucy Buther ("Buther") was the New York State Department of Corrections and Community Supervision ADA Coordinator, responsible for ensuring that all programs, services and activities operated by and under the control of DOCCS comply with the Rehabilitation Act and ADA.   She is also

responsible for creating and implementing policies governing the provision of reasonable accommodations and for reviewing all denials of grievances, other complaints, and requests for reasonable accommodations submitted by DOCCS prisoners with sensorial and physical disabilities. She is a state actor for ADA and Rehabilitation Act claims.

10. Defendant Nancy Heywood ("Heywood") is Deputy Commissioner and Counsel for DOCCS' Office of Counsel, responsible for ensuring that DOCCS and all its facilities and employees are aware of and comply with state and federal laws, court orders and DOCCS' rules, policies and regulations.  She is also responsible for ensuring that DOCCS' rules and policies, when enforced, do not violate state and federal laws. She is a state actor for ADA and Rehabilitation Act claims and is also sued in her individual capacity.

11. Defendant Wladyslaw Sidorowicz ("Sidorowicz") is a medical doctor and Facility Health Service Director at Sullivan, responsible for the overall supervision and management of the medical care system at Sullivan which includes the physical health and well being of all prisoners incarcerated there.  He is sued in his individual capacity.

12. Defendant Thomas Griffin ("T. Griffin") is the Superintendent of Eastern Correctional Facility, responsible for

the operation and administration of Eastern and all units and programs therein.   He is a state actor for ADA claims and is sued in his individual capacity.

13.   Defendant   Kenneth   Colao   ("Colao")   is   the   Deputy Superintendent   of   Programs   for   Eastern,   responsible   for overseeing  prison  programs  at  Eastern,  providing  reasonable accommodations  to  disabled  prisoners  and  ensuring  compliance with DOCCS policies regarding reasonable accommodations.   He is a state actor for ADA and Rehabilitation Act claims and is sued in his individual capacity.

14.  Defendant  Donald  Wilkins  ("Wilkins")  is  a  Captain  at Eastern, responsible for supervising and managing daily security and  administrative  matters  at  Eastern.   He  is  also  responsible for the general operation of Eastern's Special housing Unit. He is a state actor for ADA and Rehabilitation Act claims and is sued in his individual capacity.

15. Defendant Esposito ("Esposito") was a Captain at Eastern, responsible  for  supervising  and  managing  daily  security  and administrative matters at Eastern. He is a state actor for ADA and Rehabilitation Act claims and is also sued in his individual capacity.

16. Mikhail Gusman ("Gusman") is a medical doctor and Facility Health Service Director at Eastern, responsible for the overall

supervision and management of the medical care system and well being of all prisoners.  He is a state actor for ADA and Rehabilitation Act claims.

17. Defendant Bryan Bradt ("Bradt") is the ADA Coordinator for the New York State Department of Corrections and Community Supervision, responsible for ensuring that programs, services and activities operated by and under control of DOCCS comply with the Rehabilitation Act and ADA.  Bradt is also responsible for ensuring that programs, services and activities operated by and under control of DOCCS comply with the Rehabilitation Act and ADA.  He is also responsible for creating and implementing policies governing the provision of reasonable accommodations and for reviewing all denials of grievances, other complaints, and requests for reasonable accommodations submitted by DOCCS prisoners with sensorial, physical and mental disabilities.  He is a state actor for ADA and Rehabilitation Act claims and is also sued in his individual capacity.

18. Diane Van Buren ("Van Buren") was the Assistant Commissioner for Mental Health for the New York State Department of Corrections and Community Supervision, responsible for the supervision and management of the mental health units, programs and services operated jointly by DOCCS and the New York State Office of Mental Health and for ensuring that those units,

programs, and services comply with the Rehabilitation Act and ADA. She was also responsible for creating and implementing policies governing the housing and provision of mental health programs and services for prisoners with mental and emotional disabilities. She is a state actor for ADA and Rehabilitation Act claims.

19. Bryan Hilton ("Hilton") is the Assistant Commissioner for Mental Health for the New York State Department of Corrections and Community Supervision, responsible for the supervision and management of the mental health units, programs and services jointly operated by DOCCS and the New York State Office of Mental Health and for ensuring that those units, programs and services comply with the Rehabilitation Act and ADA. He is also responsible for creating and implementing policies governing the housing and provision of mental health programs and services for prisoners with mental and emotional disabilities. He is a state actor for ADA and Rehabilitation Act claims.

20. Defendant Michael Sheahan ("Sheahan") is the Superintendent of Five Points Correctional Facility, responsible for the overall operation and administration of Five Points and all units and programs therein. He is sued his individual capacity.

21. Defendant Patricia Jones ("Jones") is the Deputy Superintendent of Programs for Five Points Correctional

Facility, responsible for overseeing prison programs at Five Points, providing reasonable accommodations to prisoners, and ensuring compliance with DOCCS' policies regarding reasonable accommodations. She is a state actor for ADA and Rehabilitation Act claims and is also sued in her individual capacity.

22. Defendant Raymond Coveny ("Coveny") is the Deputy Superintendent of Security for Five Points Correctional Facility, responsible for the safety and security of Five Points. He is also the Chairman of the Time Allowance Committee. He is a state actor for ADA and Rehabilitation Act claims and is also sued in his individual capacity.

23. Defendants Tricia Miller ("Miller") is the Assistant Deputy Superintendent of Mental Health for Five Points Correctional Facility, responsible for the supervision and management of the Residential Mental Health Unit and the mental health programs and services operated jointly by DOCCS and the New York State Office of Mental Health. She is also responsible for providing reasonable accommodations to disabled prisoners, ensuring compliance with DOCCS' policies regarding reasonable accommodations and that the RMITU is in compliance with the Rehabilitation Act and ADA. She is a state actor for ADA and Rehabilitation Act claims and is also sued in her individual capacity.

24. Defendant Kevin Signore ("Signore") is a Captain at Five Points Correctional Facility, responsible for supervising the daily security and administrative operations within the Residential Mental Health Unit. He is a state actor for ADA and Rehabilitation Act claims and is also sued in his individual capacity.

25. Defendant M. Ranieri ("Ranieri") is a Commissioner Hearing Officer, responsible for presiding over tier three disciplinary proceedings at Five Points Correctional Facility and ensuring disciplinary proceedings comply with due process. He is sued in his individual capacity. He is sued in his individual capacity.

26. Defendant Sean O'Connor ("O'Connor") is a Sergeant at Five Points Correctional Facility. He is sued in his individual capacity.

27. Defendant Patrick Burns ("Burns") is a Correction Officer at Five Points Correctional Facility. He is sued in his individual capacity.

28. Defendant Christopher M. Roberts ("Roberts") is a Correction Officer at Five Points Correctional Facility. He is sued in his individual capacity.

29. Defendant Daniel McGuane ("McGuane") is a Correction Officer at Five Points Correctional Facility.   He is sued in his individual capacity.

30. Defendant John Doe ("Doe") is a correction Officer at Five Points Correction Facility.   He is sued in his individual capacity.

31. Thomas Schlee ("Schlee") is the Unit Chief for the Residential Mental Health Unit, a unit annexed to Five Points Correctional Facility and operated jointly by DOCCS and the New York State OMH.   He is responsible for the operation and administration of the RMHU's programs and services as well as the mental health care of all prisoners with the RMHU.   He is a state actor for ADA and Rehabilitation Act claims.

32. Maureen Bosco ("Bosco") is the Executive Director of Central New York Psychiatric Center, a branch of the New York State Office of Mental Health, and is responsible for the mental health care and services provided to mentally ill individuals who are a ward of the State.   She is also responsible for the clinical operations of the satellite mental health units within DOCCS, including creating and implementing mental health policies governing programs and ancillary services.   She is also responsible for ensuring that OMH's clinical units comply with

the Rehabilitation Act and ADA.  She is a state actor for ADA and Rehabilitation Act claims.

33.  Anthony Gonzalez ("Gonzalez") is the Director of Risk Management for the New York State Office of Mental Health, responsible for supervising the Residential Mental Health Treatment Units and the programs and services provided with those units, which are jointly operated by DOCCS and OMH.  He is also responsible for creating and implementing policies governing the mental health care provided to prisoners within those units, investigating complaints, and ensuring compliance with the SHU Exclusion Law, Rehabilitation Act and ADA.  He is a state actor for ADA and Rehabilitation Act claims.

34. Jill Grant ("Grant") is a Risk Management Specialist for the New York State Office of Mental Health, responsible for general oversight of the Residential Mental Health Treatment Units and the programs and services provided within those units.  She is also responsible for monitoring the mental health care provided within those units, investigating complaints, and ensuring compliance with the SHU Exclusion Law and the Rehabilitation Act and ADA.  She is a state actor for ADA and Rehabilitation Act claims.

35. Defendant New York State Office of Mental Health ("OMH") is a public entity and an arm of the State of New York, responsible

for the overall operation of its facilities and units, the programs and services provided therein, which entails protecting the mental health and well-being of all prisoners in the custody of DOCCS.

36. Defendant New York State Department of Corrections and Community Supervision ("DOCCS") is a public entity and an arm of the State of New York, responsible for all New York State prison facilities and the health and well-being of all prisoners incarcerated in those facilities.

## FACTUAL ALLEGATIONS

## I.   PLAINTIFF'S   PERSONAL   MEDICAL   HISTORY   AND   NECESSARY ACCOMMODATIONS

37. In June or July of 2010, Mr. Medina was transferred to the Sensorial Disability Unit ("SDU") at Sullivan because he is legally blind. The SDU is equipped with accommodating devices and staff trained to work with blind and visually impaired individuals.

38. On October 1, 2010, an ophthalmologist prescribed the pain medication Tramadol (a/k/a Ultram) to relieve Mr. Medina of the severe headaches and eye pain caused by his exposure to light.

39. Mr. Medina's exposure to light either causes or exacerbates dry eye, excessive tearing, double vision, light flashes, ghost shadows, chronic and severe headaches, extreme eye pain, eye

irritation, dizziness, nausea and occasional vomiting. These symptoms increase in likelihood and severity with use of contact lenses.

## II. LACK OF ADA ACCOMMODATIONS AT EASTERN CORRECTIONAL FACILITY

40. Despite Eastern's status as a facility that can accommodate the blind and visually impaired, the Private Settlement Agreement reached in *Medina v. Fischer*, 11-Civ-00176 did not address ADA or Rehabilitation Act violations at Eastern. Indeed, rather than addressing the needs of the blind and visually-impaired incarcerated in any DOCCS facility, the PSA was limited to just Wende and Sullivan. Exhibit 2, III. C. 5; III. C. 6.

41. On November 29, 2012, Mr. Medina arrived at Eastern's SHU. Eastern is a DOCCS facility designated as able to accommodate blind, visually impaired and hard of hearing prisoners. Exhibit 2, III. C. 4.

42. Mr. Medina's first week at Eastern's SHU, he did not receive any of his disability accommodations. As a result of Mr. Medina's numerous requests and written complaints, Defendants eventually provided him with general accommodations. None of these afforded Mr. Medina the ability to read.

43. On or about December 18, 2012, Mr. Medina was provided with: Sunglasses, a sun visor, dim cell lighting, bold lined paper,

20/20 pens, large print dictionary, a talking book tape player, and a CCTV. Mr. Medina was also afforded an additional five minutes of shower time to shave. The SHU counselor was also assigned to assist Mr. Medina with completing forms.

44. On June 14, 2013, due to mental health reasons, Mr. Medina was transferred back to Sullivan's SHU from Eastern. Sullivan hired a new administrative staff and superintendent since Medina's last stay in March of 2011.

**III. DENIAL OF MEDICAL TREATMENT FOR SEVERE PAIN AT SULLIVAN CORRECTIONAL FACILITY**

45. Upon Mr. Medina's arrival at Sullivan, he submitted a request to Darwood Cunningham to have the SHU cell light turned off, as this was an approved accommodation as well as a medical need. Superintendent P. Griffin and Captain A. Russo instructed Darwood Cunningham that the cell light would remain on because Medina had sunglasses.

46. Sunglasses only provide Mr. Medina with temporary relief.

47. Defendants did allow Mr. Medina to turn the cell light off in the evening from 7:30 PM to 7:00 AM. Defendants also issued Medina a table lamp, negating all light-related security concerns and providing Medina with reading light.

48. On or about June 17, 2013, Defendant Sidorowicz discontinued Mr. Medina's pain medication, Tramadol, which was prescribed to

relieve headaches and eye pain caused by light exposure. Consequently, Mr. Medina unnecessarily experienced severe headaches and numerous problems with his eyes.

49. Sidorowicz's denial of Mr. Medina's pain medication caused Mr. Medina to suffer from sharp pain in his eyes, severe headaches, light flashes, double vision and vertigo. Mr. Medina complained about these problems verbally and in writing to Defendant Sidorowicz, but nothing was done.

50. Mr. Medina and his attorneys notified Defendant Buther about the cell light being on in disregard of Mr. Median's eye condition as well as the revocation of Mr. Medina's pain medication. The decision to deny the accommodation was contrary to Defendant DOCCS' Directive No. 2612, which states that approved disability accommodations will be provided at each prison the prisoner is housed. Defendant Buther refused to rectify the matter. She affirmed Defendants P. Griffin and Russo's decision to leave the light on despite the severe pain it caused Mr. Medina and she did not reinstate Mr. Medina's pain medication.

51. From June 14, 2013 to October 31, 2013, due to constant exposure to light and the denial of pain medication, Mr. Medina was unnecessarily subjected to severe eye pain, headaches, a

form of double vision, light flashes, and occasional nausea and vertigo.

## IV. LACK OF REASONABLE ACCOMMODATIONS AT EASTERN CORRECTIONAL FACILITY

### A. Defendants Refused to Dim or Turn Off Plaintiff's Cell Light in Eastern Correctional Facility's SHU

52. On October 31, 2013, Mr. Medina was transferred back to Eastern's SHU. At some point after transfer, Dr. Gusman represcribed Medina's pain medication, Tramadol.

53. On or about November 1, 2013, Mr. Medina submitted a Reasonable Accommodation Request to Defendant Colao requesting that the cell light be dimmed and all other previously approved accommodations.

54. On November 4, 2013, the cell light was dimmed.

55. On November 15, 2013, Defendant Wilkins directed the SHU officers to turn the cell light on. When Mr. Medina questioned Defendant Wilkins about the light being turned on, Wilkins replied he was told to turn the cell light on by Defendant T. Griffin.

56. On November 15, 2013, during Defendant T. Griffin's rounds in the SHU, Mr. Medina questioned Defendant T. Griffin about the cell light being turned on and explained his photophobic ailment and the resulting severe pain and headaches. Defendant T. Griffin replied, "That's why I issued you sunglasses. You can

deal with it for seven days," referring to the number of days until Mr. Medina's release from the SHU. Defendant T. Griffin then walked away.

57. Defendant T. Griffin neither consulted with a medical doctor, nor Eastern's SDU supervisor, who were both familiar with Mr. Medina's particular eye condition before he summarily rejected Medina's requests to have the cell lights dimmed.

58. Defendant T. Griffin was aware that the bright lights in Mr. Medina's cell caused Medina to suffer severe pain and headaches.

59. Defendants are aware that the intensity of Mr. Medina's pain increases when Medina wears his contact lenses.

60. Eastern's SHU cell light policy requires that a cell light be turned on at 7:30 AM and remain on until 6:00 PM. At 6:00 PM, prisoners have the option to turn the cell light off. This policy left Mr. Medina exposed to bright light for 11 hours every day.

61. Consequently, from October 31, 2013 to November 22, 2013, due to constant exposure to light, Mr. Medina was unnecessarily subjected to severe eye pain, headaches, a form of double vision, light flashes, and occasional nausea and vertigo.

**B. Defendants Denied Plaintiff An Assistive Aide While In Eastern Correctional Facility's SDU**

62. On November 22, 2013, Mr. Medina was released from the SHU and placed in Eastern's SDU, a unit within the prison's general population.

63. While in the SDU, Mr. Medina was confined to his cell under keep lock status.

64. Due to the limitations placed on Mr. Medina by his disability, he has to rely on the assistive services of an inmate aide to read, complete forms, locate items, organize and locate documents, clean his cell, and any other tasks that he is unable to perform on his own.

65. Defendants T. Griffin and Colao denied Mr. Medina an aide to assist him with needed tasks while in keep lock.

66. As a result of Mr. Medina's numerous complaints, and the advocacy of the SDU supervisor Eve Simmons, on December 10, 2013, aides were assigned and allowed to visit Mr. Medina's cell and help him.

## C. Defendants Denied Plaintiff an Inmate Mobility Aide at Eastern Correctional Facility

67. Defendant DOCCS has promulgated Directive No. 2612 to govern prisoners with sensorial disabilities. This directive has provisions which state that a mobility aide is a "reasonable accommodation" and also tacitly states that blind prisoners

cannot be denied a mobility aide if their safety will be compromised. Exhibit 2, VII. C. , ¶ 2.

68. Defendant DOCCS also recognizes that disabled prisoners self-accommodate with learned behavioral/neurological modifications. An example is Mr. Medina's unconscious use of his hands when walking. To effectuate the purpose and intent of DOCCS Directive 2612, Defendants are supposed to modify their rules, policies and practices to accommodate disabled prisoners.

69. Due to the severity of Mr. Medina's vision loss, he requires the assistance of a mobility aide/sighted guide and/or use of a guidance cane while walking. This mobility assistance is especially important when Medina is in unfamiliar places, when the terrain changes and/or regular activity occurs in an area.

70. The mobility aide ensures Mr. Medina can safely walk without bumping into people and objects and ensures that he does not trip and fall. Essentially, the mobility aide keeps Mr. Medina from inadvertently injuring himself and/or others.

71. Those who provide mobility assistance are trained in this function and are employed as Inmate Mobility Aides ("IMA").

72. Mr. Medina also uses his hands while walking to orient himself and to help navigate confined spaces and stairs. The use

of his hands is a self-accommodation and learned adaptive behavior.

73. From November 22, 2013 through February 11, 2014, while Mr. Medina was in the SDU, Defendants T. Griffin and Colao denied Mr. Medina either trained inmate mobility assistance or a guidance cane. Due to Mr. Medina's keep lock status, he was not provided a guidance cane. Heywood and Buther both approved the denial of an IMA or a guidance cane.

74. On December 4, 2013, Mr. Median sent a letter to Eastern's Deputy Superintendent for Security explaining that he needed to use his hands while walking and requested permission to use his hands.

75. On December 6, 2013, while returning from Eastern's visiting area, Mr. Medina — unaided — walked in to a gate breaking his eyeglasses.

76. The SDU supervisor, Ms. Eve Simmons, also sent emails to Defendant Colao and the Deputy for Security regarding Mr. Medina's need for an IMA and/or the use of his hands while walking.

77. In response to Mr. Medina's December 4th letter and the email sent by the SDU supervisor, effective December 10, 2013, Mr. Medina was handcuffed behind his back whenever he exited his

cell. Defendants merely provided Medina with an untrained corrections officer to guide him.

78. The SDU supervisors at Wende, Sullivan and Eastern recognized Mr. Medina's need for an IMA and the use of his hands, yet Defendants T. Griffin, Colao, Buther, Heywood and Wilkins denied Medina this reasonable accommodation while he was housed at Eastern.

**E. Defendants Refused to Dim or Turn off Plaintiff's Cell Light In Eastern Correctional Facility's SHU**

79. On February 11, 2014, Mr. Medina returned to the SHU at Eastern. Once again, the SHU cell light was left on causing Medina severe and chronic headaches, eye pain, nausea and/or vomiting.

80. On February 11, 2014, Mr. Medina requested that Defendants Wilkins and Colao dim or turn off the cell light.  Medina explained to them that sunglasses are not an effective alternative.  Defendant Wilkins replied that Defendant T. Griffin wanted the cell light on. Mr. Medina then informed Defendant Colao and Wilkins that Defendant Heywood and Buther had previously agreed to turn the cell light off.

81. Later in the day of February 11, 2014, Defendant Colao and Defendant Wilkins returned to the SHU and told Mr. Medina that they had spoken to Defendant Heywood and she had informed them

that the cell light would remain on regardless of the pain it caused Medina.

## F. Defendants Denied Plaintiff Accommodations and Due Process Rights during Disciplinary Hearings at Eastern Correctional Facility

82. Mr. Medina reads by using a CCTV magnifier that is capable of increasing the font size of written documents from 12 point to 32 point or larger. Mr. Medina had this device while in the SHU at Eastern.

83. During the disciplinary hearing for a February 11, 2014 incident Mr. Medina was granted use of his CCTV magnifier so he could read documents and present evidence. However, the Hearing Officer, Defendant Esposito, refused to uncuff Medina's hands or detach the cuffs from the waist-chain so that Mr. Medina could use the CCTV device to read and introduce documents in his defense.

84. Mr. Medina was denied the ability to read and present evidence in violation of his due process rights under the Fourteenth Amendment. Defendant Esposito allowed no effective alternative so Medina could study documents and present evidence at the disciplinary hearing.

85. Defendants' denial of reasonable accommodations and access to programs, services and activities at Five Points are capable

of repetition each and every time Medina may be transferred there.

### G. Defendants Revoked and Denied Plaintiff Medical Treatment at Sullivan Correctional Facility A Second Time

86. On or about April 2, 2014, Mr. Medina was transferred from Eastern back to Sullivan's SHU.

87. On or about April 5, 2014, Defendant Sidorowicz, without examining or even speaking to Mr. Medina, again discontinued the pain medication Tramadol, which is prescribed to treat the severe headaches and eye pain caused by Mr. Medina's exposure to light. This decision reversed Dr. Gusman's prescription.

88. When Mr. Medina spoke to Defendant Sidorowicz about the reason for discontinuing the Tramadol, Sidorowicz stated it was Defendant DOCCS policy to limit the prescription of Tramadol.

89. From April 2, 2014 through April 21, 2014, Defendants Sidorowicz and DOCCS denied Mr. Medina an effective pain medication to help relieve Mr. Medina's severe headaches and eye pain.

90. In lieu of Mr. Medina's Tramadol, Sidorowitz increased Medina's Neurontin prescription. The general purpose of Neurontin is to treat epilepsy, but it is alternatively used to treat nerve damage and pain associated therewith.

91.  Neurontin does not help with Mr. Medina's pain caused by headaches and eye pain. Furthermore, Neurontin has a reported side effect of causing suicidal thoughts and tendencies.

92.  If a pain medication that is deemed a controlled substance is prescribed, it is Defendant DOCCS policy to place the inmate in the prison's infirmary. Thus, the inmate must choose between being housed in the infirmary with pain medication or remaining in general population without treatment.

93.  The inmate must choose between receiving adequate medical care or foregoing participation in mandatory programs to obtain early release from prison as well as waiving many other privileges enjoyed by inmates in general population, to wit: out-door recreation, commissary, regular visitation, personal foods, cigarettes, and so on.

94.  Because Mr. Medina was in SHU status, he was not even offered the option of housing in the infirmary.  Defendants knew the withdrawal of Mr. Medina's Tramadol medication caused him to suffer severe pain from headaches and eye pain.

## V.   FIVE POINTS CORRECTIONAL FACILITY IS NOT CAPABLE OF ACCOMODATING BLIND OR VISUALLY IMPAIRED INMATES

95. At the times relevant to the matters at hand, Defendant DOCCS had designated five correctional facilities to accommodate sensorial disabled inmates: Sullivan Correctional Facility,

Wende Correctional Facility, Eastern Correctional Facility, Woodbourn Correctional Facility and Wyoming Correctional Facility. Exhibit 2, III.

96. Those five facilities operate Sensorial Disability Units or Programs (SDU/SDP) and employ staff certified to work with the blind, visually impaired, deaf and hard of hearing and make available accommodating devices, equipment aids and assistive services. These facilities have created resource rooms that maintain PC computers with software for the blind, V-text/CCTV magnifiers, SARA reading scanners, along with other devices, services and supplies.

97. At these five accommodating SDU/SDP facilities blind and visually impaired inmates may also be furnished with guidance canes, magnifiers, tape players, headphones, audio books, low wattage lamps, sunglasses, writing guides, talking watches, talking calculators, talking dictionaries, 16 font dictionaries, sight saving 20/20 markers, bold and raised lined paper, talking and braille board games, braille paper, braille slates, modified typewriters, large print/braille/audio rule books, instructional materials on audio tape, legal texts on audio tape and large print forms and notices.[1]   Under best circumstances, these

---

[1] This list is not all inclusive, but only illustrative.
[2] Defendant Signore provided Mr. Medina with a cassette player to

facilities with SDU/SDP reasonably modify DOCCS policies and practices to accommodate the sensorial disabled.

98. Civilian and security staff within the five SDU/SDP facilities are aware of the presence of sensorial disabled inmates and are somewhat familiar with and considerate of the functional abilities and limitations of the sensorial disabled. These facilities also have trained inmates who act as mobility guides, readers, note takers, living skill aides and provide other needed assistance. This is not true of Five Points.

99. On April 22, 2014, Mr. Medina was transferred from Sullivan Correctional Facility to the Residential Mental Health Unit (RMHU) at Five Points. Mr. Medina's repeated placement at Five Points was deliberately indifferent to Medina's accommodating needs and safety.

100. At all relevant times at hand, Five Points was not a facility designated by Defendant DOCCS to house the blind and visually impaired. See Exhibit 2, § III. C. Directive No 2612 specifically states that Five Points "has the ability to accommodate only hard of hearing inmates, NOT deaf, legally blind or severely visually impaired inmates." Ibid.

101. Mr. Medina was the first blind inmate to be housed at Five Points. Defendant's decision to place Mr. Medina at Five Points created unique and unfamiliar challenges to both Mr. Medina and

prison officials and placed Medina's safety and well-being in jeopardy.

102.    Plaintiff's attorneys at the time wrote numerous letters to Defendants regarding the lack of accommodations for Plaintiff at Five Points.

103. Five Points does not employ a sign language interpreter or an Instructor for the Blind.

104.    Since April of 2014, Mr. Medina has been transferred to Five Points on three separate occasions.   Defendants' denial of reasonable accommodations and access to programs, services and activities at Five Points are capable of repetition each and every time Medina may be transferred there.

**A. Cruel and Inhumane Treatment at Five Points Correctional Facility**

105. Upon Mr. Medina's arrival at Five Points on April 22, 2014 he questioned whether Five Points was an appropriate facility considering his blindness and his need for various accommodating devices and assistive services. Mr. Medina's primary concern was his need for mobility guidance while ambulating, an accommodation Five Points could not provide.

106. Since Five Points is not one of the five prisons equipped to house blind inmates, and Mr. Medina's presence presented

novel situations, Defendant Signore and Doctor Trabout placed Mr. Medina in the prison's infirmary for his own safety.

107. On April 23, 2014, around 12:10 pm, Mr. Medina asked Nurse Deming for his contract lens solutions and eye drops. The nurse provided the solutions with the expectation that Mr. Medina was going to place a couple of drops in his eyes and then return the bottles. Nurse Deming refused to wait while Mr. Medina went through the process of using each solution and demanded the bottles be immediately returned to her.

108. Mr. Medina explained to Nurse Deming the process of using the solutions stated when he was done he would call for her to retrieve the bottles. The nurse refused to wait and asked for the solutions. Mr. Medina refused to return them until he completed application of the solutions.

109. In response, Nurse Deming notified Defendant Roberts that Mr. Medina was refusing to return the solutions. Mr. Medina explained to Defendant Roberts that putting the contact lenses in required the contacts to be rinsed, lubricated, the eye lubricated and then the contact inserted with additional drops - - a halting and laborious process complicated by Medina's poor vision. After explaining this, Mr. Medina informed Defendant Roberts that when done he would promptly return the solutions.

110. Nurse Administrator Jansen then approached and told Mr. Medina he had to return the solutions. Defendant O'Connor also

approached and stood to the side. Mr. Medina reiterated to both the nurse administrator and Defendant O'Connor the problem and explained it took a few minutes to put the contacts in and that when he was done he would return the solutions.

111. Nurse Administrator Jensan walked away telling Defendant O'Connor, "[h]e's all yours." Defendant O'Connor came to the door with Defendants Burns, Roberts, McGuane, Doe One and one or two other officers standing to the side and yelled, "[t]ake that off your neck!" Mr. Medina knew this game and replied, "There's nothing on my neck." Defendant O'Connor then stepped back and ordered the officers to go get Medina. The Defendants and other officers rushed the room. Defendants Burns and Roberts pushed the hospital bed into Mr. Medina causing Medina to fall to the floor.

112. One of the Defendants then covered Mr. Medina's upper body with a clear, plastic shield wile Defendant Roberts struck Mr. Medina in the lower back, legs and feet with a baton. While striking Mr. Medina, Defendant Roberts stated, "Welcome to Five Points, Ray Charles." Medina used his feet to deflect the baton and did kick Defendant Roberts once to try and stop the beating. Defendants Burns and McGuane then jumped on the shield knocking the breath out of Mr. Medina. Defendant Roberts and another officer commenced kicking Medina in his legs and buttocks.

113. After the Defendants became winded from their unnecessary and wanton beating of Mr. Medina, they rolled Mr. Medina on his stomach and handcuffed his arms behind his back.   While Mr. Medina was laying face down on the floor, a Defendant tried to break Mr. Medina's fingers by twisting them.   The Defendant dislocated the ring and middle fingers of the Mr. Medina's left hand and hyper-extended the index and thumb of the same hand.

114. Defendants next lifted Mr. Medina from the floor and hung him over the bed railing.   The Defendants then took turns punching Mr. Medina in the head and face.

115. Defendants then lifted Mr. Medina again and one of the officers grabbed the back of Mr. Medina's head and slammed his face into the wall.

116. Defendants then dragged Mr. Medina to one of the infirmary's examination rooms.   When medical personnel attempted to enter the room, Defendant O'Connor instructed them to stay away.

117. In the exam room Mr. Medina was placed face down on a gurney. The Defendants and other officers then unnecessarily and maliciously bent, twisted and held Mr. Medina's legs and feet in painful angles and positions while Defendant McGuane held Mr. Medina's upper body and head.

118. Defendants McGuane, Roberts, Burns and other officers unnecessarily and maliciously punched Mr. Medina multiple times

in both thighs causing painful cramps. During this second beating, Defendant O'Connor continued to tell medical personnel to get away from the room.

119. Defendant O'Connor instructed one of the officers to grab a small garbage bag. A Defendant then placed the bag over Mr. Medina's head and the lip of the bag was pulled back and forth in an attempt to create a ligature mark on Mr. Medina's neck.

120. When the bag failed to make a mark, Defendant O'Connor asked someone to retrieve the cord to Mr. Medina's CCTV reading device. Mr. Medina struggled to prevent the cord from being put around his neck. Defendant McGuane punched Mr. Medina in the head multiple times chipping one of Medina's teeth.

121. The cord was eventually placed around Mr. Medina's neck and yanked from left to right a couple of times to create a vinculum print. The cord was then removed and Defendant O'Connor pulled on its ends snapping the cord in half.

122. Defendant McGuane then resumed punching Mr. Medina repeatedly in the head and ears. Defendant McGuane punched Mr. Medina multiple times then stopped. Then, he would resume punching Mr. Medina in the head again, then stop. Due to one of the punches Mr. Medina's right ear popped and blood flowed from his ear.

123. In an attempt to protect the right ear, Mr. Medina turned his head and Defendant McGuane continued to unnecessarily and

repeatedly punch Mr. Medina on the left side of his head. Both of Mr. Medina's ears were ringing and Mr. Medina was incredibly disoriented from the beatings.

124. Defendant O'Connor asked Mr. Medina a couple of questions and because Mr. Medina did not answer, Defendant McGuane resumed punching Mr. Medina in the head.

**B. Sexual Assault at Five Points**

125. While still in the examination room cuffed on his stomach, Mr. Medina's shirt was torn and off and Defendants removed Mr. Medina's pants. Mr. Medina's underwear was then pulled down and one of Defendants took a baton and ran it up and down the crevice of Mr. Medina's buttocks. A defendant then attempted to insert the baton in Mr. Medina's anus. Mr. Medina started to scream and struggle. The defendants then ceased the sexual assault.

126. Someone pulled up Mr. Medina's underwear and the Defendants again struck Medina's feet with a baton and punched him in the thighs.

127. Defendant O'Connor then allowed medical personnel to enter and examine Mr. Medina. However, Defendant O'Connor did not allow medical staff to conduct a proper examination. When Mr. Medina tried to explain his non-visual injuries, Defendant O'Connor told him to shut up.

128.   The Defendants told medical personnel that Medina had attempted suicide with the CCTV cord and that they intervened. Because of Defendants' false story, Medina was dragged to the mental health unit and placed on suicide watch.  Mental health staff discharged Mr. Medina the next day, having found no cause to believe he was suicidal.

## C. Defendants Denied Plaintiff Accommodations and Due Process Rights During Disciplinary Hearings at Five Points Correctional Facility

129.   On the same day as the beatings, Defendant O'Connor authorized a misbehavior report charging Mr. Medina with violating departmental rules 100.11 (assault on staff), 102.10 (threats), 104.11 (violent conduct), 107.10 (interfering with staff), 106.10 (disobeying a direct order), 113.10 (weapon possession), 116.11 (altered item), and 104.13 (creating a disturbance).

130.   On April 24, 2014 while Mr. Medina was in the mental health unit's observation cell, a staff member requested a urine sample from him. Due to the injuries to his legs, Mr. Medina could not stand without aide and could not give a urine sample. As a consequence, Correction Officer Henderson filed a misbehavior report charging Mr. Medina with violating departmental rules 180.14 (non-compliance with urinalysis testing) and 106.10 (disobeying a direct order).

131.    On April 29, 2014, Mr. Medina was served a copy of both misbehavior reports. Defendants Sheahan, Coveny, Miller and Signore confiscated Medina's visual aides (i.e. CCTV, contact lenses and eyeglasses) and he was, consequently, unable to read the reports. Mr. Medina chose an employee assistant to help him comprehend the charges. Mr. Medina met with the assistant, but the assistant refused to read the reports aloud to Mr. Medina. Mr. Medina then requested that the misbehavior reports and other documents be furnished to him in either 32 font or on an audio cassette.[2] The assistant provided Mr. Medina with 50 to 60 pages purportedly of the requested documents in 14 font.[3] As Mr. Medina can only read characters in 32 font or larger, Mr. Medina could not read the documents provided to him by the assistant.

132.    Mr. Medina's primary and best accommodation for reading is a CCTV magnifier and/or 32 font characters. Both are prescribed needs and indicated as such in his optometry records. Mr. Medina's secondary means of reading, but rarely used, is a SARA reading scanner or someone to read to him.[4] A sheet magnifier and 14 font are both ineffective for Mr. Medina, whether

---

[2] Defendant Signore provided Mr. Medina with a cassette player to listen to audio materials.
[3] The assistant did not provide Medina with the misbehavior report for the April 23, 2014 incident.
[4] The Defendants refused Mr. Medina a SARA reader or an assistant to read to him aloud.

individually or used together.  A sheet magnifier lacks clarity and only enlarges size 14 font to 16 font.

133.    On May 8, 2014, two separate disciplinary hearings convened on the misbehavior reports lodged April 23rd and April 24, 2014.  At the start of both hearings, Mr. Medina informed the Hearing Officer, Defendant Ranieri, that he is legally blind, did not possess his visual aids and therefore could not read the misbehavior reports, nor other documents.  Defendant Ranieri adjourned the hearings to inquire about Mr. Medina's visual aids.

134.    Later in May 2014, the disciplinary hearings reconvened. Defendant Ranieri told Mr. Medina, that he was informed by Defendant Bradt, from the Office of Diversity Management, that Mr. Medina did not need a CCTV magnifier, nor 32-font type. Ranieri further stated that Mr. Medina could use 14-font type and the sheet magnifier to allow Mr. Medina to read.  Defendants Miller and Signore were also consulted on the matter and they stated that size 14-font and the sheet magnifier were sufficient to accommodate Mr. Medina's visual impairment.

135. During the disciplinary hearings, Mr. Medina asked that Defendant Ranieri either: provide him with a CCTV, enlarge the documents to 32-font, or have the assistant read the documents aloud to Mr. Medina. Defendant Ranieri refused to provide these

reasonable accommodations and failed to provide effective alternatives to enable Mr. Medina to read and present evidence.

136. During the preparatory stages and the disciplinary proceedings themselves, Defendants Bradt, Ranieri, Sheahan, Jones, Miller, Coveny, and Signore denied Mr. Medina the use of contact lenses and eyeglasses. They refused to adequately accommodate Mr. Medina's vision disability by providing the devices and assistive services needed for Medina to understand the charges, marshal evidence and meaningfully respond.

137. Based on the charges lodged by Defendant O'Connor, on May 27, 2014, Mr. Medina was penalized with nine months in keep lock cell confinement and six months loss of good time. The disposition is currently being challenged in a New York Civil Procedure Law and Rules Article 78 proceeding. See Medina v. Shehan, Index No. 48639 (Seneca Co. Sup. Ct, Appellate Division, Fourth Department).

138. Based on the charges lodged by Officer Henderson, on May 20, 2014, Mr. Medina was penalized with thirty days keep lock cell confinement. On September 16, 2014, the disciplinary disposition was annulled.

139. For an incident alleged to have occurred on March 27, 2014 at Eastern Correctional Facility, a disciplinary hearing was convened at Five Points for a misbehavior report authored by

Correction Officer Cronin. During the preparatory stage of the

disciplinary proceeding, and the proceeding itself, Defendants Bradt, Sheahan, Jones, Miller, Coveny and Signore denied Mr. Medina use of contact lenses and eyeglasses and refused to accommodate or adequately accommodate Mr. Medina's vision disability. Defendants refused to provide Medina the devices and assistive services needed so that Mr. Medina could understand the charges, marshal evidence and meaningfully respond.

140. Based on the charges lodged by Officer Cronin at Eastern, Mr. Medina was penalized with two months keep lock cell confinement.

141. A disciplinary hearing was convened at Five Points for a misbehavior report authored by Correction Officer S. Vavrica, for an incident alleged to have occurred on February 11, 2014 at Eastern Correctional Facility. During the preparatory stage of the disciplinary proceeding, and the proceeding itself, Defendants Bradt, Ranieri, Sheahan, Jones, Miller, Coveny and Signore denied Mr. Medina use of his contact lenses, eyeglasses and refused to adequately accommodate Mr. Medina's vision disability. Defendants refused Mr. Medina's use of devices and assistive services so Medina could understand the charges, marshal evidence and meaningfully respond.

39

142.   Based on the charges lodged by Officer Vavrica, on May 23, 2014, Mr. Medina was penalized with four months keep lock cell confinement.

143.   For an incident alleged to have occurred on February 25, 2015 at Five Points, Sergeant Masner authored a misbehavior report. On February 26, 2015, Mr. Medina was served a copy of the misbehavior report but could not read the report because he had none of his visual aids. On this occasion, staff left Mr. Medina's aids at Wende Correctional Facility. Defendant Miller refused to provide reasonable alternative accommodations. Moreover, the employee assistant refused to read the report or explain the charges to Mr. Medina.

144.   On March 5, 2015, Defendant Signore provided Mr. Medina with a CCTV magnifier; however, the magnification function was inoperable. Mr. Medina notified Defendants Signore and Miller that the device's magnification was not working.

145.   During the preparatory stage and the disciplinary proceeding itself, Defendants Signore and Miller failed to accommodate Mr. Medina's vision disability or furnish an effective alternative while the CCTV device was not in Mr. Medina's possession and/or was not operating. Consequently, Mr. Medina could not understand the charges, marshal evidence or meaningfully respond.

146.   The disciplinary proceeding on Sergeant Masner's report convened on March 10, 2015 and concluded on March 11, 2015. A sixty-day keep lock cell confinement penalty was imposed on Mr. Medina.

147.   On March 12, 2015, the day after the hearing, Defendant Signore had the CCTV device fixed and returned to Medina.

## D. Mr. Medina Was Not Granted Reasonable Accommodations Ensuring his Participation in RMHU Programs, Services and Activities

148.   While at Five Points, Mr. Medina is housed in the Residential Mental Health Unit ("RMHU"). The purpose of RMHU is to afford inmates, including Mr. Medina, the skills necessary to be reintegrated into the general prison population and to be a productive member of society upon release from prison. Unfortunately, the RMHU cannot accommodate sensory disabled inmates and Mr. Medina is denied the benefits of this program.

149.   For instance, desks are placed in a room to mimic a classroom for instruction. Inmates are shackled to desks.  Due to the shackling and Mr. Medina's vision disability, Mr. Medina cannot meaningfully participate in the tutorial exchanges between staff and inmates.

150.   Most, if not all, of the RMHU's therapeutic and rehabilitative curricula is disseminated in either video or

regular print formats, both of which are unsuitable for Mr. Medina without proper accommodations.

151.   While Mr. Medina is shackled to the desk, it is impossible for him to see the television screens mounted to the ceilings that play educational videos.

152.   Mr. Medina has requested reasonable accommodations so he can view the instructional videos and read instructional materials in the RMHU. OMH and DOCCS defendants have refused Mr. Medina's requests for reasonable accommodations.

**E. Defendants Often Deny Plaintiff Devices Necessary for Him to Read While at Five Points**

153.   Defendants Sheahan, Coveny, Signore, Miller, Heywood, Van Buren, Jones and Bradt deprived Mr. Medina use of a CCTV magnifier after the April 23, 2014 beatings. Defendants knew this device is Mr. Medina's primary (and only available) means of reading.[5]

154.   On April 30, 2014, Mr. Medina filed a grievance stating that he could not read without a CCTV magnifier and/or tailored print. The nurse administrator, in response, stated the CCTV was being repaired.   The CCTV, however, was not damaged except its power cord – an easily replaceable part.

_____

[5] Defendants had already confiscated Mr. Medina's contact lenses, sunglasses and eyeglasses.

155. On May 10, 2014, Mr. Medina submitted a reasonable accommodation request to Defendant Miller seeking a CCTV magnifier, audio books, sunglasses, 20/20 pens, help with forms, a reader, note taker and ancilla/amanuensis forms in 32 font, mobility aid or the use of his hands, free matter for the Blind envelopes, a typewriter or typing services, inter-facility memoranda in 32 font, audio legal materials and magnified paper clippers.

156. In response to this request for reasonable accommodations, Defendant Miller advised Mr. Medina that during morning rounds a DOCCS counselor or OMH clinician could help fill out forms. In lieu of the CCTV, defendants Sheahan, Signore, Miller provided Mr. Medina with a sheet magnifier at the direction of Defendant Bradt.

157. The sheet magnifier provided to Mr. Medina is ineffective. The Defendants are aware of this and it is the reason Mr. Medina was issued a portable CCTV magnifier in May of 2012.

158. On May 23, 2014, Mr. Medina returned the sheet magnifier to Defendant Miller with a letter explaining the sheet magnifier was ineffective, that print is only legible at 32 font and the sheet magnifier only enlarges 12 font to 14 font and 14 font to 16 font, and therefore, it does not accommodate Mr. Medina's disabilities.

159.   Defendants Bradt, Signore, and Miller continued stating 14 font and a sheet magnifier was sufficient even after Mr. Medina provided them with optometry records stating otherwise. After numerous complaints about the uselessness of the sheet magnifier Defendant Miller informed Mr. Medina that Defendants were seeking a more suitable device.

160.   On June 6, 2014 Defendants Heywood, Bradt, Jones, Signore, Sheahan, Coveny and Miller replaced the sheet magnifier with a globe magnifier. This globe magnifier was also ineffective. In a June 9, 2014 grievance, Mr. Medina outlined the inadequacies of the globe magnifier.

161.   On June 25, 2014, two months after Mr. Medina informed Defendants that the provided reading devices were inadequate, Defendant Sheahan allowed the CCTV magnifier to be returned to Mr. Medina.

162.   When Defendants denied Mr. Medina use of a CCTV device, they failed to provide an effective alternative. An effective alternative for Mr. Medina is printed material in 32-font or audio format, a SARA reading scanner or a person to read to him or a combination of both.

163.   Mr. Medina was not able to read his mail or review legal documents due to the Defendants denial of a CCTV reading device, 32-font or another equally effective accommodation.

44

164.  Defendant Miller did approve for OMH and DOCCS counselors to help Mr. Medina with completing forms, but this assistance was not allowed consistently.  Furthermore, staff members are not available to help Mr. Medina complete forms after 3:00pm.  Consequently, Mr. Medina endures delays sending his mail, is denied and/or delayed commissary and denied and/or delayed in requesting and receiving other services.

## F. Defendants Deny Plaintiff Large Print Forms While at Five Points

165.  Access to many DOCCS programs, services and activities is dependent on the prisoner being able to use certain prescribed forms and other documents. Requests for services must be made in writing and are often granted or denied in writing. Mr. Medina needs the same access to these documents as non-disabled inmates. But at Five Points, all manner of documents, including disbursement forms, sick call slips, commissary forms, law library slips, disciplinary appeal forms, disciplinary disposition sheets, grievance forms, etc. are not provided to Mr. Medina in large print, recorded on audio or provided in some other accessible and usable format. Without another reasonable accommodation, the lack of large print, or audio versions of these documents renders these materials unreadable and unusable for Mr. Medina.

166. Defendants DOCCS, OMH, Bradt, Heywood, Van Buren, Sheahan, Jones, Miller, Signore and Schlee refused to provide Mr. Medina with large print forms on many occasions.

167. Due to the lack of large print forms, during the month of April and early May 2014, Mr. Medina was denied access to medical care because he was unable to complete the form used to request medical care and medical services.

## G. Mr. Medina is Denied Adequate Access to Bold-Lined Paper and 20/20 Markers While at Five Points

168. Because of his visual disability, Plaintiff Medina authors documents and correspondence using 20/20 sight saving markers and bold lined or raised lined paper. The size of Mr. Medina's penmanship and the format of the paper restrict Mr. Medina to using 55 to 65 words per page. For every one page handwritten by a sighted person, Mr. Medina uses 6 to 7 pages of bold lined paper.

169. Sighted inmates in the RMHU are allowed 5 sheets of lined paper a day. They can also obtain, upon request, large quantities of lined and blank paper every day from the law library and RMHU school. Sighted inmates can also purchase an unlimited number of writing pads from the commissary every two weeks.

170. Mr. Medina is not able to obtain his specialized paper from the law library, school or the commissary because the specialized paper is simply not available.

171.   Defendants Signore and Miller instituted a practice by which Mr. Medina's special paper and pens would be maintained in the RMHU's Officers' Station and distributed to Mr. Medina upon his request. However, this accommodation is dependent on which officers are available. The RMHU officers familiar with Mr. Medina's situation might provide 20 to 30 sheets of paper and exchange a 20/20 pen upon Mr. Medina's request. At other times, some officers intentionally delayed or denied Mr. Medina paper and pen because they feel Mr. Medina is receiving preferential treatment. Some officers only provide Medina with the normal 5 sheets of bold lined paper, denying Medina reasonable accommodations.

172.   Mr. Medina filed numerous administrative complaints – including verbal – about the deficiencies in his receipt of sufficient paper and pens. Because of Mr. Medina's complaints the officers would then retaliate by intentionally delaying or denying Mr. Medina pen and paper.

173.   Due to the lack of adequate paper, Mr. Medina often has to choose between writing a letter to family, friends, his lawyers or addressing an administrative or legal matter. The Defendants'

paper and pen policy interferes with and/or denies Mr. Medina free association and speech as well as his right to access the courts and communicate with his attorneys, and to participate in DOCCS and OMH programs, services and activities.

**H. Medina is Denied Necessary Eyewear While at Five Points**

174.   Mr. Medina suffers from severe photophobia (sensitivity to light). Mr. Medina's pain is exacerbated from exposure to light -- the more intense the light, the greater his suffering. Mr. Medina's contact lenses further intensify his exposure and pain. Such exposure causes Mr. Medina eye irritation, sharp eye pain, headaches, nausea and vertigo.

175.   To reduce Mr. Medina's exposure to light he has to wear tinted eyeglasses, sunglasses and a visor. Following the April 23, 2013 excessive force incident, Defendants Sheahan, Coveny, Miller and Signore confiscated Mr. Medina's eyeglasses (3 pairs) and sunglasses, because Mr. Medina allegedly altered his sunglasses to make a weapon. The required deprivation order was not filed to justify withholding these visual aids from Mr. Medina.

176.   In early May 2014, Doctor Trabout ordered Mr. Medina a pair of tinted sports goggles as an alternative to his sunglasses. However, the order was placed without regard to the particulars of Mr. Medina's individual eye ailments.

Consequently, on June 3, 2014, Mr. Medina was issued a pair of tinted goggles. Mr. Medina returned the goggles to Nurse Gardner, as the glasses did not share the same prescription as Medina's contact lenses and they did not fit Mr. Medina's face. The ill fit, allowed light to reach his eyes, and thus, the sports goggles were completely ineffective.

177.   While attending the RMHU classes without sunglasses Mr. Medina was subject to unnecessary eye pain by the overhead lights, the whiteness of the walls, the glare from the windows and the glare from the polished floors.

178.   Mr. Medina requested the lights directly above him be turned off while he attended class, but Defendants denied this reasonable accommodation. Mr. Medina was forced to choose between attending the RMHU's programs and services and subjecting himself to pain. Foregoing class time means Medina does not advance in the RMHU program and results in his denial of early release from disciplinary segregation, denial of better commissary items, phone calls, additional visits from family, and possession of personal property, etc.

## I. Five Points Does Not Employ An Instructor for The Blind Nor a Vocational Rehabilitation Counselor

179.   Defendant DOCCS has a policy that requires that sensorial disabled inmates have access to persons certified and knowledgeable in sensory disabilities. For instance, blind

inmates have access to an Instructor for the Blind and deaf inmates have access to a Manual Sign Language Interpreter. A Vocational Rehabilitation Counselor is certified to work with both the blind and deaf.

180. While at Five Points, Mr. Medina does not have access to either an Instructor for the Blind or a Vocational Rehabilitation Counselor.

181. Upon information and belief, Defendant Bradt was once an Instructor for the Blind. Some Five Points staff members consult with Bradt regarding Medina's accommodations, but telephonic consultations with Bradt are not helpful. Bradt is not familiar with Mr. Medina's particular eye condition, the tasks the requested accommodation is needed for, the layout of the area where the accommodation will be used and other details necessary to make meaningful decisions and appropriate accommodation requests.

**VI.  DEFENDANTS' RULES REGARDING ACCOMMODATIONS DURING DISCIPLINARY HEARINGS ARE UNCONSTITUTIONAL AS THEY VIOLATE THE DUE PROCESS CLAUSE OF THE 14th AMENDMENT**

182. The Defendant State of New York enacted Title 7 New York Code, Rules and Regulations (7 NYCRR) §§ 251, 253.2 and 254.2, regulations which require sensory disabled inmates be reasonably accommodated with assistive devices and services during disciplinary proceedings. These regulations are intended to

50

apply to blind, visually impaired, deaf and hard of hearing inmates in DOCCS custody; however, the language used in these regulations allows one to read and interpret them as only applying to deaf and hard of hearing inmates.

## VII. EXHAUSTION OF ADMINISTRATIVE REMEDIES

183. Plaintiff Medina exhausted all available administrative remedies concerning each of the claims at issue in this complaint.

### STATEMENT OF CLAIMS
### COUNT ONE
### (Violations of the Americans with Disabilities Act; Against Defendants DOCCS and OMH)

184. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-44; 52-85; 95-104; and 130-141 as if set forth herein at length.

185. Plaintiff is a qualified individual with a disability as defined in the ADA. He is legally blind, which substantially limits the major life activity of seeing, and also affects other major life activities including reading, learning, performing manual tasks, walking, communicating and working.

186. Plaintiff has records of having such disability.

187. As a state prisoner, Plaintiff meets the essential eligibility requirements for the receipt of services or the

participation in programs or activities provided by Defendants. 42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2); 29 U.S.C. § 794.

188.  Defendants discriminate against Plaintiff by failing to accommodate his disability and provide access to programs and services in at least the following areas: educational, vocational, work, grievance, disciplinary proceedings and health services.

189.  Defendants discriminate against Plaintiff on the basis of his disability in violation of 42 U.S.C. § 12132.

190.  Defendants are agents or officials of public entities and or public entities as that term is defined in 42 U.S.C. § 12131(1)(B).

## COUNT TWO

### (Violations of Section 504 of the Rehabilitation Act; Against Defendants DOCCS and OMH)

191.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-44; 52-85; 95-104 and 129-181 as if set forth herein at length.

192.  Plaintiff is a qualified individual with a disability as defined by the Rehabilitation Act. He is legally blind, which substantially limits the major life activity of seeing, and also affects other major life activities including reading, learning, performing manual tasks, walking communicating and working.

193.   Plaintiff has a record of having such impairment and is regarded as having such impairment.

194.   As a state prisoner, Plaintiff meets the essential eligibility requirements for the receipt of services or the participation in programs or activities as provided by Defendant DOCCS. 42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2).

195.   Defendants discriminate against Plaintiff solely on the basis of his disability by failing to accommodate his disability in denying access to prison educational, vocational, disciplinary proceedings, and grievance proceedings.

196.   DOCCS and OMH receive federal financial assistance.

**COUNT THREE**

**(Violation of The Eighth Amendment Prohibition against Cruel and Inhumane Treatment in Denial of Medical Treatment; Against Defendant Sidorwicz)**

197.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-39; 45-51 and 86-94 as if set forth herein at length.

198.   Defendant Sidorowicz's discontinuance of Plaintiff's Tramadol pain medication in both instances without examining the Plaintiff or prescribing an effective alternative, constitutes deliberate indifference to Plaintiff's serious medical needs in

violation of the Eighth Amendment to the United States Constitution's prohibition against cruel and inhumane treatment.

### COUNT FOUR

**(Violation of The Eighth Amendment Prohibition against Cruel and Inhumane Treatment in Denial of Request to Dim or Turn Off Overhead Lights; Against Defendants Wilkins, T. Griffin, Colao and Heywood)**

199. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-44; 52-61 and 79-81 as if set forth herein at length.

200. Defendants Wilkins, T. Griffin, Colao and Heywood's refusal to dim or turn off the overhead cell lights in Plaintiff Median's cell constitutes deliberate indifference to Plaintiff's serious pain and suffering in violation of the Eighth Amendment to the United States Constitution's prohibition against cruel and inhumane treatment.

### COUNT FIVE

**(Violation of The Eighth Amendment Prohibition against Cruel and Inhumane Treatment in Use of Excessive Force; Against Defendants Jensan, O'Connor, Burns, Roberts, McGuane, John Doe)**

201. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-39 and 105-128 as if set forth herein at length.

202. Defendants wanton and sadistic beating of Plaintiff violated the Eighth Amendment to the United States Constitution's prohibition against cruel and inhumane treatment.

**COUNT SIX**

**(Violation of The Eighth Amendment Prohibition against Cruel and Inhumane Treatment in Use of Sexual Assault; Against Defendants Jensan, O'Connor, Burns, Roberts, McGuane, John Doe)**

203. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-39 and 105-128 as if set forth herein at length.

204. Defendants sexual assault of Plaintiff violated the Eighth Amendment to the United States Constitution's prohibition against cruel and inhumane treatment.

**COUNT SEVEN**

**(Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution; Against Defendants Esposito, Sheahan, Coveny, Miller, Signore, Ranieri and Bradt)**

205. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-39 and 82-85 as if set forth herein at length.

206. The failure and refusal by Defendant Esposito during the disciplinary proceeds held at Eastern, to either un-cuff Plaintiff's hands or detach the handcuffs from the waist-chain so that Plaintiff could use his reading device to read and introduce documents violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

207. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-39 and 129-147 as if set forth herein at length.

208. The failure and refusal by Defendants Sheahan, Coveny, Miller, Signore and Ranieri to provide Plaintiff with his reading device or an effective alternative so he could read and introduce documents during disciplinary hearings violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court grant the following relief and enter judgment in his favor:

(1) Order Defendants DOCCS, Heywood, Buther, Sidorowicz, Gusman and their successors, agents, employees and all those acting in concert with them to:

   (A) Immediately provide plaintiff with his Tramadol pain medication at 100 mg 3 times a day, or an effective alternative;

(B) Provide Plaintiff with a trained mobility aide while he is walking within any prison; and

(C) Direct Defendants to dim or turn off Plaintiff's cell overhead light regardless of the location of his housing;

(2) Permanently enjoin Defendants, their agents, employees, and all persons acting in concert with them from subjecting Plaintiff to the illegal policies, practices, omissions and conditions described above;

(3) Order Defendants to take all necessary action to provide full access to DOCCS services and activities as well as a full range of programming options, including educational and vocational, to Plaintiff at any prison where he is housed;

(4) Declare 7 NYCRR §§ 251, 253.2 and 254.2 unconstitutional, as they do not provide for the protection of due process rights for blind or visually impaired prisoners at disciplinary hearings;

(5) Task Defendants with drafting and promulgating rules that will protect the due process rights of blind and visually impaired prisoners at disciplinary hearings;

B. Award Compensatory damages in the following amounts:

**COUNT ONE**

$200,000.00 against Defendants DOCCS and OMH jointly and severally for actions taken by its employees thereby

57

discriminating against Mr. Medina on the basis of his disability.

## COUNT TWO

$200,00.00 against Defendants DOCCS and OMH jointly and severally for actions taken by its employees thereby discriminating against Plaintiff solely on the basis of his disability by failing to accommodate his disability to provide access to prison educational, vocational disciplinary proceedings and grievance proceedings as well as other programs, services or activities provided by DOCCS and OMH.

## COUNT THREE

$100,000.00 against Defendant Sidorowicz for discontinuance of Plaintiff's pain medication and failure to treat Plaintiff's serious medical needs with deliberate indifference in violation of the Eighth Amendment to the United State's Constitution's prohibition against cruel and inhumane treatment.

## COUNT FOUR

$100,000.00 against Defendants Wilkins, Colao, T. Griffin and Heywood jointly and severally for deliberate indifference to Plaintiff Medina's pain and suffering in violation of the Eighth Amendment to the United State's Constitution's prohibition against cruel and inhumane treatment.

## COUNT FIVE

$100,000.00 against Defendants Jensan, O'Connor, Burns, Roberts, McGuane, and John Doe jointly and severally for use of excessive force against Plaintiff that caused the unnecessary and wanton infliction of pain in violation of the Eighth Amendment's protection against cruel and inhumane treatment.

### COUNT SIX

$500,000.00 against Defendants Jensan, O'Connor, Burns, Roberts, McGuane and John Doe jointly and severally for the sexual assault on Plaintiff in violation of the Eighth Amendment's protection against cruel and inhumane treatment.

### COUNT SEVEN

$20,000.00 each against Defendants Esposito, Sheahan, Coveny, Miller, Signore, Ranieri and Bradt for the failure and refusal to afford Plaintiff procedural due process rights during disciplinary hearings that affected his liberty interests.


C. Award Punitive damages in the following amounts:

### COUNT ONE

$100,000.00 against Defendants DOCCS and OMH jointly and severally for actions taken by its employees thereby discriminating against Mr. Medina on the basis of his disability.

### COUNT TWO

$100,000.00 against Defendants DOCCS and OMH jointly and severally for actions taken by its employees thereby discriminating against Plaintiff solely on the basis of his disability by failing to accommodate his disability to provide access to prison educational, vocational disciplinary proceedings and grievance proceedings as well as other programs, services or activities provided by DOCCS and OMH.

### COUNT THREE

$100,000.00 against Defendant Sidorowicz for discontinuance of Plaintiff's pain medication and failure to treat Plaintiff's serious medical needs with deliberate indifference in violation of the Eighth Amendment to the United State's Constitution's prohibition against cruel and inhumane treatment.

### COUNT FOUR

$100,000.00 against Defendants Wilkins, Colao, T. Griffin and Heywood jointly and severally for deliberate indifference to Plaintiff Medina's pain and suffering in violation of the Eighth Amendment to the United State's Constitution's prohibition against cruel and inhumane treatment.

### COUNT FIVE

$1,000,000.00 against Defendants Jensan, O'Connor, Burns, Roberts, McGuane, and John Doe jointly and severally for use of excessive force against Plaintiff that caused the unnecessary

and wanton inflicition of pain in violation of the Eighth Amendment's protection against cruel and inhumane treatment.

## COUNT SIX

$1,000,000.00 against Defendants Jensan, O'Connor, Burns, Roberts, McGuane and John Doe jointly and severally for the sexual assault on Plaintiff in violation of the Eighth Amendment's protection against cruel and inhumane treatment.

## COUNT SEVEN

$100,000.00 against Defendants Esposito, Sheahan, Coveny, Miller, Signore, Ranieri and Bradt jointly and severally for the failure and refusal to afford Plaintiff procedural due process rights during disciplinary hearings which affected his liberty interests.

D. Ordering such other and further relief as the Court may deem just and proper.


Dated:    Newark, New Jersey
          November 4, 2015

**LAW OFFICE OF AMY JANE AGNEW, P.C.**

_____

Amy Jane Agnew, Esq.
43 West 43rd Street, Suite 79
New York, New York 10036
(973) 600-1724
aj@ajagnew.com
_Pro Bono Counsel for Plaintiff_

Counsel for Plaintiff gratefully acknowledges the assistance of the following students enrolled in the Rutgers Law School Constitutional Rights Clinic in the preparation of this Complaint: Mr. Daniel Giordano, Mr. Mike Griffin, Ms. Caitlin Miller, Ms. Annabel Pollioni and Mr. Schawn-Paul Rotella.

**EXHIBIT 1**

## *7 NYCRR § 251-4.1*

This document reflects those changes received from the NY Bill Drafting Commission through October 9, 2015

*New York Codes, Rules, and Regulations* > *TITLE 7. DEPARTMENT OF CORRECTIONAL SERVICES* > *CHAPTER V. PROCEDURES FOR IMPLEMENTING STANDARDS OF INMATE BEHAVIOR AND FOR GRANTING GOOD BEHAVIOR TIME ALLOWANCES* > *SUBCHAPTER A. PROCEDURES FOR IMPLEMENTING STANDARDS OF INMATE BEHAVIOR* > *PART 251. CASES OF INMATE MISBEHAVIOR* > *SUBPART 251-4. INMATE'S ASSISTANT*

## § 251-4.1 Inmate assistant

  (a)  An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if:

    (1)  the inmate is either illiterate or non-English speaking; or

    (2)  the inmate is sensorially disabled (in which case the inmate will be provided reasonable accommodations including, but not be limited to, the provision of a qualified sign language interpreter for a deaf and hard of hearing inmate who uses sign language to communicate); or

    (3)  the inmate is charged with drug use as a result of a urinalysis test; or

    (4)  the inmate is confined pending a superintendent's hearing to be conducted pursuant to Part 254 of this Title.

  (b)  In other cases where a misbehavior report has been issued, the review officer or hearing officer, in his absolute discretion, may offer an inmate the opportunity to pick an inmate assistant where such assistance would enable the inmate to adequately comprehend the case in order to respond to the charges.

## Statutory Authority

**Part Statutory authority:**

*Correction Law, § 112*

**Subpart Statutory authority:**
*Correction Law, §§ 112, 138*

## History

Repealed and added 251-4.1 on 7/08/86; amended 251-4.1 (a) on 11/05/97.

NEW YORK CODES, RULES AND REGULATIONS

*7 NYCRR § 254.2*

This document reflects those changes received from the NY Bill Drafting Commission through October 9, 2015

*New York Codes, Rules, and Regulations* > *TITLE 7. DEPARTMENT OF CORRECTIONAL SERVICES* > *CHAPTER V. PROCEDURES FOR IMPLEMENTING STANDARDS OF INMATE BEHAVIOR AND FOR GRANTING GOOD BEHAVIOR TIME ALLOWANCES* > *SUBCHAPTER A. PROCEDURES FOR IMPLEMENTING STANDARDS OF INMATE BEHAVIOR* > *PART 254. SUPERINTENDENT'S HEARING*

## § 254.2 Non-English speaking and sensorially disabled inmates

A non-English speaking inmate who cannot read and understand English must be given a translated notice of the charges and statements of evidence relied upon and reasons for actions taken, and provided with a translator who shall be present at the hearing. A deaf or hard of hearing inmate who uses sign language to communicate shall receive the assistance of a qualified sign language interpreter who shall be present at the hearing. A hard of hearing inmate who uses an amplifier or other device as a reasonable accommodation must have the opportunity to use such device during the hearing.

## Statutory Authority

**Statutory authority:**

*Correction Law, §§ 70, 112, 138* and *146*

## History

Added 254.2 on 6/15/83; amended 254.2 on 6/25/87; amended 254.2 on 11/05/97.

NEW YORK CODES, RULES AND REGULATIONS

*7 NYCRR § 253.2*

This document reflects those changes received from the NY Bill Drafting Commission through October 9, 2015

*New York Codes, Rules, and Regulations* > *TITLE 7. DEPARTMENT OF CORRECTIONAL SERVICES* > *CHAPTER V. PROCEDURES FOR IMPLEMENTING STANDARDS OF INMATE BEHAVIOR AND FOR GRANTING GOOD BEHAVIOR TIME ALLOWANCES* > *SUBCHAPTER A. PROCEDURES FOR IMPLEMENTING STANDARDS OF INMATE BEHAVIOR* > *PART 253. DISCIPLINARY HEARING*

## § 253.2 Non-English speaking and sensorially disabled inmates

A non-English speaking inmate who cannot read and understand English must be given a translated notice of the charges and statements of evidence relied upon and reasons for actions taken, and provided with a translator who shall be present at the hearing. A deaf or hard of hearing inmate who uses sign language to communicate shall receive the assistance of a qualified sign language interpreter who shall be present at the hearing. A hard of hearing inmate who uses an amplifier or other device as a reasonable accommodation must have the opportunity to use such device during the hearing.

## Statutory Authority

**Statutory authority:**

*Correction Law, §§ 70, 112, 138* and *146*

## History

Repealed and added 253.2 on 6/15/83; amended 253.2 on 6/25/87; amended 253.2 on 11/05/97.

NEW YORK CODES, RULES AND REGULATIONS

**EXHIBIT 2**

| NEW YORK STATE **Corrections and Community Supervision** **DIRECTIVE** | TITLE **Inmates With Sensorial Disabilities** | NO. 2612 |
| --- | --- | --- |
| | | DATE 4/30/2015 |

| SUPERSEDES DIR #2612 Dtd. 10/26/2010 | DISTRIBUTION A B | PAGES PAGE 1 OF 14 | DATE LAST REVISED |
| --- | --- | --- | --- |

| REFERENCES (Include but are not limited to) Americans with Disabilities Act, Criminal Procedure Law | APPROVING AUTHORITY |
| --- | --- |

**I.  POLICY**:  Title II (Subtitle A) of the Americans with Disabilities Act (ADA) prohibits State and local entities from discriminating against any qualified individual with a disability in their programs, services, and activities.  Therefore, the programs and services provided to inmates by this Agency, or those that may be contracted to other entities, must ensure accessibility and usability by qualified inmates in the most integrated setting.  The Department is required to make "reasonable accommodations" or modifications to existing policies and procedures in order to allow qualified inmates with disabilities the same opportunity as non-disabled inmates unless to do so would be an undue burden to the Department, cause a fundamental alteration to a program, or compromise the security of the facility.  This directive addresses inmates with sensorial disabilities, that is, impairments to hearing and seeing.  See Directive #2614, "Reasonable Accommodations for Inmates with Disabilities," for procedures addressing inmates with all other disabilities.

**II.  DEFINITIONS**

A.  <u>Individual with a Sensorial Disability</u>:  Anyone who has a sight or hearing impairment that substantially limits one or more of the person's major life activities and meets the definition of legal blindness, severe visual impairment, deaf, or hard of hearing as defined in Sections II-D, E, F, or G below;

**Major life activity**: Includes functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, learning, and working.

**Substantially limits**: Means that the impairment imposes a barrier in the performance of a major life activity.

The determination of whether an impairment substantially limits a major life activity shall be made without regard to the improvement made to a major life activity by use of any of the following:

- Medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids, and cochlear implants or other implantable hearing devices
- Use of assistive technology
- Reasonable accommodations or auxiliary aids or services
- Learned behavioral or adaptive neurological modifications

(EXCEPTION:  The improvement made to sight by the use of ordinary eyeglasses or contact lenses SHALL be considered in determining whether impairment limits a major life activity.)

B.  Reasonable Accommodation:  Any change in the environment or the manner in which tasks are completed that enables a qualified individual with a disability to participate in a program or service.  Such accommodation should not impose any undue hardship on the Department.  Reasonable accommodations might include the following:

- Making existing facilities readily accessible to meet a particular individual's needs
- Providing readers, interpreters, note takers, sighted guides, daily living skill aides
- Acquisition or modification of equipment or devices

A more complete list of reasonable accommodations is included on Form #2612C, "Reasonable Accommodations for Sensorially Disabled."

C.  Qualified Individual with a Disability:  An individual with a disability who, with the assistance of a reasonable accommodation, is able to meet the essential eligibility requirements for the receipt of services or the participation in programs or activities.

D.  Severe Visual Impairment (V230)

- Visual acuity of 20/70 or less in the better eye with best correction, or
- Visual field of no greater than 40 in the better eye

E.  Legal Blindness (B240)

- Visual acuity of 20/200 or less in the better eye with best correction, or
- Visual field of no greater than 20 in the better eye

F.  Deaf (HL10):  Severe profound hearing loss in the BETTER ear unaided of at least 70 dB as measured by the Pure Tone Audiometry (PTA - 500, 1000, and 2000 Hz) or unaided Speech Recognition Threshold (SRT) or primarily relies on visual communication such as sign language, writing, visual cues or gestures (does not include unilateral deafness).

G.  Hard of Hearing (HL20):  Hearing loss in the BETTER ear unaided of at least 40 dB but less than 70 dB as measured by the Pure Tone Audiometry (PTA - 500, 1000, and 2000 Hz) or unaided Speech Recognition Threshold (SRT) or functional hearing communication difficulties with proper amplification as determined by a person with expertise in the field of deafness.

H.  Non-Significant Hearing Loss (HL30):  Hearing loss in the BETTER ear unaided of less than 40 dB as measured by the Pure Tone Audiometry (PTA - 500, 1000, and 2000 Hz) or unaided Speech Recognition Threshold (SRT).  Inmates with non-significant hearing loss need only hearing aid(s) and preferred seating as a reasonable accommodation and do not need a designated facility.

I.  Qualified Sign-Language Interpreting Services:  A sign language interpreter certified by the National Registry of Interpreters for the Deaf or other National or New York State credentialing authority, or a sign-language interpreter who is able to interpret effectively, accurately, and impartially both receptively and expressively, using any necessary specialized vocabulary.  The qualifications of an interpreter are determined by the actual ability of the interpreter in a particular interpreting context to facilitate effective communication.  Except as otherwise indicated below, qualified interpreters may include inmates, correctional staff, including Correction Officers and volunteers, when their skills meet the above definition and factors such as emotional or personal involvement and considerations of confidentiality will not adversely affect their ability to interpret "effectively, accurately, and impartially" or jeopardize the safety and security of the inmate.

J.    TTY:  A telephone communication device for the deaf - uses an electronic transmission of text.

K.    Amplified Telephone Modification:  This might include T coil on hearing aid and/or volume control telephone.

L.    Closed-Caption Decoder:  An apparatus which subtitles the spoken text on television or film.

## III.  FACILITIES ACCOMMODATING INMATES WITH SENSORIAL DISABILITIES

A.    The Department of Corrections and Community Supervision (DOCCS) shall provide qualified sign language interpreting services in each facility in which an inmate is housed who communicates primarily by sign language.  Deaf and hard of hearing inmates who primarily communicate in sign language shall have reasonable access to qualified sign language interpreters whenever necessary as provided in this directive.

B.    When male deaf or hard of hearing inmates who require sign language interpreter services for effective communication are received in reception facilities, they shall be transferred immediately to Downstate or Ulster Correctional Facility for reception and classification.

C.    Inmates with sensorial disabilities (i.e., those that meet the definition of deaf (HL10), hard of hearing (HL20), legally blind (B240) or severely visually impaired (V230) inmates, as defined in this directive) shall be referred for transfer to one of the following designated facilities which can accommodate their needs.  Inmates with a non-significant hearing loss (HL30) need only hearing aids, batteries, preferred seating, and amplified telephone, and do not need placement in a designated facility.

Please note:  Five Points CF and Albion CF can only accommodate hard of hearing inmates (HL20), NOT deaf (HL10), legal blindness (B240), or severe visual impairments (V230).

1.    Downstate Correctional Facility:  Maximum security reception center that will process all maximum-security male sensorially disabled inmates.  There is an initial classification process that will be expeditiously completed and the inmate will then be transferred to a designated facility for further evaluation.  Downstate CF will also process medium and minimum-security male sensorially disabled inmates in need of OMH Level 1 or 2 services or medical or programmatic needs which cannot be met at Ulster CF.

2.    Ulster Correctional Facility:  Medium security reception center that will process medium and minimum-security male sensorially disabled inmates.  There will be an initial classification process that will be expeditiously completed and the inmate will then be transferred to a designated facility for further evaluation.  Inmates in need of OMH Level 1 or 2 services or other medical or programmatic needs which cannot be met at Ulster CF will be transferred to Downstate CF.

3. **Bedford Hills Correctional Facility:**  Maximum security reception center and general confinement facility that will process all female sensorially disabled, with the assistance of sign language interpreter services.  Appropriate staff will be available with sign language capabilities.  The staff will complete an extended assessment and a needs assessment on the functional ability of deaf (HL10), hard of hearing (HL20), blind (B240), and severely visually impaired (V230) inmates, if those assessments have not already been completed.  Needs assessments will be updated as an inmate's sensorial disabilities change.  Staff will also make placement and program and reasonable accommodation recommendations.  Bedford Hills CF will share staff with expertise in the area of the sensorially disabled with Taconic CF when necessary.

4. **Eastern New York Correctional Facility:**  Maximum security, male, general confinement facility that also has the capability to meet the needs of visually and hearing impaired inmates.  Eastern CF operates a 31 bed residential unit for those individuals who cannot safely function in the general population of a prison.  Appropriate staff will be available with sign language capabilities.  The staff will complete an extended assessment and a needs assessment on the functional ability of deaf (HL10), hard of hearing (HL20), blind (B240), and severely visually impaired (V230) inmates, if those assessments have not already been completed.  Needs assessments will be updated as an inmate's sensorial disabilities change.  Staff will also make placement and program and reasonable accommodation recommendations.  Eastern CF will share staff with expertise in the area of the sensorially disabled with Sullivan CF, Woodbourne CF, and Downstate CF when necessary.

5. **Wende Correctional Facility:**  Maximum security, general confinement facility that also has the capability to service sensorially disabled male inmates and individuals with intellectual limitation and the mentally ill.  Wende CF also operates a Regional Medical Unit (RMU).  Appropriate staff will be available with sign language capabilities.  The staff will complete an extended assessment and a needs assessment on the functional ability of deaf (HL10), hard of hearing (HL20), blind (B240), and severely visually impaired (V230) inmates, if those assessments have not already been completed.  Needs assessments will be updated for deaf and hard of hearing inmates as their sensorial disabilities change.  Staff will also make placement and program and reasonable accommodation recommendations.  Wende CF will share staff with expertise in the area of the sensorially disabled with Wyoming CF and Lakeview CF when necessary.

Wende Correctional Facility will accommodate Legally Blind and Severely Visually Impaired (BL/SVI) inmates in accordance with the Private Settlement Agreement entered in the case of *Medina et al. v. DOCCS. et al.* 11-CV-176.

6.  Sullivan Correctional Facility:  Maximum security, general confinement facility that also has the capability to service sensorially disabled male inmates, individuals with intellectual limitation, and the chronically mentally ill.  Appropriate staff will be available with sign language capabilities.  The staff will complete an extended assessment and a needs assessment on the functional ability of deaf (HL10), hard of hearing (HL20), blind (B240), and severely visually impaired (V230) inmates, if those assessments have not already been completed.  Needs assessments will be updated for deaf and hard of hearing inmates as their sensorial disabilities change.  Staff will also make placement and program and reasonable accommodation recommendations.  Sullivan CF will share staff with expertise in the area of the sensorially disabled with Eastern CF, Woodbourne CF, and Downstate CF when necessary.

Sullivan Correctional Facility will accommodate Legally Blind and Severely Visually Impaired (BL/SVI) inmates in accordance with the Private Settlement Agreement entered in the case of *Medina et al. v. DOCCS. et al.* 11-CV-176.

7.  Woodbourne Correctional Facility:  Medium security, general confinement facility that also has the capability to service sensorially disabled male inmates.  Appropriate staff will be available with sign language capabilities. The staff will complete an extended assessment and a needs assessment on the functional ability of deaf (HL10), hard of hearing (HL20), blind (B240), and severely visually impaired (V230) inmates, if those assessments have not already been completed.  Needs assessments will be updated as an inmate's sensorial disabilities change.  Staff will also make placement and program and reasonable accommodation recommendations.  Woodbourne CF will share staff with expertise in the area of the sensorially disabled with Eastern CF, Sullivan CF, and Downstate CF when necessary.

8.  Wyoming Correctional Facility:  Medium security, general confinement facility that also has the capability to service sensorially disabled male inmates.  Appropriate staff will be available with sign language capabilities. The staff will complete an extended assessment and a needs assessment on the functional ability of deaf (HL10), hard of hearing (HL20), blind (B240), and severely visually impaired (V230) inmates, if those assessments have not already been completed.  Needs assessments will be updated as an inmate's sensorial disabilities change.  Staff will also make placement and program and reasonable accommodation recommendations.  Wyoming CF will share staff with expertise in the area of the sensorially disabled with Wende CF and Lakeview CF when necessary.

9.  Lakeview Shock Incarceration Correctional Facility (Males and Females):  Minimum security.  This facility will accommodate the shock incarceration population and have access to sign language interpreting services.

10.  Taconic Correctional Facility:  Female, medium security.  This female facility will accommodate those individuals that have met the criteria for substance abuse treatment and/or general confinement.  This facility will provide inmate access to Bedford Hills CF staff with expertise in the area of the sensorially disabled when needed and have access to sign language interpreting services.

11. Albion Correctional Facility: Female, medium security and Work Release. This facility has the ability to accommodate only hard of hearing inmates (HL20), NOT deaf (HL10), legally blind (B240), or severely visually impaired (V230) inmates.

12. Five Points Correctional Facility:  Maximum security, double celled in general population, wheelchair accessible. Five Points' Special Treatment Program (STP) and Intermediate Care Program (ICP) are OMH Level 1.  Inmates in wheelchairs may also be OMH Level 1.  This facility has the ability to accommodate hard of hearing inmates (HL20), legally blind (B240), severely visually impaired (V230), NOT deaf (HL10) inmates.

13. Work Release Facilities:  Facilities operating work release programs shall contract with a sign language interpreter or utilize sign language services when inmates requiring such services enter the program.  Reasonable accommodations, including sign language interpreting services, with outside entities such as employers or other community services, are the responsibility of the outside entities.  Reasonable accommodations, including the provision of a sign language services, for programs and services offered within the facility are the responsibility of the facility.

14. Willard Drug Treatment Campus:  Drug treatment campus operated by the Department to provide a program of intensive drug treatment services for individuals sentenced to parole supervision sentences pursuant to Section 410.91 of the Criminal Procedure Law or for certain parole violators.  This facility will contract with sign language interpreters when necessary.

15. Other Correctional Facilities:  Facilities housing inmates with sensorial disabilities on a temporary basis shall be alerted by the sending facility of the special needs of the inmates with sensorial disabilities.  Such facilities shall contract with a sign language interpreter when necessary.  Any questions on reasonable accommodations should be referred to the ADA Coordinator or the sending facility.

16. All Correctional Facilities

    a.   Posters entitled "Inmates With Disabilities Notice of Rights Under the Americans With Disabilities Act," Form #2612A, describing the Americans with Disabilities Act and inmates' rights to reasonable accommodations will be posted in areas frequented by inmates, including messhalls, law libraries, recreation areas, housing units, counseling, medical, psychiatric offices, and satellite units.

    b.   THE "NOTICE TO ALL NEW YORK STATE PRISONERS WHO ARE DEAF OR HARD OF HEARING CONCERNING MOTIONS FOR CONTEMPT AND ENFORCEMENT OF THE CLARKSON V. GOORD CONSENT JUDGMENT," Form #2612D (English and Spanish versions) will be posted in all Law Libraries and housing units.

## IV.  RECEPTION AND RETURN PAROLE VIOLATORS - INITIAL CLASSIFICATION PROCEDURES

A.  All inmates newly received into the custody of the Department and returned parole violators who wear hearing aids, or have a history of hearing loss or observable behavior indicating hearing loss, or who appear to meet the definition of legally blind or severe visual impairment will be immediately transferred to Downstate or Ulster Correctional Facility (males) or Bedford Hills Correctional Facility (females) for classification and assessment.

B.  Returned parole violators who have already been assessed as being deaf (HL10), hard of hearing (HL20), legally blind (B240), or severe visual impairment (V230) **MUST** be transferred to a designated facility.  The transfer request must clearly state the inmate disability and that the inmate needs a designated facility.

C.  During initial classification, Form #2612A, describing the Americans with Disabilities Act will be given and explained to these inmates by appropriate guidance staff with experience in sensorial disabilities.  A sign language interpreter must be utilized for deaf or hard of hearing inmates whose primary means of communication is sign language. They shall be advised of their right to reasonable accommodations, which may include qualified sign language interpretive services, or other auxiliary aids, services and devices, the method for requesting such accommodations, and the procedures for grieving denials or modifications of requested accommodations.

D.  The guidance staff member explaining the Americans with Disabilities Act will also present Form #2612B, "Request for Reasonable Accommodation for Inmates with Sensorial Disabilities," to the inmate and provide the inmate with assistance in completing it.

E.  Medical staff will complete the medical verification section and return the form to the staff member who assisted the inmate in its completion.  For deaf and hard of hearing inmates, medical staff will complete the medical verification section after reviewing the audiograms and audiologist recommendations.  For blind and severe visual impairments, medical staff will complete the medical verification section after reviewing eye reports and/or vision reports.  Questions on interpreting audiograms and audiologist recommendations should be referred to staff with an expertise in the field of deafness, such as a sign language interpreter or vocational rehabilitation counselor or audiologist. Questions on interpreting eye or vision reports should be referred to the instructor for the blind, vocational rehabilitation counselor, the optometrist, ophthalmologist, or vision specialist.

If there is no documentation of a hearing or vision problem in the inmate's record, the inmate should be called out to be seen by the facility physician or physician's assistant or nurse practitioner.  If the physician determines the hearing or vision loss may be significant, the physician should request a consultation with an audiologist or optometrist/ophthalmologist.  Form #2901, "Audiology Report," should be sent with the inmate to the audiologist for use.

F.   Guidance staff members shall complete the Reasonable Accommodation Determination section of Form #2901, basing his or her determination on his or her assessment of the inmate's limitations, the verification from medical, and their knowledge of accommodations and the inmate's preferences.  The completed form will be placed in the guidance folder.  A copy will be sent to medical and will be shared with OMH staff if the inmate is referred for OMH services.   A copy of the completed form will also be sent to the facility Parole Officer for inclusion in the inmate's community supervision file and to the ADA Coordinator.  The reasonable accommodation determination will remain in effect until modified by the receiving facility designated for the sensorial disabled.

G.   THE "NOTICE TO ALL NEW YORK STATE PRISONERS WHO ARE DEAF OR HARD OF HEARING CONCERNING MOTIONS FOR CONTEMPT AND ENFORCEMENT OF THE CLARKSON V. GOORD CONSENT JUDGMENT" (Form #2612D) will be distributed to all incoming deaf and hard of hearing inmates.

**V.   ORIENTATION**:  Form #2612A, the notice of the rights of the inmates under the Americans with Disabilities Act, will be reviewed with deaf, hard of hearing, blind, and severely visually impaired inmates by appropriate staff during orientation at any new facility.  Posters described in Section IV-G above, Form #2612D, will be posted in all facilities.

**VI.   ASSESSMENT PROCEDURES**:  Upon completion of the reception program, inmates with hearing or vision disabilities who require adaptive equipment other than hearing aids or eye glasses will enter an evaluation period for assessment of:

- Vocational skills
- Functional abilities
- Academic level
- Medical assessment (vision specialist, audiologist)

Male inmates will be transferred to the Eastern New York Correctional Facility or Wende Correctional Facility or any other facility designated in this directive which has staff with expertise in the field of deafness and/or visual impairments for the assessment.  Female inmates will remain at Bedford Hills Correctional Facility.  Upon completion of the assessment, utilizing the needs assessment form, inmates who use sign language as their primary means of communication and/or need adaptive equipment other than hearing aids, preferred seating, or glasses, will be assigned to the facilities identified in Section III consistent with security, medical, and mental health level classifications.

**VII.  EQUIPMENT AND SERVICES FOR THE DEAF AND HARD OF HEARING**

A.   Facilities designated in Section III shall make available to deaf and hard of hearing inmates the auxiliary aids, services, and assistive devices as approved through the reasonable accommodation process which are necessary to facilitate full and effective participation in prison programs, activities, and services.  Each facility shall provide reasonable accommodations which shall include, as necessary, qualified sign language interpreting services for those deaf and hard of hearing inmates who use sign language to communicate, and other auxiliary aids, services, and devices where appropriate.

B.   Each designated facility will provide reasonable accommodations which may include reasonable access to qualified sign language interpreting services for inmates who primarily communicate through sign language as defined in Section II-I for the following:

1.   Program participation, including educational, rehabilitative, vocational, employment within the facility, and special events for which the deaf inmate is otherwise qualified;

2.  Grievance proceedings;

3.  Administrative or disciplinary proceedings (including protective custody, involuntary protective custody, and administrative segregation hearings) including investigation and meetings with employee assistants, whenever a deaf or hard of hearing inmate is a party or witness, or in which a deaf or hard of hearing inmate may be subject to any sanction;

4.  Temporary release consideration, if an interview with the inmate is required;

5.  Reception and classification interviews and assessment;

6.  Counseling sessions:

    a.  However, where either the inmate or the Offender Rehabilitation Coordinator seeks to discuss information which is confidential in nature, otherwise qualified inmate sign language interpreters may not interpret in these settings;

    b.  Where inmates meet in a group setting and are required to keep confidential the discussions of the group, inmates who are qualified sign language interpreters may assist the deaf or hard of hearing inmate.  The inmate interpreter is also bound to keep the matters discussed by the group confidential; and

7.  Medical, audiological, and dental contacts when communication between patient and medical personnel is critical to the efficacy of treatment or the safety or security of the inmate.

    a.  Due to the need to maintain confidences in these contexts, otherwise qualified inmate interpreters may not act as sign language interpreters in these settings except in cases of emergency where the failure to communicate would result in serious injury, illness, or death.

    b.  When medical services are to be provided outside of the correctional facility, the person responsible for scheduling the appointment shall notify the hospital or clinic (provider) that the patient will require qualified sign language interpreting services.  This notification should be accomplished as soon as possible so the hospital or clinic can arrange for the provision of the interpreter.  If the initial notification is made by telephone, it must be confirmed in writing or electronically.

    c.  If a qualified sign language interpreter is not available on site, the facility may utilize the teleconferencing system for obtaining the services of a qualified sign language interpreter.

    Note:  It is understood that mental health agencies will provide interpreter services for their contacts with sensorially impaired inmates.  However, DOCCS will only provide interpreter services to OMH in psychiatric emergency situations.

C.  The assistive devices listed on Form #2612C "Reasonable Accommodations for Sensorially Disabled," will be maintained by the designated facilities and provided to individual inmates with sensorial disabilities on an as needed basis as approved by staff through the reasonable accommodation process.

    Sighted guides and guided canes may not be refused by blind inmates or severely visually impaired inmates if their safety would be compromised without them.

    Inmates may not choose or refuse the assigned sign language interpreter.

D.  Verbal announcements and commands, whether through a public address system, roll call, or otherwise, shall be communicated alternatively to deaf and hard of hearing inmates in a manner which can be understood by a deaf and hard of hearing inmate. No deaf or hard of hearing inmate shall be disciplined for failing to obey an verbal order or rule which has not been communicated alternatively in a manner which can be understood by the deaf or hard of hearing inmate.

E.  The facility will ensure that visual alarms or warning systems or, where equally effective, other visual or manual means of notifying deaf or hard of hearing inmates of emergencies, counts, program changes, or other matters of which the inmate should be informed will be utilized in the areas under facility control in which a deaf or hard of hearing inmate resides, sleeps, works, eats, exercises, attends classes, or can otherwise be expected to be present.

## VIII. EQUIPMENT AND SERVICES FOR THE VISUALLY IMPAIRED

A.  Replacement of Corrective Lenses and Glasses: DOCCS shall replace corrective lenses or glasses for Legally Blind/Severely Visually Impaired (LB/SVI) inmates whenever damaged or lost.  The replacement corrective lenses or glasses shall be provided to the LB/SVI inmate at no cost unless DOCCS can demonstrate that the inmate negligently or intentionally broke or lost the lenses or glasses, in which case the LB/SVI inmate will have to pay for the replacement lenses or glasses.  Such demonstration may include repeated breaking or losing of such glasses or lenses.

B.  DOCCS shall not deny an LB/SVI inmate reasonable accommodations appropriate to his or her uncorrected vision if a DOCCS medical professional determines in good faith that he or she is not able to effectively use the corrective lenses or glasses that DOCCS has provided.

C.  Downgrading of Visual Disability Classification:  DOCCS shall not change an LB/SVI inmate's visual disability classification from LB to SVI or from LB/SVI to not visually impaired until the inmate has been physically offered appropriate corrective lenses or glasses and he or she has either accepted or rejected those lenses.

  If a formerly LB/SVI inmate, whose visual disability classification has been downgraded to a classification of not visually impaired but who needs corrective lenses or glasses to see properly, loses, breaks, or is otherwise not in possession of his or her corrective lenses or glasses for more than seven days, DOCCS shall grant a request for reasonable accommodations for his or her vision impairment despite the fact that he or she has been re-classified as not visually impaired, unless DOCCS can demonstrate that the inmate negligently or intentionally broke the lenses or glasses.  Such demonstration may include repeated breaking or losing of such glasses or lenses.

D.  Technology Instruction:  DOCCS shall provide, upon request, instruction on the proper use of all available assistive devices in the Resource Room for LB/SVI inmate, including the various uses of assistive software and other computer technology.

E.  Resource Room

  1.  DOCCS shall provide, upon request, removable glare screens for use by LB/SVI inmates on computers.

  2.  DOCCS shall maintain a sufficient number of computers at each facility Resource Room with assistive programs for LB/SVI inmates.

3. DOCCS shall allow inmates to use headphones with the SARA scanner, or the equivalent device, and provide headphones for that purpose.

F. Educational Classrooms

1. If computers are available in the educational classrooms, DOCCS shall provide, upon request, removable glare screens for use by LB/SVI inmates on computers.

2. DOCCS will provide enlarged text materials to LB/SVI inmates who are approved for large print as a reasonable accommodation. DOCCS will not unreasonably deny requests by an LB/SVI inmate participating in an academic program administered by DOCCS for reasonable accommodations to use in that academic program, including, but not limited to, SARA scanners and electronic magnifiers (e.g., CCTVs or portable CCTVs).

G. Housing Block

1. LB/SVI inmates shall be permitted to buy from an outside vendor a typewriter capable of typing 14 point font or larger, if such typewriters are available and DOCCS determines they are not a security risk.

H. Law Library

1. DOCCS shall provide, upon request, removable glare screens for use by LB/SVI inmates on computers.

2. Each facility designated for the LB/SVI inmates shall have at least one computer with assistive programs in the Law Library for use by LB/SVI inmates.

I. Protective Custody

1. LB/SVI inmates shall have access to bold-lined paper, a magnifier, and 20/20 pens while in Protective Custody.

2. LB/SVI inmates in Protective Custody shall have access to other reasonable accommodations that they would have in General Population, subject to security, cost, or operational concerns.

J. SHU

1. LB/SVI inmates shall have access to bold-lined paper, a magnifier, and 20/20 pens while in SHU.

2. LB/SVI inmates in SHU shall have access to other reasonable accommodations that they would have in General Population, subject to security, cost, or operational concerns.

K. Trained Staff

1. DOCCS shall have on staff at least one employee who is trained to operate the LB/SVI assistive devices in the Resource Room.

2. DOCCS will make best efforts to have available an employee trained in the operation of the LB/SVI equipment in the Resource Room during regularly scheduled weekday hours.

L. Extended Closings:  Subject to emergencies, DOCCS shall use best efforts never to close the Resource Room for more than six consecutive days, but if the Resource Room is unavailable for more than ten consecutive days, DOCCS will make available during regular Resource Room hours a SARA scanner, a computer with the full complement of assistive programs, and a CCTV.

M. <u>Large Print</u>:  DOCCS shall make forms used by LB/SVI inmates available in Large Print, including at a minimum:

    1. Reasonable Accommodation Request forms;

    2. Disbursement or refund request forms;

    3. State Shop forms;

    4. Call-out slips, including for sick call, dentist, library and resource room requests;

    5. Grievance forms; and

    6. Commissary sheets.

## IX. REASONABLE ACCOMMODATION PROCESS

A. <u>Reception</u>:  Requests for reasonable accommodations may be an ongoing process throughout the inmate's incarceration.  The initial determination as described in Section IV should follow the inmate through any transfers.  However, appropriate reasonable accommodations may change depending upon the abilities of the inmate and the nature of the program or activity.

For instance, a sign language interpreter is necessary for a doctor to explain to an inmate why he or she wants to administer an HIV test.  However, a reasonable accommodation for a deaf inmate who knows how to read who wants to make a commissary buy is a pencil and paper.

B. <u>Subsequent Requests for Reasonable Accommodations</u>

    1. Inmate requests for accommodations may be made verbally <u>or in writing</u> to any person employed by DOCCS.

    Inmates shall be provided with <u>Form #2612B</u> and shall be assisted in completing it, if necessary.

    2. Requests for accommodations shall be <u>acted upon within five business days, or less if necessary</u>, by either granting the request, denying it, granting it with modifications, or advising the inmate that the request is pending medical evaluation.  In making a decision, consideration shall be given to the choice of accommodation made by or on behalf of the inmate.

    All requests for accommodations shall be forwarded to the Deputy Superintendent for Program Services or designee within the facility and all time frames within this Section shall apply.  Another medical verification is usually not necessary in most cases where the inmate has been previously evaluated.

    If a deaf or hard of hearing inmate has difficulty in communicating, accommodations should be provided expeditiously.

    3. Inmates shall be informed of the determination in writing via a completed <u>Form #2612B</u> and interpreted into sign language, if necessary.  The inmate response section will record whether the inmate agrees with the determination or disagrees and desires a review by the Superintendent.

C. Review by the Superintendent

1. If the inmate requests a review by the Superintendent, the Superintendent or designee shall grant the request, or if necessary, arrange a meeting with the inmate within 24 hours to discuss the nature of the request and the needs of the inmate. The assistance of a sign language interpreting service shall be provided where required to facilitate communication.

2. The Superintendent or designee shall render a decision within five business days of receiving the request or sooner where medical needs or other exigencies make it necessary.

   The review decision shall be presented to the inmate in writing via a completed page 2 of Form #2612B and interpreted into sign language where necessary.

   The inmate shall be advised of his or her right to grieve the decision in accordance with Directive #4040, "Inmate Grievance Program."

3. When considering an individual request for reasonable accommodation, DOCCS will consider similar requests that have been made by other inmates at the facility within the past six months.

4. Upon request, DOCCS shall provide LB/SVI inmates with bold-lined paper in lieu of blank writing paper whenever a person who is not visually impaired would be entitled to free blank writing paper. DOCCS shall not subject bold-lined writing paper to any additional restrictions beyond those placed on blank writing paper for non-visually impaired inmates.

5. DOCCS shall provide LB/SVI inmates in SHU or Protective Custody with at least two 20/20 pens for in-cell use and shall replace them as needed. LB/SVI inmates housed in other locations may obtain, by request or purchase, 20/20 pens for in-cell use.

6. The person in charge of providing reasonable accommodations at each facility, or if unavailable, another staff person, shall make rounds at least one time per week to see LB/SVI inmates who are not housed in general population, including those in SHU, Protective Custody, and MHU, and provide those inmates with reasonable accommodations as appropriate.

D. Removal of Reasonable Accommodations

1. When an LB/SVI inmate receives a correction for his or her vision impairment that results in a change of his or her classification from LB to SVI or from LB/SVI to not visually impaired, DOCCS shall not discontinue that inmate's access to a previously approved accommodation without first consulting with a medical professional.

2. If DOCCS determines that a removal of a previously approved accommodation is justified, as provided for above, DOCCS will provide the reasons for that decision, in writing, to the inmate. If the reasonable accommodation is removed for a security reason, no further explanation beyond this statement need be given.

3. DOCCS can remove an accommodation if staff determines that allowing the inmate to possess the accommodation presents a security risk to himself, herself, or others.

E.  Record Keeping

    1.  A copy of all requests for accommodations and determinations shall be maintained in the guidance folder, medical, community supevision files.  A copy shall also be maintained in the OMH file, if applicable.

    2.  Inmate Grievance Program files concerning reasonable accommodations shall be kept in the facility grievance office for five years from the date of final action.

    3.  A copy of all written requests for reasonable accommodations, subsequent determinations, and related grievance decisions, complaints, and letters shall be forwarded to the ADA Coordinator in Central Office and maintained by that office for five years from the date of final action.

**X.  GRIEVANCE PROCEDURE**:  Any inmate who believes that he or she has been discriminated against because of a disability or who disagrees with a decision on his or her request for a reasonable accommodation can submit complaints pursuant to Directive #4040.  The facility shall send all decisions rendered by the Superintendent or designee on reasonable accommodation grievances to the ADA Coordinator in Central Office.  The ADA Coordinator shall have the authority to initiate a review of any denied request for accommodations, or any denied grievance.

**XI.  TRANSFERS OF INMATES WITH SENSORIAL DISABILITIES**

A.  Not all facilities can accommodate inmates with sensorial disabilities.  Transfer requests (both scheduled and unscheduled) for inmates who are deaf (HL10), hard of hearing (HL20), legally blind (B240), or severely visually impaired (V230) must indicate the inmate's disability on the transfer request.  It is the responsibility of the person submitting the transfer request (usually the Offender Rehabilitation Coordinator) to indicate the inmate's sensorial disability.

B.  If a transfer of a sensorially disabled inmate involves an overnight stay at an interim facility, it is the responsibility of the sending facility's Inmate Record Coordinator (IRC) to alert the interim facility of the needs of the inmate.  Facilities should avoid transfers of sensorially disabled inmates immediately prior to weekends or holidays in order to avoid weekend or holiday stays in interim facilities.

C.  SHU to SHU transfers of deaf (HL10), hard of hearing (HL20), legally blind (B240), and severely visually impaired (V230) inmates must be to another designated facility.

D.  Personal items provided to a sensorially disabled inmate as reasonable accommodations, such as a Shake-Awake alarm, phone amplifier, or talking watch, will be sent with the inmate upon transfer to another facility which is designated for the sensorially disabled.  This equipment should be transferred via the IRC Office under separate cover.  The sensorial staff at the receiving facility will be responsible for the reissue of the equipment as appropriate.

    Other items of reasonable accommodation, such as talking calculators, pocket talkers, etc., are loaned to the inmate and should be kept at the loaning facility.