USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2-13-19

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

ANTHONY MEDINA,                        :    15-cv-1955(LAP)
                                       :
                   Plaintiff,          :
                                       :
                                       :    OPINION AND ORDER
v.                                     :
                                       :
LUCY BUTHER, et al.,                   :
                                       :
                   Defendants.         :
                                       :
----------------------------------------X


### List of Attorneys

Attorney for Plaintiff:                     Amy Jane Agnew

                              Law Office of Amy Jane Agnew, P.C.
                                    24 Fifth Avenue, Suite 1701
                                       New York, NY 10011
                                         973-600-1724


Attorneys for Defendants:                Barbara Kathy Hathaway
                                           Daniel A. Schulze
                                            Bruce J. Turkle
                                             Sofya Uvaydov
                                             Samuel Yaggy


                              Office of New York State Attorney General
                                           120 Broadway
                                        New York, NY 10271
                                          212-416-8869

TABLE OF CONTENTS

I.    BACKGROUND.................................................  4
      A. Pre-Preliminary Injunction...........................  4
           1. Deliberate Indifference........................  7
                a. Objective Component........................  8
                b. Subjective Component.......................  9
      B. Post-2017 Order Proceedings..........................  11
           1. Hearing............................................  12
                a. Anthony Medina.............................  12
                b. Dr. Janice Wolf............................  13
                c. Dr. David Dinello..........................  14
                d. Dr. Carl Koenigsmann.......................  15
                e. Dr. Adam Carinci...........................  16
                f. Dr. Charles Argoff.........................  17
           2. Post-2017 Order Pain Treatment.................  20
           3. Post-2017 Order Window Tinting.................  75
II.   LEGAL STANDARD............................................  79
      A. Standard for Contempt.................................  79
      B. Standard for Attorney's Fees and Fines..............  81
III.  DISCUSSION................................................  83
      A. Pain Medication........................................  83
      B. Window Tinting.........................................  88
      C. Attorney's Fees and Fines............................  89
IV.   CONCLUSION................................................  91

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court is Plaintiff Anthony Medina's ("Plaintiff," "Medina" or "Mr. Medina") Motion for Contempt (the "Civil Contempt Motion"), dated June 21, 2018 [dkt. no. 284], to hold the New York State Department of Correction and Community Supervision ("DOCCS") in contempt for violating the Court's Memorandum and Order, dated Feb. 3, 2017 [dkt. no. 159] (the "2017 Order").

Specifically, Plaintiff requests the following relief:

a) Monetary damages to Plaintiff for his unnecessary pain and suffering;

b) Coercive fines to compel future obedience with [the 2017 Order];

c) Plaintiff's health care to be transferred to an independent pain management specialist for the duration of the instant litigation; [and]

d) Plaintiff's reasonable attorney fees and costs for the prosecution of this contempt motion and proceeding.

(Civil Contempt Motion at 2.) Defendants have opposed the Civil Contempt Motion. For the reasons set forth below, the Civil Contempt Motion [dkt. no. 284], is granted in part and denied in part.

# I.  BACKGROUND

## A. Pre-Preliminary Injunction

As set out in detail in the 2017 Order, Mr. Medina is legally blind, which substantially interferes with his quality of life, causing him to rely heavily on various reasonable accommodating devices, equipment, aids, and auxiliary services to see, read, write, and walk.  Mr. Medina cannot read unless he uses a device that is capable of magnifying print to size 32 font.  (2017 Order at 2.)

Mr. Medina suffers from keratoconus, a disease caused by a decrease in protective antioxidants in the cornea that causes the cornea to change from its normal round shape and to bulge outward like a cone.  See What is Keratoconus?, WEBMD, https://www.webmd.com/eye-health/eye-health-keratoconus (last visited Feb. 7, 2019).  That disability causes him sustained acute eye pain, chronic headaches, a form of double vision, light flashes, and occasional nausea and vertigo. (2017 Order at 2-3.)  Plaintiff's pain management expert, Dr. Adam Carinci, testified that, based on his review of Mr. Medina's medical records, his examination of Mr. Medina, and his observations and experiences, Mr. Medina "had four main complaints.  Number one was essentially neuropathic eye pain, or complaints of headache and eye pain.  The second was lumbar axial back pain.  The third

4

was right shoulder pain. And the fourth was right arm/elbow pain." (Transcript of September 18, 2018 Hearing on the Civil Contempt Motion ("Sept. 18, 2018 Tr."), dated Oct. 3, 2018 [dkt. no. 392], at 266:5-12.) Dr. Carinci added that Mr. Medina's primary complaint was his eye pain. (Id. at 274:7-9; see also Transcript of September 17, 2018 Hearing on the Civil Contempt Motion ("Sept. 17, 2018 Tr."), dated Jan. 24, 2019 [dkt. no. 402], at 51:5-53:5 (Mr. Medina describes his pain as of September 2018).)

Beginning in 2006, Mr. Medina was prescribed Tramadol[1] by DOCCS medical personnel to relieve his severe headaches and eye pain caused by light exposure and his visual disability. (2017 Order at 3.)[2] Mr. Medina testified credibly that he had not "had

---

[1] Several exhibits relevant to Mr. Medina's prescriptions are included in the Declaration of Amy Jane Agnew in Support of Motion for Contempt ("Agnew Decl."), dated June 25, 2018 [dkt. no. 295], and the Reply Declaration of Amy Jane Agnew in Support of Motion for Contempt ("Agnew Reply Decl."), dated Aug. 14, 2018 [dkt. no. 356]. As set out in Exhibit 206 to Agnew Reply Decl. ("Meds Spreadsheet") [dkt. no. 356-45], the following drugs are medical equivalents and were used interchangeably throughout the record: Neurontin and Gabapentin; Ultram and Tramadol; Percocet and oxycodone. (See also Exhibit 109 to Agnew Decl. [dkt. no. 295-110] (noting Esgic is equivalent to Fioricet).) For consistency, this opinion will use Gabapentin to refer to both Gabapentin and Neurontin, and Tramadol to refer to both Tramadol and Ultram.

[2] At the time of the 2016 preliminary injunction hearing, the record reflected that an ophthalmologist first prescribed Tramadol for Mr. Medina in 2010. (2017 Order at 3.) However, the more complete record assembled for the 2018 contempt hearing revealed that Dr. David Dinello, a DOCCS physician, first prescribed it for Mr. Medina in 2006 at a DOCCS (continued)

any problems with [Tramadol] since 2007," and that "it's effective with the least amount of side effects." (Sept. 17, 2018 Tr. at 94:7-9.) DOCCS prescribed Tramadol and Gabapentin for Mr. Medina repeatedly and consistently between 2006 and 2014. (Exhibit 205 to Agnew Reply Decl. ("Agnew Reply Decl. Ex. 205") [dkt no. 356-44].) In fact, despite having supposedly gone over Mr. Medina's medical records "in depth," Dr. Dinello did not even realize he was the first provider to prescribe Tramadol to Mr. Medina in 2006. (Sept. 17, 2018 Tr. at 165:8-167:8; Pl. Ex. 233.)

As set out in the 2017 Order, over time, various DOCCS medical personnel discontinued the Tramadol – addressed to Mr. Medina's eye pain – and the Gabapentin – addressed to his neuropathic pain, primarily in his arms. Other DOCCS personnel refused him the use of a closed circuit television ("CCTV") reader and refused to dim the lights in his space, the latter causing him eye pain. Thus, Mr. Medina sought a preliminary injunction to require Defendants:

1) to reinstate Plaintiff's prescription of [Tramadol], or an alternate, but equally effective, pain medication immediately;

---

(continued) facility. (Sept. 17, 2018 Tr. at 165:8-167:9; Pl. Ex. 233.) "Pl. Ex." As used throughout this opinion refers to a "Plaintiff's Exhibit" admitted into evidence during the 2018 contempt hearing.

2) to dim or turn or turn off Plaintiff's overhead cell light
in accordance with past accepted requests for the
reasonable accommodation regardless of his housing facility
and unit; and, when a housing unit and/or facility has both
cells facing windows and cells not facing windows, to house
Plaintiff in a cell which does not face a window or to tint
the window;

3) to provide Plaintiff with a closed circuit television
("CCTV") and/or documents in 32 font print before and
during any disciplinary hearing and ensure that he can use
them.

(2017 Order at 1-2.)

## 1. Deliberate Indifference

In deciding Mr. Medina's request for a preliminary
injunction (the "Preliminary Injunction Motion"), dated Dec. 22,
2015 [dkt. no. 43], the Court reviewed the law regarding
deliberate indifference.  Under the Eighth and Fourteenth
Amendments, states have a limited obligation to provide medical
care to sentenced prisoners.  See Estelle v. Gamble, 429 U.S.
97, 103-06 (1976) ("[D]eliberate indifference to [the] serious
medical needs of prisoners constitutes the 'unnecessary and
wanton infliction of pain' proscribed by the Eighth Amendment."
(quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976) (plurality
opinion)).  The failure to provide medical care to a prisoner
will give rise to a constitutional violation if two elements are
established:

The first requirement is objective: the alleged
deprivation of adequate medical care must be

> sufficiently serious. The second requirement is
> subjective: the charged officials must be subjectively
> reckless in their denial of medical care. This means
> that the charged official [must] act or fail to act
> while actually aware of a substantial risk that
> serious inmate harm will result. Officials need only
> be aware of the risk of harm, not intend harm.

DeMeo v. Koenigsmann, No. 11 Civ. 7099(HBP), 2015 WL 1283660, at

*8 (S.D.N.Y. Mar. 20, 2015) (alteration in original) (emphasis

omitted) (quotation marks omitted) (quoting Salahuddin v. Goord,

467 F.3d 263, 279-80 (2d Cir. 2006)).

### a. Objective Component

To prove the objective component, a plaintiff must allege a

"deprivation of adequate medical care [that is] 'sufficiently

serious.'" Salahuddin, 467 F.3d at 279 (quoting Farmer v.

Brennan, 511 U.S. 825, 834 (1994)). The inadequately treated

"medical need is sufficiently serious if it is a 'condition of

urgency, one that may produce death, degeneration, or extreme

pain.'" DeMeo, 2015 WL 1283660, at *8 (quoting Johnson v.

Wright, 412 F.3d 398, 403 (2d Cir. 2005)).

As set forth by the Court of Appeals, the analysis of what

constitutes a "sufficiently serious condition" should include

consideration of "(1) whether a reasonable doctor or patient

would perceive the medical need in question as 'important or

worthy of comment or treatment,' (2) whether the medical

condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" Sereika v. Patel, 411 F. Supp. 2d 397, 406 (S.D.N.Y. 2006) (quoting Chance v. Armstrong, 143 F.3d 698, 702-03 (2d Cir. 1998)).

As to the objective component in the instant case, the Court has found that "[t]here is no question that Mr. Medina's pain is 'sufficiently serious' under the Court of Appeals analysis." (2017 Order at 23.) The Court noted Medina's extended treatment by DOCCS medical personnel for pain over the years and their referral of him out to a pain specialist. (See id. at 24.)

### b. Subjective Component

As to the subjective component, the Court has found that DOCCS medical personnel failed to treat Mr. Medina's pain effectively despite repeatedly being advised of it by Mr. Medina and his counsel. (Id. at 25-26.) Although Mr. Medina was referred out to a pain specialist, he did not see one until a year later. (Id. at 26.)

The Court has already recognized that

> "[t]he subjective prong . . . for inadequate medical care requires the plaintiff to prove that 'the charged official [acted] with a sufficiently culpable state of mind.'" DeMeo at *9 (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)). In other words, "a plaintiff must show that 'the prison official was

9

aware of, and consciously disregarded, the prisoner's medical condition.'" Id. (quoting Hernandez v. Goord, 99 F.3d 550, 553 (2d Cir. 1996)). Indeed, mere "proof of awareness of a substantial risk of the harm suffices." Salahuddin at 280.

(2017 Order at 25 (alterations in original).)

The Court also noted that "Mr. Medina's claim is not merely a disagreement with the prison doctors' professional judgement." (Id. at 26.) Indeed, one doctor revoked his Tramadol prescription without examining or speaking to him, (id. at 27), and another decreased his Gabapentin prescription without the benefit of his medical records and without examining him, (id. at 8; see also id. at 27-28). The latter doctor, Dr. Michelle Belgard, discontinued Mr. Medina's Gabapentin prescription pursuant to her own, unwritten rule, admitting that "[i]t doesn't matter if [inmates] are suffering from pain . . . whether they have pain or not, it's irrelevant . . . There are other medications that can be used. So it doesn't matter if you're in pain. It's [Gabapentin] discontinued." (Id. at 28 (alterations except last in original) (quoting Transcript of June 15, 2016 Hearing on the Preliminary Injunction Motion ("June 15, 2016 Tr."), dated June 28, 2016 [dkt. no. 128], at 48-49).)

A hearing was held, and the Court granted the Preliminary Injunction Motion, ordering Defendants:

1) to reinstate Plaintiff's prescription of [Tramadol], or an alternate, but equally effective, pain medication immediately;

2) to dim or turn or turn off Plaintiff's overhead light in accordance with past accepted requests for the reasonable accommodation regardless of his housing facility and unit; and, when a housing unit and/or facility has both cells facing windows and cells not facing windows, to house Plaintiff in a cell with does not face a window or to tint the window; and

3) to provide Plaintiff with a closed circuit television ("CCTV") and/or documents in 32 font print before and during any disciplinary hearing and ensure that he can use them.

(Id. at 54.)

The Memorandum and Order granting the Preliminary Injunction Motion was issued on February 3, 2017. (Id. at 55.) There was no appeal and no request for clarification.

## B. Post-2017 Order Proceedings

Following entry of the 2017 Order on February 3, it only took two months for Mr. Medina to return to Court seeking a finding of contempt with regard to the window tinting and use of a CCTV device. (Plaintiff's Intended Motion for a Finding of Civil and Criminal Contempt, dated Apr. 2, 2017 [dkt. no. 164]; Order, dated Apr. 6, 2017 [dkt. no. 168].) By June 8, Mr. Medina added to the contempt motion his assertion that, upon his arrival at Five Points Correctional Facility on June 1, he was denied his pain medication due to "Dr. Belgard's policy." (Motion to Expedite Civil Contempt, dated June 8, 2017 [dkt. no.

11

181], at 1-2.)  There ensued another 209 docket entries regarding Mr. Medina's treatment plan, renewed motions for contempt, disclosure of Mr. Medina's medical records, and the like, [dkt. nos. 182-391], until the contempt hearing was finally held on September 17 and 18, 2018.

### 1. Hearing

The hearing spanned two days, and six witnesses testified. The Court's general observations of the witnesses are as follows:

### a. Anthony Medina

Overall, the Court found Mr. Medina's testimony to be credible.  He had an extraordinary recollection of detail and did not seem to be exaggerating.  He characterized his pain on some occasions as excruciating and on other occasions as merely "irksome."  (Sept. 17, 2018 Tr. at 27:1.)  He readily admitted to saying he had chest pains, when he did not, in an effort to get a nurse to see him after waiting, in pain, for over four hours for Dr. Dinello's approval of his request for Tramadol. He acknowledged breaking a window in the transport van after his appearance before Judge Geraci because of his excruciating

headache. The Court did not find his testimony about drug diversion to be credible.[3]

Mr. Medina's testimony was corroborated by medical records, other prison records, and his and his counsel's correspondence with prison officials. Accordingly, with the exception noted, the Court credits Mr. Medina's testimony.

Mr. Medina's attitude and demeanor also inspired confidence. He answered his lawyer's questions and opposing counsel's questions in the same measured tone. He struck the Court as a witness doing his best to report his best recollection of the facts.

### b. Dr. Janice Wolf

Dr. Wolf, who treated Mr. Medina at Sullivan Correctional Facility, was somewhat defensive and evasive in her testimony. For example, Mr. Medina inquired about non-medical treatment, which Dr. Wolf initially said meant physical therapy for the neuropathic pain in his arm. (Sept. 17, 2018 Tr. at 142:10-13.)

---

[3]
    Q. Have you ever been charged with diverting
    medication?
    A. Maybe.
    Q. How many times?
    A. I don't know. One time maybe, many, many years
    ago.

(Sept 17, 2018 Tr. at 100:7-10.)

An outside physical therapist refused and recommended occupational therapy, citing Mr. Medina's "tingling, cramping, and numbness." (Sept. 17, 2018 Tr. at 143:5-12.) Thereafter, the nurse practitioner noted the case was discussed with Dr. Wolf "without referral to occupational therapy needed" and checked "no action is required at this time." (Sept. 17, 2018 Tr. at 143:15-20.) Dr. Wolf subsequently acknowledged that the entry meant she was not going to send Mr. Medina for occupational therapy but said it was "not what [she] indicated." (Sept. 17, 2018 Tr. at 143:21-23.) As will be detailed below, Dr. Wolf eventually testified that she did not send Mr. Medina to occupational therapy because he was a flight risk. As also noted below, that testimony was incredible on its face.

### c. Dr. David Dinello

Dr. Dinello was a Regional Medical Director ("RMD") during the relevant time. While Dr. Dinello gave long soliloquies about his interest in providing Mr. Medina with effective pain management, those good intentions are belied by (1) periods when Mr. Medina had no pain medication at all for his headaches and his neuropathy, (2) Dr. Dinello's failure to accept and act upon the adverse reactions Mr. Medina reported (and nurses confirmed) to various alternative medications, and (3) Dr. Dinello's emails between and among other DOCCS physicians.

## d. Dr. Carl Koenigsmann

Dr. Koenigsmann was the Chief Medical Officer for DOCCS during the relevant time period. Although Dr. Koenigsmann had supervisory input into Mr. Medina's treatment, his testimony did not add much because he was, at best, uninformed. When questioned about his note to Drs. Mikhail Gusman and Wolf that he "ha[d] no issue authorizing [Tramadol] until [the pain] workup [was] done," (Sept. 18, 2018 Tr. at 195:1-4 (quoting Pl. Ex. 99)), he did not know why he denied the request for Tramadol that same day, (Sept. 18, 2018 Tr. at 195:5-7). Similarly, when questioned about why, after Gabapentin had been refused to Mr. Medina, Dr. Koenigsmann changed his mind on December 4, 2017, to permit Gabapentin, he had no idea. (Sept. 18, 2018 Tr. at 196:4-8.) Dr. Koenigsmann also acknowledged that he was not aware of what medications Mr. Medina had tried between February of 2017 and February of 2018 and that he did not inquire what other treatments or modalities had been tried for Mr. Medina. (Sept. 18, 2018 Tr. at 197:18-24.)

Finally, when asked why Tramadol or other opioids were not indicated for Mr. Medina, he gave a lengthy, vague answer about issues with controlled substances, (Sept. 18, 2018 Tr. at 197:25-199:1), acknowledged that he could not recall why he believed there were issues with opioids with Mr. Medina, (Sept.

18, 2018 Tr. at 199:4-15), and referred to "past experience" with Mr. Medina but without recalling what the past experiences were, (Sept. 18, 2018 Tr. at 199:16-201:13).

### e. Dr. Adam Carinci

In stark contrast, the Court found Plaintiff's expert, Dr. Carinci, to be both credible and persuasive. Dr. Carinci was thoroughly familiar with Mr. Medina's lengthy medical history. He spoke credibly about why numerous prior medications had either failed to provide Mr. Medina with pain relief, or, while providing some relief, caused adverse side effects such as extreme drowsiness, blood in his stool, and the like. Dr. Carinci noted that Mr. Medina had "tried and failed at least 12 different medications, really not even including nonmedication trials, to control his pain." (Sept. 18, 2018 Tr. at 267:10-13.)

As detailed in his report, Dr. Carinci testified persuasively that "the combination of Gabapentin and Tramadol, I think, is medically appropriate and reasonable for him. Furthermore, I think I don't see any contraindications to treatment with that, and, importantly, the treatment with those two medications really does comport with the MWAP policy, as well as CDC guidelines for opioids, and the New York State guidelines for opioids." (Sept. 18, 2018 Tr. at 268:19-269:3.)

16

Dr. Carinci's testimony dealt with the details of Mr. Medina's specific case, not just with standard factors such as avoiding opioids. Also, Dr. Carinci distinguished between Gabapentin, which is prescribed for Mr. Medina's neuropathy and should be taken continuously for maximum effect, and Tramadol, which is prescribed for Mr. Medina's eye pain and headaches and should be taken on an as-needed basis. (Sept. 18, 2018 Tr. at 269:10-21.) Dr. Carinci also pointed out that the low dosage of Tramadol prescribed to Mr. Medina was a "small percentage" of the CDC-recommended maximums. (Sept. 17, 2018 Tr. at 271:21-272:3.) Accordingly, the Court found Dr. Carinci's detailed, careful testimony to be very persuasive.

Dr. Carinci's attitude and demeanor also impressed the Court. He was calm and measured in answering both lawyers' questions.

### f. Dr. Charles Argoff

As pointed out on cross-examination, Defendants' expert, Dr. Charles Argoff testified in 2017 before the FDA Joint Meeting of the Drug Safety and Risk Management and Analgesic Drug Products Advisory Committee that "[t]he reality is that for millions of people with chronic pain, opioid therapy is effective and safe in helping them to live more comfortable and productive lives," and "[f]irst, we must maintain the

availability of multiple specific opioid analgesics to meet the specific and personalized needs of the people we treat, who without such availability would suffer unnecessarily." (Sept. 18, 2018 Tr. at 318:23-219:11 (quoting Pl. Ex. 234, at 110:3-6, 110:15-19).) Nevertheless, he failed to address Mr. Medina's specific and personalized needs. When asked why Mr. Medina was not a candidate for opioids for pain relief, Dr. Argoff relied on generic counter-indications: Mr. Medina's age, his prior tobacco use, his criminal record, and his prior drug-seeking behavior (a single disciplinary ticket that had been expunged). (Sept. 18, 2018 Tr. at 319:19-321:11.) He also mentioned the possibility of drug interactions without acknowledging that Mr. Medina had been on Tramadol for substantial periods of time while in custody with no adverse interactions reported and failed to acknowledge that Mr. Medina failed non-opioid therapy. (Sept. 18, 2018 Tr. at 306-322.)

In addition, after a discussion of whether or not Mr. Medina's records disclosed dirty urinalyses, counsel asked a simple question of whether Dr. Argoff saw any other instances of drug abuse in Mr. Medina's records. Dr. Argoff gave a lengthy, hyper-technical, and evasive answer about the definition of abuse as including refusal to take medication. Eventually, however, he admitted that he was not aware of any drug abuse or misuse reflected in Mr. Medina's records other than his refusal

to take medication and the dirty urinalysis.[4]  For these reasons,

the Court did not find Dr. Argoff's testimony credible or

persuasive.

---

[4]

Q. Did you see any other instances of drug abuse or
use in his medical records in his entire
incarceration?
A. Drug abuse or misuse?
Q. Yes, sir.
A. I did.
Q. And why isn't that documented in your report?
A. Well, it is, I believe. Just let me review, please.
Q. Sure. Take your time.
    (Pause)
    THE WITNESS: I'm reading on top of page 3. So
just so we're clear, for everyone here, the definition
of abuse is to use a medication for a nonmedical
purpose. The definition of misuse -- and you asked me
about abuse and misuse -- is to take a medication
other than the way it was prescribed. And misuse means
undertaking as well as overtaking the medicine. So on
page 3, I write, "The medication records" -- this is
the first paragraph, third line. "The medical records
further reflect multiple instances since February 3rd,
2017, in which plaintiff has refused to take
medications prescribed to treat his claimed eye pain
and headaches after only a few doses. This is
particularly important since standard of practice
regarding the pharmacologic treatment of pain, and/or
specifically headache, acknowledges and advises that
successful treatment outcome most often depends upon
adherence to a consistent medical regimen, and that
pain/headache relief for chronic conditions may take
four to six weeks of treatment at a minimum.
Therefore, the fact that plaintiff refused to complete
an adequate trial of treatment is vital to recognize
as plaintiff's choice, not as an adequate treatment of
plaintiff."
BY MS. AGNEW:
Q. I understand that. I'm actually not asking you a
question about the treatment he was provided. I'm
asking you about instances of drug diversion or abuse
(continued)

Dr. Argoff's attitude and demeanor confirmed the Court's finding that his testimony was not credible. The doctor was resistant to answering questions and addressed Plaintiff's counsel in a nasty, condescending, and sexist fashion.[5]

### 2. Post-2017 Order Pain Treatment

Immediately after the 2017 Order was issued, Mr. Medina's pain medication issues improved. (Declaration of Anthony Medina in Support of Motion for Contempt ("Medina Decl."), dated June

---

(continued)
that you noted from his medical records. I understand what you're saying. I just don't think that answers my question.
A. You said abuse -- and you said abuse and misuse, and I defined it the way in which we would use misuse in the medical profession, and I commented based upon that.
Q. Okay.
    THE COURT: Is there any abuse or misuse reflected in the medical records, other than refusal to take medication and the one dirty urine?
    THE WITNESS: Not that I'm aware of.

(Sept. 18, 2018 Tr. at 315:15-317:9 (emphasis added).)
[5]
    Q. Yes. And you read [Mr. Medina's] deposition, which detailed in really icky terms, actually, what happens to him when he is sustainably exposed to light [vomiting]; isn't that correct?
    A. Well, I wouldn't describe my writing as icky.
    Q. No, no, what happened to him that day. Forgive me. He vomited during the --
    A. I don't know what you mean by "icky." I think if we're going to have a productive discussion, maybe you need to speak to me in professional terms.

(Sept. 18, 2018 Tr. at 313:4-12.)

25, 2018 [dkt. no. 293], at ¶ 3; Sept. 17, 2018 Tr. at 53:19-55:5.) On February 6, 2017, Dr. Jacqueline Levitt, a physician at Wende Correctional Facility, prescribed Tramadol, at a low dose, and Lyrica, an alternative to Gabapentin. (Exhibit 2 to Agnew Decl. [dkt. no. 295-2]; Exhibit 3 to Agnew Decl. [dkt. no. 295-3]; Exhibit 4 to Agnew Decl. ("Agnew Decl. Ex. 4") [dkt. no. 295-4].) She noted that Mr. Medina has chronic photophobia, is legally blind, and has cervical stenosis. She also noted that she would request a non-formulary trial of Lyrica because "[Gabapentin] → diarrhea." (Agnew Decl. at ¶ 5; Agnew Decl. Ex. 4.)[6]

Mr. Medina found that the Lyrica "was not as effective as the [Gabapentin] but it did help with [his] neuropathy." (Medina Decl. at ¶ 3.)[7]

---

[6] Inexplicably, the medical department started to list Mr. Medina as "allergic" to Gabapentin on medical records documents. (Exhibit 9 to Agnew Decl. [dkt. no. 295-9]; Exhibit 15 to Agnew Decl. [dkt. no. 295-15] (referral forms); Exhibit 19 to Agnew Decl. [dkt. no. 295-19] (same); Exhibit 23 to Agnew Decl. ("Agnew Decl. Ex. 23") [dkt. no. 295-23] (same).)
[7] On February 27, 2017, Mr. Medina was referred to Dr. Evgeny Dyskin, an orthopedist, regarding his progressive bilateral carpal tunnel syndrome. The referral requested an evaluation of Mr. Medina for surgery. (Declaration of Evgeny Dyskin, M.D. in Support of Motion for Contempt ("Dyskin Decl."), dated June 21, 2018 [dkt. no. 286], at ¶ 7; Exhibit 1 to Dyskin Decl. [dkt. no. 286-1]; Exhibit 7 to Agnew Decl. [dkt. no. 295-7].) In his declaration submitted on the Civil Contempt Motion, Dr. Dyskin wrote "I have no reason to believe based on my examinations and treatment of Mr. Medina that he was malingering (continued)

Dr. Levitt attempted to increase the dosage of Lyrica when the prescription was due for renewal, (Exhibit 11 to Agnew Decl. [dkt. no. 295-11]; Exhibit 14 to Agnew Decl. ("Agnew Decl. Ex. 14") [dkt. no. 295-14]; Medina Decl. at ¶ 8; Sept. 17, 2018 Tr. at 55:9-18), but neither the dosage increase nor further treatment with Lyrica was approved by the RMD, Dr. Dinello, (Agnew Decl. at ¶¶ 18-19; Exhibit 16 to Agnew Decl. [dkt. no. 295-16]; Exhibit 17 to Agnew Decl. ("Agnew Decl. Ex. 17") [dkt. no. 295-17]; Sept. 17, 2018 Tr. at 55:16-18). Both Mr. Medina and his counsel raised concerns with DOCCS personnel about his pain treatment during this period. (E.g., Exhibit 3 to Medina Decl. [dkt. no. 293-3]; Agnew Decl. Ex. 14; Exhibit 18 to Agnew Decl. ("Agnew Decl. Ex. 18") [dkt. no. 295-18].)[8] Indeed, Plaintiff's counsel wrote to defense counsel expressing her concern that Dr. Levitt was adjusting Mr. Medina's pain medication not out of any medical necessity, but due to instructions "from Albany." (Agnew Decl. Ex. 18, at 1.)

On March 15, 2017, Dr. Dinello emailed Dr. Levitt, "I would definitely not recommend Lyrica especially in this situation.

_____

(continued) about the neuropathic pain he suffered in his left and right arms." (Dyskin Decl. at ¶ 9.)

[8] The Court has not attempted to note every time Mr. Medina or his counsel complained to DOCCS personnel about the lack of effective pain treatment. To do so would have doubled the length of this already lengthy opinion. Also, Defendants have nowhere suggested that DOCCS medical personnel were not aware of Mr. Medina's pain.

Being a Controlled/Scheduled Substance and therefore Addictive in nature, it has an unacceptable risk/benefit ratio. . . . [S]afer alternatives like Cymbalta and even Lamictal should be attempted." (Agnew Decl. Ex. 17.) As noted in the Meds Spreadsheet, Lyrica was discontinued on March 30, 2017.[9] (Meds Spreadsheet at 7-9.) By halting the Lyrica — which had been effective — Dr. Dinello willfully interfered with Dr. Levitt's treatment of Mr. Medina based only upon the nature of the particular medications, not Mr. Medina's medical needs.[10]

Pursuant to Dr. Levitt's referral, Dr. Evgeny Dyskin, an orthopedist, performed surgery on Mr. Medina's left arm on March 24, 2017. (Dyskin Decl. at ¶ 11.) Post-surgery, Dr. Dyskin recommended that Mr. Medina be treated with Gabapentin, (Dyskin Decl. at ¶ 12), but it was not prescribed at Wende when he returned, (see Agnew Decl. Ex. 23 (indicating Mr. Medina is allergic to Gabapentin)). In lieu of the Gabapentin or Lyrica, Dr. Levitt prescribed Cymbalta, but that medication made Mr. Medina incredibly sleepy. (Exhibit 24 to Agnew Decl. ("Agnew Decl. Ex. 24") [dkt. no. 295-24]; Medina Decl. at ¶ 9.) By failing to follow the surgeon's recommendation for Mr. Medina's

---

[9] There is no indication of medication from April 1 to June 1. (Meds Spreadsheet at 7-9.)

[10] Plaintiff does not contend that an RMD's approving medication is not part of the normal course, only that but for the interference of RMDs Mr. Medina would have been effectively treated by facility doctors.

post-surgical medication, Dr. Dinello willfully caused Dr. Levitt to fail to treat Mr. Medina's pain.

As noted above, on March 30, 2017, Medina's Lyrica prescription was discontinued. (Meds Spreadsheet at 7.) Wende's pharmacy supervisor wrote to Dr. Levitt: "This has now expired per Dr. David Dinello. . . . We have no approval to continue this NF medication, so you will have to use your clinical judgment on how to proceed with his treatment. Lyrica 50mg will have to be discontinued by you at this time however." (Exhibit 20 to Agnew Decl. [dkt. no. 295-20].) Dr. Levitt noted in an Ambulatory Health Record Progress Note ("AHR") that "Lyrica not be approved by RMD for further [treatment] of neuropathy. Will begin Cymbalta. . . ." (Exhibit 21 to Agnew Decl. [dkt. no. 295-21].) This further evidences Dr. Dinello's willful interference with Mr. Medina's pain treatment.

The April 13, 2017 entry in Mr. Medina's medical records states that Mr. Medina requested an increase in Tramadol dosage due to his photophobia. It also noted that the surgery helped his left hand, that "[the] pain [is] better – still numb but no further cramping." (Agnew Decl. Ex. 24.) Mr. Medina requested the same surgery for his right arm. The corresponding AHR states, "[Tramadol] does not affect numbness but Lyrica was helpful, Cymbalta not effective . . . claims Cymbalta is

antidepressant, makes him tired." (Id.) Dr. Levitt increased

the Tramadol prescription to 75mg PO TID[11] for 30 days, though

she added that she doubted the need for neuropathic medication.

(Id.) Despite stating that she felt there was no need for

neuropathic medication, Dr. Levitt referred Mr. Medina to Dr.

Dyskin for surgery on his right arm. (Exhibit 25 to Agnew Decl.

[dkt. no. 295-25].)

Mr. Medina states that on April 18, 2017, "[he] was

presented with a disciplinary ticket for a dirty urinalysis. A

urine sample was never taken from [him]. The charge was

overturned and expunged." (Medina Decl. at ¶ 13; Exhibit 5 to

Medina Decl. [dkt. no. 293-5], at 4; Exhibit 26 to Agnew Decl.

[dkt. no. 295-26]; Sept. 17, 2018 Tr. at 100:11-14 (charged with

dirty urine in last two years but overturned); see also Sept.

17, 2018 Tr. at 124:19-125:1 (Mr. Medina has never had a

positive urine test for drugs in over 22 years of

imprisonment).)

On April 25, 2017, Mr. Medina wrote Dr. Levitt, stating:

---

[11] TID is an abbreviation for "ter in die," Latin for three times
per day. TID, MERRIAM-WEBSTER ONLINE MEDICAL DICTIONARY,
https://www.merriam-webster.com/dictionary/tid#medicalDictionary
(last visited Feb. 1, 2019). BID denotes "bis in die" or twice
a day. BID, MERRIAM-WEBSTER ONLINE MEDICAL DICTIONARY,
https://www.merriam-webster.com/dictionary/bid#medicalDictionary
(last visited Feb. 1, 2019).

> For some reason I am receiving mandatory call-outs for morning medication. The call-out should not be mandatory. There are occasions when I do not take the medication because I am not in pain.
>
> The problem arises when I refuse. Some times [sic] I sign a refusal form and other times I do not. On a few occasions I had to go the RMU to sign a refusal and threatened with a misbehavior report if I did not.
>
> Doctor Levitt, would you please prescribe the medication 3 times a day on an as needed basis so that I could refuse and not worry about being disciplined? Thank you.

(Exhibit 6 to Medina Decl. [dkt. no. 293-6] (emphasis omitted).)

This is hardly drug-seeking behavior.

The next day, Dr. Levitt amended Mr. Medina's Tramadol prescription to permit him to take the pain medication "as needed." (Exhibit 29 to Agnew Decl. [dkt. no. 295-29].) Mr. Medina replied, "but I was still getting no medication for my neuropathic pain." (Medina Decl. at ¶ 15; see Exhibit 31 to Agnew Decl. [dkt. no. 295-31].)

On June 1, 2017, DOCCS implemented a new Health Care Services Policy regarding Medications with Abuse Potential ("MWAP").[12] The policy states that all inmates will have access

---

[12] While DOCCS doctors have recently noted the dangers associated with these medications, those dangers have been known to DOCCS for years. In 2003, Dr. Dinello's supervisor at Auburn Correctional Facility, Dr. Pang Kooi, issued a memorandum for his staff about prescribing Tramadol. (Pl. Ex. 232, at Ex. 3.) In 2005, then-Chief Medical Officer Lester Wright made Gabapentin non-formulary and a nurse-administered (continued)

to medically appropriate medications, however, if a medication is deemed to have abuse potential, the prescription of such medication will require the "review and approval of a Regional Medical Director." (Agnew Decl. at ¶ 39; Exhibit 37 to Agnew Decl. ("Agnew Decl. Ex. 37") [dkt. no. 295-37]; Declaration of David Dinello, M.D. in Opposition to Plaintiff's Motion for Contempt ("Dinello Decl."), dated Aug. 3, 2018 [dkt. no. 325], at ¶ 19.) Dr. David Dinello was RMD at Five Points Correctional Facility at that time. (Agnew Decl. at ¶ 40; Dinello Decl. at ¶ 3.)

At or about the time the MWAP policy was adopted, Dr. Koenigsmann, Chief Medical Officer for DOCCS, (Sept. 18, 2018 Tr. at 183:25-184:3), wrote to Dr. Dinello about Mr. Medina:

> I hope he is being honest in his agreeing to taper off the [Tramadol] and try the Lamictal. His attorneys have fought vehemently to keep the [Tramadol]. My only point was that in discussions, grievance responses, et cetera, we need to be extremely careful about indicating that anyone is having their medication discontinued because of a new policy. Changing meds based on policy is doomed to failure and is not what we are doing.

(Sept. 18, 2018 Tr. at 187:22-188:4 (quoting Pl. Ex. 212)). At the hearing, Dr. Koenigsmann testified that he meant that "changing meds based on policy is doomed to failure legally."

---

(continued) medication. (Id. at Ex. 5.) It is clear that DOCCS was long aware of any risks and complications.

(Sept. 18, 2018 Tr. at 185:5-190:4.) He also testified that "if a patient was on an effective medication, it's possible that after June 1st of 2017, a treating physician would submit an MWAP request, and that that medication would be discontinued despite the fact that it was effective up until that date." (Sept. 18, 2018 Tr. at 191:11-16.) Unfortunately for Mr. Medina, DOCCS medical personnel did in fact discontinue Mr. Medina's effective medication based on policy.

On June 1, 2017, Plaintiff's counsel learned that Mr. Medina had been transferred to Five Points and she, once again, sent an email to Defendants' counsel voicing concern about Mr. Medina's medication. (Exhibit 33 to Agnew Decl. [dkt. no. 295-33]; see also Exhibit 39 to Agnew Decl. ("Agnew Decl. Ex. 39") [dkt. no. 295-39]; Medina Decl. at ¶ 17.) Before Mr. Medina even arrived at Five Points, Dr. Dinello, the RMD, had decided that Mr. Medina would be stripped of Tramadol and Gabapentin. Deputy Superintendent Amy Lamanna inquired of Dr. Dinello about the court order regarding Mr. Medina, and he replied, "The judge cannot order a specific medication. I will see Mr. Medina. [Mr. Medina] will not be receiving a controlled substance medication. . . ." (Sept. 17, 2018 Tr. at 167:9-22 (quoting Pl. Ex. 40).) Dr. Dinello had not examined Mr. Medina since 2006, and he did not have access to his AHR. (Sept. 17, 2018 Tr. at 167:23-168:13; see Exhibit 200 to Agnew Reply Decl. ("Agnew

28

Reply Decl. Ex. 200"), dated Aug. 14, 2018 [dkt. no. 356-39], at 116:20-22 ("[June is] when I first met him, if I'm not mistaken.").) He had not reviewed Mr. Medina's medical records, and he had not read this Court's order. (See Agnew Reply Decl. Ex. 200, at 113:8-114:13 ("When [Medina] first came into Five Points, there was this huge court order, which I have never seen. . . .").) Again, Dr. Dinello willfully interfered with effective treatment of Mr. Medina's pain. When asked why he decided to discontinue Mr. Medina's medication even before he arrived at the facility or had been examined, Dr. Dinello testified:

> Q. OK. Why would you say before he even got to your facility that he would not be receiving a controlled scheduled medication?
>
> A. Because of research I had done on him at that point in regards to Dr. Belgard and having to talk to her about that case. There was insufficient medical justification that my reading at that time would warrant a use of medication of [Tramadol].

(Sept. 17, 2018 Tr. at 168:21-169:3.)[13]

Dr. Dinello admitted that he was well aware of Mr. Medina's pain. (Sept. 17, 2018 Tr. at 169:4-13.) On June 2, 2017, Dr.

_____

[13] As pointed out in the 2017 Order at 27-30 and above, Dr. Belgard vindictively discontinued Mr. Medina's Gabapentin in 2016 pursuant to her own, unwritten rule, testifying to her own deliberate indifference: "It doesn't matter if [inmates] are suffering from pain. . . . Whether they have pain or not, it's irrelevant. There are other medications that can be used. So it doesn't matter if you're in pain. It's [Gabapentin] discontinued." (June 15, 2016 Tr. at 48:22-49:5.)

Dinello went to see Mr. Medina. (Sept. 17, 2018 Tr. at 171:12-15; Agnew Decl. Ex. 39; Dinello Decl. at ¶ 20.) DOCCS had just instituted a MWAP policy which did not allow for the prescription of Tramadol for more than seven days. (Agnew Decl. at ¶ 39; Agnew Decl. Ex. 37.) Dr. Dinello ordered that Mr. Medina be weaned from Tramadol but said he would "consider" Gabapentin. (Agnew Decl. at ¶ 43; Agnew Decl. Ex. 39; Exhibit 42 to Agnew Decl. ("Agnew Decl. Ex. 42") [dkt. no. 295-42]; Medina Decl. at ¶ 17.) Tramadol was discontinued on June 25. (Meds Spreadsheet at 10.) Dr. Dinello willfully interfered with Mr. Medina's effective pain treatment, "changing meds based on policy," a course Dr. Koenigsmann correctly stated was "doomed to failure legally." (Sept. 18, 2018 Tr. at 187:22-190:4.)

"Considering" effective treatment but not actually prescribing it is a theme for Dr. Dinello. (See, e.g., Agnew Decl. Ex. 39; Agnew Decl. Ex. 42; Exhibit 50 to Agnew Decl. ("Agnew Decl. Ex. 50") [dkt. no. 295-50]; Exhibit 143 to Agnew Decl. ("Agnew Decl. Ex. 143") [dkt. no. 295-144]; Exhibit 145 to Agnew Decl. ("Agnew Decl. Ex. 145") [dkt. no. 295-146]; Agnew Reply Decl. Ex. 200, at 112:22-113:7.) Dr. Dinello wrote, "[patient] is willing to try alternative treatment modalities, even re-instating Gabapentin which he stated helped but at high doses caused adverse reaction (diarrhea)." (Agnew Decl. at

¶ 49; Exhibit 45 to Agnew Decl. ("Agnew Decl. Ex. 45") [dkt. no. 295-45], at 1.)

When Mr. Medina continued to complain of pain, Dr. Dinello prescribed Lamictal. (Agnew Decl. at ¶ 49; Agnew Decl. Ex. 45, at 1; Medina Decl. at ¶ 17; Sept. 17, 2018 Tr. at 171:19-172:9; Meds Spreadsheet at 10.)[14] Mr. Medina had an adverse reaction to the Lamictal on the morning of June 14, 2017, which required medical intervention. (Exhibit 46 to Agnew Decl. [dkt. no. 295-46]; Agnew Reply Decl. Ex. 200, at 115:4-5; Medina Decl. at ¶ 19; Sept. 17, 2018 Tr. at 58:7-22 (Mr. Medina describing the adverse reaction).) When Nurse Gardner reported on June 14 that Mr. Medina had had an adverse reaction to the Lamictal — his vitals were 128/88, he was profusely sweating, and was experiencing heightened anxiety — Dr. Dinello wrote back, "You do realize that his response is overly dramatic and DOES NOT routinely happen after such a small dose of Lamictal. Well played by Mr. Medina . . . well played indeed." (Exhibit 47 to Agnew Decl. ("Agnew Decl. Ex. 47") [dkt. no. 295-47], at 1; Sept. 17, 2018 Tr. at 172:13-21.) When asked what he meant by "well played," Dr. Dinello testified that "[his] initial

---

[14] On a June 13 call from Plaintiff's counsel to Defendant's counsel, Ms. Agnew was assured that Mr. Medina's medication was not being changed. (Agnew Decl. at ¶ 50.) When Ms. Agnew wrote on June 14 about Mr. Medina's reaction to Lamictal, counsel said he would look into it. (Agnew Decl. at ¶ 34; see Exhibit 34 to Agnew Decl. [dkt. no. 295-34].)

impression of Mr. Medina was that a lot of his behavior was drug-seeking in nature, and [his] concern was to avoid medications that could make that behavior worse." (Sept. 17, 2018 Tr. at 172:23-25.)

Nurse Gardner responded: "Not so sure, it's hard to fake the sweat that was pouring off of him – he was in class when he reacted." (Agnew Decl. Ex. 47; Sept. 17, 2018 Tr. at 173:3-6.) Dr. Dinello's "well played" remark typifies his adversarial attitude toward Mr. Medina and demonstrates the willfulness of his failure to treat Mr. Medina's pain effectively.

Dr. Dinello discontinued Lamictal without putting an adverse reaction alert in Mr. Medina's medical chart. (Medina Decl. at ¶ 19; Sept. 17, 2018 Tr. at 173:15-22.)

As yet another example of Dr. Dinello's practice of merely "considering" medication but not prescribing it, Dr. Dinello examined Mr. Medina on June 19, 2017, and noted, "[Patient] reluctant to consider Tramadol. . . . MWAP approved 6/16/17. Consider Gabapentin. All other agents have not worked." (Agnew Decl. Ex. 50 (emphasis added).)[15] Accordingly, Mr. Medina's

---

[15] At his deposition, Dr. Dinello suggested – unpersuasively – that his note that other agents had not worked was misguided. He ultimately agreed that "definitely a few of the medications have been used and have been attempted and did not work. A good portion of them. . . ." (Agnew Reply Decl. Ex. 200, at 115:23-117:2.)

Tramadol (for his headaches) was discontinued on June 25, and Gabapentin (for the neuropathy in his arms) was commenced on June 24. (Meds Spreadsheet at 10.)

On or about June 16, when Dr. Dinello submitted the MWAP form for Mr. Medina's Tramadol prescription, he answered "Yes" to the question "Is there evidence of recent drug abuse or diversion?" Under the "Reviewer Comments" section, Dr. Dinello wrote, "Court Ordered until Successful Alternative Treatment is Found." The forms are filed under seal. (Exhibit 49 to Agnew Decl. [dkt. no. 295-49].) But on the June 24 MWAP for Gabapentin, Dr. Dinello answered "No" to the same question about drug-seeking behavior. (Exhibit 54 to Agnew Decl. [dkt. no. 295-54].) As noted in the Meds Spreadsheet and above, though, Mr. Medina only received Tramadol through June 24. (Meds Spreadsheet at 10.)

After a call with the Court, Dr. Dinello met with Mr. Medina on June 24, 2017, and they agreed to explore a course of treatment that included discontinuing Tramadol, prescribing Toradol, re-prescribing Gabapentin, and discontinuing Mr. Medina's programming so he was not exposed to overhead lights. They also agreed that Dr. Dinello would issue Mr. Medina a permit for double mattresses to help alleviate back pain at night. (Medina Decl. at ¶ 21; Exhibit 53 to Agnew Decl. [dkt.

no. 295-53]; Exhibit 58 to Agnew Decl. [dkt. no. 295-58]; Sept. 17, 2018 Tr. at 97:9-98:16.)

Mr. Medina testified credibly that on July 14, 2017, he told Dr. Dinello that the Toradol was working well for his back and neck pain but did not say it was working for his headaches. (Sept. 17, 2018 Tr. at 98:21-99:11.) In Dr. Dinello's notes of their visit that day, however, after an entry spanning two boxes on the form, followed by Dr. Dinello's signature, there is another entry that says "[Patient] states Toradol is working well for [headache] and neck/back pain." (Exhibit 57 to Agnew Decl. ("Agnew Decl. Ex. 57") [dkt. no. 295-57], at 1; Sept. 17, 2018 Tr. at 98:25-99:5.) When asked at the hearing if he added that entry after the visit with Mr. Medina was over, Dr. Dinello initially quibbled, then testified that he "ha[d] no idea." (Sept. 17, 2018 Tr. at 177:9-179:2.)[16] The doctor's evasive

---

[16]
    Q. Now, Mr. Medina has testified that he told you Toradol was working well for a lot of his spinal issues and he did not say it was working well for his headaches and -- he didn't say it was working well for his headaches. Did you hear that testimony [about] Toradol?
    A. That is incorrect. He said it worked for his headaches as well as his neck and back pain.
    Q. Do you recall telling me -- testifying at the deposition that you sign at the end of every meeting with a prisoner?
    A. No, I do not.
    Q. In your charts?
    A. I sign it -- I signed a note, yes. I don't know
(continued)

(continued)

exactly where --

Q.   Your AHR entries, you sign at the end of AHR
entry?

A.   After each one, yes.

Q.   Yes. So can you tell me why, with these two
entries on July 14th memorializing your meeting with
Mr. Medina, we have one complete entry that goes over
two boxes, then we have your signature, then we have
another entry that says, "Patient states Toradol is
working well for headache and neck/back pain," and
it's after the other entry? Did you go back and add
that entry after your visit with Mr. Medina was over?

A.   On the 14th?

Q.   Yes, sir.

A.   It was the same day.

Q.   That wasn't my question. My question was: Did you
add that entry at the bottom after your meeting with
Mr. Medina was over?

A.   I wrote the whole note after it was over with him.

Q.   Really? Because we have videotape of that meeting.

A.   I usually write my notes -- I don't usually -- if
I see them in the exam room, I will write it as we go,
but if I will see them at cell site, I will not.

Q.   You were in the exam room, just --

A.   Then I probably wrote it in the AHR as I was
talking to him.

Q.   So is it safe to say that you added, then, that
last entry, "Patient states Toradol is working well
for headaches and neck/back pain" after your visit
with Mr. Medina was over?

A.   I have no idea.

Q.   Did you actually check to see how many times Mr.
Medina had taken the Toradol that you say was working
so well for him?

A.   Yes.

Q.   How many times had he taken it?

A.   I don't know the specific number but -- I have no
specific idea, specific memory, but he definitely was
taking it.

Q.   So why won't you look at 57-A. That's his medical
administration chart for that month. Can you tell me
how many times he had taken Toradol?

A.   Let's see here. That was canceled. He took it
three times -- three times, in this MAR.

(continued)

attitude and demeanor during the exchange (searching for answers, shifting explanations), and the fact that Mr. Medina had taken only two doses of Toradol in the six days before the visit, (Sept. 17, 2018 Tr. at 179:3-20; Pl. Ex. 57-A), persuade the Court that Mr. Medina did not say that the Toradol was working for his headaches and that Dr. Dinello added that comment to the chart without foundation as an afterthought and then lied about it on the stand, (see Agnew Decl. at ¶ 63; Agnew Decl. Ex. 57, at 1).

In any event, Mr. Medina quickly developed blood in his stool, an adverse reaction to the Toradol. (Medina Decl. at ¶ 22; Exhibit 59 to Agnew Decl. ("Agnew Decl. Ex. 59") [dkt. no. 295-59]; Exhibit 60 to Agnew Decl. ("Agnew Decl. Ex. 60") [dkt. no. 295-60].) That adverse reaction was confirmed by Nurse Salotti. (Agnew Decl. Ex. 59.) The Toradol was discontinued on July 18, 2017. (Medina Decl. at ¶ 23; Meds Spreadsheet at 12.)

---

(continued)
Q. Isn't it true that third time was on the evening of July 14th, so that would have been after your meeting?
A. Yes, he took it twice on the 8th as well.
Q. So Mr. Medina took Toradol twice six days before your meeting and then told you it's working for his headaches?
A. Yes.
Q. Okay.

(Sept. 17, 2018 Tr. at 177:13-179:20 (emphasis added).)

On July 18, Mr. Medina filed a Reasonable Accommodation request for a deviation from the new MWAP policy so that his eye pain and headaches could be effectively treated with Tramadol. The request was denied by Dr. Koenigsmann. (Exhibit 10 to Medina Decl. [dkt. no. 293-10]; Exhibit 62 to Agnew Decl. ("Agnew Decl. Ex. 62") [dkt. no. 295-62].) Thus, Dr. Koenigsmann willfully denied Mr. Medina effective pain medication.

On August 9, 2017, Dr. Dyskin performed the cubital and carpal releases on Mr. Medina's right arm. (Dyskin Decl. at ¶ 16; Exhibit 9 to Dyskin Decl. [dkt. no. 286-9]; Sept. 17, 2018 Tr. at 61:2-16.) Again, Dr. Dyskin prescribed Gabapentin for post-surgical neuropathic pain relief. (Dyskin Decl. at ¶ 17; Exhibit 10 to Dyskin Decl. [dkt. no. 286-10].) Despite this recommendation and the pleas from Mr. Medina that he still suffered from neuropathy in his right arm, Dr. Dinello started actively weaning Mr. Medina from Gabapentin, contrary to the surgeon's recommendation. (Agnew Decl. at ¶¶ 71-73; Exhibit 65 to Agnew Decl. ("Agnew Decl. Ex. 65") [dkt. no. 295-65]; Exhibit 66 to Agnew Decl. [dkt. no. 295-66]; Exhibit 67 to Agnew Decl. [dkt. no. 295-67]; Medina Decl. at ¶ 27; Sept. 17, 2018 Tr. at 61:14-62:9, 64:16-25, 122:24-123:7; Dyskin Decl. at ¶ 17; see also Sept. 18, 2018 Tr. at 210:19-216:4 (Dr. Dinello testifying about whether Mr. Medina complained of pain following the

surgery and his treatment of Mr. Medina); id. at 250:11-251:10

(same).)[17] Dr. Dinello wrote: "Following surgery, I temporarily

discontinued Plaintiff's prescription for [Gabapentin] pending

an anticipated EMG. It was my understanding that [Gabapentin],

by potentially masking pain, could prevent a conclusive finding

as to whether the surgery had been successful." (Dinello Decl.

at ¶ 32; see also Sept. 17, 2018 Tr. at 64:12-14.)[18] By weaning

Mr. Medina off Gabapentin after surgery, contrary to the

surgeon's prescription, Dr. Dinello willfully denied Mr. Medina

effective pain medication.

The EMG was not performed until November 14, 2017 - some

two months later. When confronted with studies that

contradicted his unsupported belief that Gabapentin could

interfere with the results of an EMG, Dr. Dinello replied that

"[he was] not convinced of the studies" but failed to offer any

scientific basis for this disbelief. (Agnew Reply Decl. Ex.

200, at 129:10-25.) Instead, Dr. Dinello said that he once saw

"one abstract" that he did not "know if [he] would agree with"

---

[17] Even the weaning was not consistent. Mr. Medina's doses of
Gabapentin varied almost randomly (e.g., Mr. Medina took
Gabapentin 600mg three times per day until August 28, when the
dose went to twice a day, then back up to three times per day on
September 8, to twice a day on September 30, etc.), until it was
discontinued on October 23. (Meds Spreadsheet at 13-18.)
[18] In an October 18 email, Dr. Wolf reported that "[Medina]
stated he reviewed with a neurology person that [Gabapentin]
does not need to be stopped to do an EMG." (Exhibit 93 to Agnew
Decl. ("Agnew Decl. Ex. 93") [dkt. no. 295-94].)

about Gabapentin affecting EMGs but that he "c[ouldn't]
reproduce and [didn't] remember where [he] saw it" and did not
"print it or save it." (Id.)  This apparently unremarkable
abstract was the only basis offered for Dr. Dinello's rather
remarkable decision to disregard the surgeon's advice because he
wanted Mr. Medina "off all medications that could even have a
hint of a possibility of influence." (Id. at 130:9-19.)  A
half-remembered abstract was enough for Dr. Dinello to make his
decision, perhaps because he was "not necessarily worried about
how [Mr. Medina] feels." (Id.)

Again, based on a post hoc and unsupported disbelief of the
studies, Dr. Dinello willfully denied Mr. Medina effective pain
medication – this time, contrary to the surgeon's advice.  To
recap, it was now late August of 2017, Mr. Medina had no
effective medication for his eye pain and headaches,[19] and Dr.

---

[19] Mr. Medina continued to grieve the lack of effective pain
medication:

> On June 24, 2017, Dr. Di[n]ello and I entered
> into a written contract whereby, in lieu of
> [Tramadol], for a 21 day trial period, Toradol would
> be prescribed.  On July 18, 2017, the Toradol was
> discontinued due to adverse reaction.  No other pain
> medication has been prescribed. . . .  Moreover, the
> Toradol is not an effective substitute for [Tramadol]
> because it cannot be taken for more than 5 consecutive
> days. . . .
>     . . . .
>     [O]n or about July 7, 2017, Dr. Di[n]ello and I
> entered into [a] verbal agreement, whereby, I would be
> housed in the infirmary until my transfer (continued)

Dinello was actively weaning the Gabapentin used to treat Mr. Medina's neuropathic pain. (Medina Decl. at ¶¶ 26-27.) Mr. Medina was still complaining of pain to nurses and Dr. Dinello. (E.g., Exhibit 64 to Agnew Decl. [dkt. no. 295-64]; Agnew Decl. Ex. 65.)

In anticipation of Mr. Medina's transfer to Wende in September, Dr. Dinello wrote to the medical staff there acknowledging, among his other health issues, Mr. Medina's "[s]ignificant photophobia causing frontal lobe headaches," but he also suggested that because Mr. Medina had not requested the Toradol – which caused blood in his stool – he was not in pain. (Exhibit 72 to Agnew Decl. [dkt. no. 295-72].) This is not the reaction of a physician diligently attempting to comply with a court order.

On September 18, Dr. Levitt wrote:

I/M returned to Wende late last week, on [Gabapentin] 600mg tid. As you may recall he has a court order for [Tramadol] "or an alternative", which the previous facility (5 Points) interpreted as [Gabapentin].

_____

(continued) as a means to reduce my exposure to light and thus reduce my pain. Nevertheless, on August 30, 2017, Dr. Di[n]ello once again breached this contract by discharging me from the infirmary. On August 31, 2017, I was returned to the RMHU [Regional Mental Health Unit].

(Exhibit 12 to Medina Decl. [dkt. no. 293-12], at 2-3, 6-7; see generally Sept. 17, 2018 Tr. at 120:25-121:1 (explaining RMHU stands for Regional Mental Health Unit).)

> Unfortunately, his chart is missing so I have filled
> out the MWRAP (or whatever) as best I can, however
> time is running out and if he doesn't get the
> [Gabapentin] we will be in violation of the court
> order. I say "we", including me, you, Dinello,
> Koenigsman[n], Neal, etc. etc.

(Exhibit 75 to Agnew Decl. ("Agnew Decl. Ex. 75") [dkt. no. 295-75].)

Dr. Levitt was prescient. Dr. Paula Bozer replied: "Re. court order, the court's comment 'or an alternative,' is, as you said, up to interpretation. I will support you if this is your clinical decision and interpretation of the court order. I would have interpreted it differently." (Exhibit 76 to Agnew Decl. ("Agnew Decl. Ex. 76") [dkt. no. 295-76].) This is another example of senior DOCCS medical personnel discouraging pain treatment that had been effective for Mr. Medina.

On September 22, Mr. Medina wrote to Dr. Levitt stating that he was experiencing eye and back pain, and "[w]hen [he] complain[s] to the nurses Tylenol and Motrin is offered, neither of which is effective. . . . Please rescribe [sic] the [Tramadol]." (Exhibit 13 to Medina Decl. [dkt. no. 293-13].) He also wrote to Deputy Superintendent of Health for Wende Correctional Facility, Robin Neal, stating the same. (See Exhibit 14 to Medina Decl. [dkt. no. 293-14].)

Mr. Medina wrote Dr. Levitt again on September 27, stating that he was "constantly exposed to light," was not receiving

medication to relieve his pain, and asking for "[Tramadol] at 100mgs." (Exhibit 15 to Medina Decl. [dkt. no. 293-15].) He states that "Dr. Levitt told [him] she could not prescribe [Tramadol] because of 'notes' in [his] file. She prescribed [him] Lamictal to which [he had] had a bad reaction." (Medina Decl. at ¶ 34.) In addition to Lamictal, Dr. Levitt prescribed Esgic, and she continued weaning him from the Gabapentin. (Medina Decl. at ¶¶ 35-36; Exhibit 80 to Agnew Decl. ("Agnew Decl. Ex. 80") [dkt. no. 295-81], at 3.) Dr. Levitt also refused Mr. Medina a program waiver to keep him out of bright lights, a decision Mr. Medina grieved. (Medina Decl. at ¶¶ 37-38; Exhibit 17 to Medina Decl. ("Medina Decl. Ex. 17"), dated June 21, 2018 [dkt. no. 293-17].)

Mr. Medina testified that "Esgic is for migraine headaches," (Sept. 17, 2018 Tr. at 65:4-6), a fact confirmed by Dr. Wolf, (Medina Decl. at ¶ 43; Exhibit 92 to Agnew Decl. ("Agnew Decl. Ex. 92") [dkt. no. 295-93]; Exhibit 93 to Agnew Decl. ("Agnew Decl. Ex. 93") [dkt. no. 295-94]; Sept. 17, 2018 Tr. at 109:11-14). He then went on to say that he explained to Drs. Wolf, Dinello, and Levitt that his eye pain was not being treated:

> Not only that, like I keep on explaining this to all
> the doctors -- Dr. Wolf, Dr. Dinello, Dr. Levitt --
> although they prescribe me stuff, let's say, something
> a medication might help with the headache, they

totally leave out my eye pain. So, okay, you're
helping me with the headache, but you're not helping
me with my eye pain. And that was all -- that
particular dilemma was always there, and I explained
that, and nobody ever dealt with it.

(Sept. 17, 2018 Tr. at 65:7-14.) There can be no doubt that

DOCCS medical personnel were well aware of Mr. Medina's eye

pain.

Mr. Medina repeatedly refused to take the Lamictal due to

his history of adverse reactions. (E.g., Medina Decl. at ¶ 39;

Exhibit 81 to Agnew Decl. [dkt. no. 295-82]; Exhibit 83 to Agnew

Decl. [dkt. no. 295-84]; Exhibit 87 to Agnew Decl. [dkt. no.

295-88].) He testified:

> Q. Do you recall, right before this court appearance
> in late September, that Dr. Levitt also represcribed
> [sic] the Lamictal?
>
> A. Yes.
>
> Q. What did you do when she represcribed [sic] the
> Lamictal?
>
> A. Lamictal? I don't -- Lamictal, I think informed
> -- oh, excuse me all this. I informed her that I was
> on it, and I had a bad experience to it, and I wrote
> her that. I even put that in, I believe, a formal
> grievance. And it seems like people were kind of too
> lazy to go and confirm what I was telling them.
>
> Q. Did you take the Lamictal?
>
> A. Not at all, no.

(Sept. 17, 2018 Tr. at 66:14-25.)

In his September 30 grievance, Mr. Medina stated,

> On september [sic] 27, 2017, I met with Dr. Levitt. I
> reiterated my ailments. Dr. Levitt was obdurate about

not prescribing [Tramadol] due to notations in my
medical file from a Dr. Dinello at Five Points C.F.
In liue [sic] of [Tramadol], Dr. Levitt prescribed
Lymictal (phonetic spelling) [Lamictal], a medication
previously prescribed and which caused an adversed
[sic] reaction.  This was just recently at Five
Points.  I informed Dr. Levitt about the negative
experience therewith.  Dr. Levitt, instead of
searching my medical file for confirmation or erring
on the side of caution by believing me, prescribed
Lymictal anyway.

(Exhibit 16 to Medina Decl. ("Medina Decl. Ex. 16") [dkt. no.

293-16], at 5 (emphasis omitted).)

Dr. Levitt initially responded to Mr. Medina's grievances

about the Lamictal that she did not see an allergy in his AHR

but later found an entry which indicated a bad reaction.

(Exhibit 88 to Agnew Decl. ("Agnew Decl. Ex. 88") [dkt. no. 295-

89].)[20]  Even after Plaintiff's counsel reached out to

Defendants' counsel on October 6, 2017, about this prescription,

it took until October 23 and the intervention of an

administrator at Sullivan to get the Lamictal discontinued.

(Meds Spreadsheet at 16-18; see Medina Decl. at ¶¶ 39-42 ("I

repeatedly refused Lamictal as there was no way I wanted to risk

another reaction.  I told anyone I could that I could not take

Lamictal. . . . Finally, on October 16, an administrator

---

[20] At the same time, Dr. Levitt acknowledged "it was apparent, in
[her] judgement, that [Medina] had two separate types of pain,
which required two differently acting medications. . . ."
(Agnew Decl. Ex. 88.)  Dr. Levitt's opinion is consistent with
the testimony of Plaintiff's expert, Dr. Carinci.  (See Sept.
18, 2018 Tr. at 266:5-269:5.)

intervened and the Lamictal was finally discontinued. It took
almost a full month for anyone to stop the Lamictal
prescription."); Exhibit 86 to Agnew Decl. ("Agnew Decl. Ex.
86") [dkt. no. 295-87]; Exhibit 90 to Agnew Decl. [dkt. no. 295-
91]; Agnew Decl. Ex. 92; see also Exhibit 82 to Agnew Decl.
("Agnew Decl. Ex. 82") [dkt. no. 295-83]; Exhibit 85 to Agnew
Decl. ("Agnew Decl. Ex. 85") [dkt. no. 295-86].) Dr. Levitt
willfully denied Mr. Medina effective pain medication.[21]

Mr. Medina continued to complain about right arm pain,
(Exhibit 101 to Agnew Decl. ("Agnew Decl. Ex. 101") [dkt. no.
295-102]), and grieved Deputy Superintendent Gabel's rescinding
the waiver from programming granted by Dr. Dinello to prevent
headaches from light exposure, (Medina Decl. Ex. 17, at 5-7;
Exhibit 22 to Medina Decl. ("Medina Decl. Ex. 22") [dkt. no.
293-22], at 4-7). Those grievances were denied. (Medina Decl.
Ex. 17, at 8-10; Medina Decl. Ex. 22, at 2.)

On October 23, 2017, when corresponding with Dr. Wolf and
Dr. Susan Mueller about Mr. Medina, Dr. Koenigsmann wrote: "I am
not familiar with his eye condition being associated with pain.
We need input from ophthalmology regarding pain associated with
keratoconus or resultant headaches from the condition," and Dr.

---

[21] In her September 28 notes, Dr. Levitt acknowledged Mr.
Medina's "chronic headaches and light exposure." (Agnew Decl.
Ex. 80, at 2.)

Mueller wrote back to say that "[t]he usual, if any, complaint is itching, which, if present, is matched with antihistamine, gtts [drops]." (Sept. 18, 2018 Tr. at 193:5-19 (quoting Pl. Ex. 214).) The record contains no complaints of eye itching by Mr. Medina. Dr. Koenigsmann admitted that he never followed up to see if that was what the ophthalmologist actually said or to request ophthalmology records. (Sept. 18, 2018 Tr. at 194:1-7.)

At the end of October, Mr. Medina was transferred to Sullivan Correctional Facility. (Medina Decl. at ¶ 41.) He testified that at that time, he was not being treated for his neuropathy, (Sept. 17, 2018 Tr. at 68:5-9), and that he requested "[Gabapentin] or Lyrica for the neuropathy" and Tramadol for an upcoming court appearance, (Sept. 17, 2018 Tr. at 68:10-16).

Mr. Medina met with Dr. Wolf, who discontinued the Esgic because it was for "migraine headaches," and on October 18, she finally submitted a MWAP request to prescribe Tramadol. (Medina Decl. at ¶ 43; Agnew Decl. Exs. 92-93; Exhibit 94 to Agnew Decl. ("Agnew Decl. Ex. 94") [dkt. no. 293-95].)[22] She refused to

_____

[22] In the MWAP, Dr. Wolf noted that Medina "ha[d] been on multiple meds the last 2-3 years with relief only with [Tramadol]. [H]e had [M]obic-states caused significant gastritis.[ W]as on [P]ercocet for a short time.[ H]as had [C]ymbalta for pain – did not help.[ R]ecently tried on [L]amictal but had significant side effect with 1st (continued)

reinstate his Gabapentin prescription, despite the fact that the EMG, necessary to "justify" his neuropathic pain, had still not occurred. (Exhibit 91 to Agnew Decl. [dkt. no. 295-92]; Agnew Decl. Ex. 93.)[23]

When RMD Dr. Mueller did not respond to the MWAP request on October 22, 2017, Dr. Gusman told Dr. Wolf that he had submitted an MWAP for a five-day emergency supply of Tramadol because "the patient [Mr. Medina] said he was having pain." (Sept. 17, 2018 Tr. at 132:13-133:7; Pl. Ex. 178.)[24] Dr. Mueller left a message for Dr. Wolf saying that she, Dr. Mueller, did not feel that Tramadol was a good choice because Mr. Medina's problem was chronic, he had a history of addiction, and had a urinalysis test positive. But Dr. Wolf admitted that she did not know the dirty urine charge had been expunged or that Mr. Medina had not had any positive urine results in over twenty-two years of incarceration. Dr. Wolf testified that she did not have access to that information – only RMDs and the Chief Medical Officer

---

(continued) dose[]offered." (Agnew Decl. Ex. 94; Exhibit 177 to Agnew Reply Decl. [dkt. no. 356-16].)
[23] During this same period, Mr. Medina wrote a "letter to Deputy Superintendent Edward Burnett outlining difficulties with obtaining [his] medication due to it being unavailable and Dr. Wolf failing to write a prescription for it." (Medina Decl. at ¶ 44; Exhibit 19 to Medina Decl. [dkt. no. 293-19.)
[24] Tramadol is prescribed for Mr. Medina's eye pain and headaches. (Sept. 17, 2018 Tr. at 153:1-2.)

did. (Sept. 17, 2018 Tr. at 151:16-152:13.)[25]  The MWAP was

denied by Dr. Koenigsmann because "[a]fter lengthy consultation

[with] Dr. Wolf, [they had] agreed that there are several better

treatment alternatives available for this patient." (Exhibit 99

to Agnew Decl. [dkt. no. 295-100], at 8.)

At that time, Dr. Mueller told Dr. Wolf to consult the

"current approach to neuropathic pain handout." (Sept. 17, 2018

Tr. at 152:14-25.)  Upon being asked at the hearing where the

---

25

     Q.  Tell me you and Dr. Gu[s]man put in this MWAP for
     [Tramadol] and then what happens? How do you hear from
     Dr. Mueller?
     A.  She left a message for me to contact her that
     morning which I did. And she expressed that she did
     not feel that [Tramadol] would be a good choice for
     this patient because it being a chronic problem and
     she expressed to me that he has a history of addiction
     and positive urines.
     Q.  Positive urines, plural?
     A.  "Urine".
     Q.  And did she tell you that the positive urine was
     overturned and expunged?
     A.  No.
     Q.  Did anyone ever tell you that positive urine was
     overturned and expunged?
     A.  I'm not sure if Mr. Medina ever mentioned it to me
     but if -- and I'm not sure but nobody else did.
     Q.  Were you aware that Mr. Medina had in fact not had
     -- scratch that.
          In 2014 he did have a charge for having a pill
     out of place in his cell. Other than that were you
     aware he had never had a positive urine test in the 22
     years he'd been in prison?
     A.  I normally don't have access to that information.
     The RMDs and the chief medical officer do.

(Sept. 17, 2018 Tr. at 151:16-152:13.)

document refers to pain management for eye pain and headaches, Dr. Wolf gave yet another two-page evasive answer before admitting that the document does not cover that topic. (Sept. 17, 2018 Tr. at 152:14-154:21.)[26]

---

26

    Q.  OK. So did Dr. Mueller -- am I pronouncing that correctly? id she tell you at that time to consult with the current approach to neuropathic pain?
    A.  I'm sorry. Repeat that.
    Q.  Did she tell you to consult with the current approach to neuropathic pain handout at that time?
    A.  Yes.
    Q.  OK. Can I just direct your attention to that document. It is in binder two at 159.
    A.  All right.
    Q.  Did you in fact consult with that document?
    A.  Yes.
    Q.  <u>And just to refresh your memory, right now we're talking about [Tramadol] for Mr. Medina's eye pain and headaches. Can you please tell me how this document directs pain management for eye pain and headaches?</u>
    A.  You'll have to give me a moment to review it.
    Q.  By all means.
      (Pause)
    A.  All right. What was your question please?
    Q.  How does this document guide your treatment of eye pain and headaches?
    A.  This document is discussing a neuropathic pain and how to evaluate for the neuropathic pain and for treatment options.
    Q.  OK. I am not a doctor. So as I flip through this document I see a lot of schematics of nerve passageways in the body, arms, legs, tushies, hands. I don't see anything about eyes or heads or headaches?
    A.  This is actually a secondary document. The primary document to treating neuropathic pain that I reviewed is much shorter. I don't know if you have a copy of that.
      THE COURT: Well, we're all in favor of shorter but I think the question counsel asked you was, how does this document guide your treatment of eye pain
(continued)

Dr. Wolf also conceded that she was aware from Mr. Medina's medical records of the "many, many times he had been on [Tramadol] for lengthy periods of time" and that "his pain had been effectively controlled on [Tramadol] during those periods of time." (Sept. 18, 2018 Tr. at 159:25-160:13.) When asked why Mr. Medina would not be put back on the medication that had worked, Dr. Wolf testified that it was "[b]ecause of the side effects including death." She also testified that she relied on

_____

(continued)
and headaches?
A.   It recommends that if, to evaluate if somebody has something central to do an MRI --
     THE COURT:  Where is that? Where? Where in the document?
     THE WITNESS:   Diagnosis number two.
     THE COURT:   If the presentation is convincing for neuropathic pain the evidence of the diagnosis is then obtained with the next step which is a committed neurological exam. There's nothing else in this document about that, right?
     THE WITNESS:   Well, if there's diagrams --
     THE COURT:   Right.
     THE WITNESS:   -- are to go over, to go over different parts of the exam and its mostly discussing nerves as they come out from the spinal cord.
     THE COURT:   The question is, how does it guide your treatment of eye pain and headaches?
A.   It says --
     THE COURT:   Show me.
     THE WITNESS:   In that same section it describes what should be done to evaluate eye pain -- excuse me -- to evaluate neuropathic pain.
     THE COURT:   OK. Where does it say "eyes or headaches" anywhere in the document?
     THE WITNESS:   No, it does not state that.

(Sept. 17, 2018 Tr. at 152:14-154:21 (emphasis added).)

Mr. Medina's supposed "history of substance abuse" but conceded

that "all of the medical problem lists entries dealing with

diversion, cheeking, dirty urinalysis were" "most likely" added

after he filed his lawsuit.  (Sept. 17, 2018 Tr. at 159:25-

162:9.)[27]  Mr. Medina was not given Tramadol.  (Exhibit 20 to

---

27

    Q.  Dr. Wolf, at the time you were treating Mr. Medina
in October of 2017, had you reviewed his medical
records personally?
    A.  I had reviewed his records within the previous
year.
    Q.  OK. Did you look at the SIPS to see what
medications he had taken in the past?
    A.  Yes.
    Q.  Did you see the many, many times he had been on
[Tramadol] for lengthy periods of time?
    A.  Yes.
    Q.  And didn't Mr. Medina tell you his pain had been
effectively controlled on [Tramadol] during those
periods of time?
    A.  I'm sorry. I need to look at my note to be sure of
what he had said. He did say that it was effective.
    Q.  So I'm just curious if Mr. Medina had been having
these addiction issues in the past, why do you think
he would have been put on [Tramadol] over and over and
over again for very long lengths of time?
    A.  Well, some of his use of [Tramadol] at least until
2014 or 2015 [Tramadol] was an accepted pain
medication with very little side effects, with
potential side effects. In 2014/2015 it came out and
Pharmacopeia started to do black box warnings about
the addictive side effects and especially cravings of
[Tramadol] in particular besides for other opioids
that were being used widely in the general public and
it was used much less.
    Q.  OK. But specific to Mr. Medina, he had a
medication that he'd used in the past successfully.
We've already established that you understood that the
order meant he was to get [Tramadol] or an equally
effective medication. So you tried some different
(continued)

Medina Decl. [dkt. no. 293-20]; Exhibit 21 to Medina Decl. [dkt. no. 293-21]; Exhibit 100 to Agnew Decl. [dkt. no. 295-101]; Sept. 17, 2018 Tr. at 69:24-25.)

---

(continued)
medications and they didn't work. I'm still at a loss and I'd like to you explain why we couldn't put him back on the thing that had worked.
A. Because of the side effects including death and that I felt at the time I did express that to Dr. Mueller. And I have to say when it came to his problem list I had not scrutinized that there was a history of substance abuse.
Q. When did you finally look at his problem list?
A. I usually look at it when somebody first comes in to get an idea. My note from October 18th is very long. Mr. Medina and I discussed multiple issues and when I wrote my MWAP request it had that was not my the first thing on my mind when I requested the [Tramadol].
Q. Do you know when this lawsuit was filed, Dr. Wolf?
A. Which? The initial?
Q. Yeah. This lawsuit Mr. Medina v. Lutheran DOCCS was filed?
A. I don't recall.
Q. It was filed -- I am going to tell you -- in 2015, middle of the year. And what I'm going to show you is the medical problem list from December of 2015 which would have been a couple of months after this lawsuit was filed?
    MR. SCHULZE: What are you showing the witness?
    MS. AGNEW: It's Exhibit 157.
Q. That medical problem list was generated in November 2017 and I'd like you to tell me whether on this medical problem list are Mr. Medina's addiction issues.
A. I don't see that on here.
Q. Were you aware that all of the medical problem lists entries dealing with diversion, cheeking, dirty urinalysis were all added after Mr. Medina filed this lawsuit?
A. Most likely.

(Sept. 17, 2018 Tr. at 159:25-162:9 (emphasis added).)

52

Dr. Wolf willfully interfered with Mr. Medina's effective pain treatment, relying on general side-effects without considering his medical history. Also, because no contrary evidence was submitted, Dr. Wolf's testimony that the medical problem list entries dealing with diversion, cheeking, and dirty urinalysis were "most likely" added after this action was filed, that testimony is undisputed. From that testimony, the Court infers that DOCCS medical personnel deliberately and willfully attempted to interfere with Mr. Medina's effective pain treatment by adding problem list entries to Mr. Medina's records in retaliation for his filing a lawsuit.

Instead of Tramadol, Dr. Wolf prescribed Topamax, yet another medication to which Mr. Medina has a history of adverse reaction. (Agnew Decl. Ex. 101; Medina Decl. at ¶ 49; Sept. 17, 2018 Tr. at 70:1-25.) Again, with knowledge of Mr. Medina's pain, DOCCS medical personnel willfully failed to prescribe effective pain medication for Mr. Medina and instead continued their practice of prescribing medications that he had already had adverse reactions to.[28] As set out on the Meds Spreadsheet at 18-20, between October 23 and December 9, Mr. Medina was not

---

[28] Also during this time period, Mr. Medina filed a grievance "because [he] was without pain medication. [His] pain treatment plan was overruled due to the new medication policy, and [his] individual history and medical records were never reviewed or considered." (Medina Decl. at ¶ 48; Exhibit 23 to Medina Decl. ("Medina Decl. Ex. 23") [dkt. no. 293-23].)

given Tramadol for his headaches or Gabapentin for his neuropathic arm pain. Instead, he was given only Esgic for migraines, which he did not suffer from, (Sept. 17, 2018 Tr. at 65:4-6; Agnew Decl. Exs. 92-94); Pamelor, which was ineffective, (Sept. 17, 2018 Tr. at 80:23-81:2); Toradol, which he previously had an adverse reaction to, (Medina Decl. at ¶ 22; Agnew Decl. Exs. 59-60); or Topamax, which he also previously had an adverse reaction to, (Agnew Decl. Ex. 101; Medina Decl. at ¶ 49; Sept. 17, 2018 Tr. at 70:1-25). This willful and deliberate violation of the 2017 Order lasted some seven weeks.

On November 19, 2017, Mr. Medina wrote to Dr. Wolf, asking "[w]hy do we not try other forms of treatment that do not include medications," which Dr. Wolf understood referred to physical therapy. (Exhibit 29 to Medina Decl. ("Medina Decl. Ex. 29") [dkt. no. 293-29], at 5; Sept. 17, 2018 Tr. at 142:7-13.) The physical therapist, however, noted that Mr. Medina was reporting tingling, cramping, and numbness and recommended occupational therapy and an EMG. (Sept. 17, 2018 Tr. at 142:25-143:14; Pl. Ex. 130.) In response, the DOCCS nurse practitioner wrote "Case discussed with Dr. Wolf" "Without referral to occupational therapy needed." (Sept. 17, 2018 Tr. at 143:15-20 (quoting Pl. Ex. 130).) When asked if that meant she was not going to send him to physical therapy, Dr. Wolf responded, "That is what it says, but that is not what I indicated" and then went

54

on to imply that she would not send Mr. Medina out to
occupational therapy because he was a flight risk.   (Sept. 17,
2018 Tr. at 143:21-144:15.)[29]  The record does not contain any
reference to Mr. Medina as a flight risk, so to say this about a
blind inmate who had been incarcerated for some two decades is
ludicrous.  This is yet another example of DOCCS medical

---

29

    Q.  And then on that document, you stamped -- and I
believed you did that, or perhaps someone who works
for you -- and checked, "No action is required at this
time"; is that correct?
    A.   That is correct. But next to it, the nurse
practitioner also wrote, "Case discussed with Dr.
Wolf" and then wrote, "Without referral to
occupational therapy needed."
    Q.  Now, doesn't that mean you were not going to send
him to occupational therapy?
    A.   That is what it says, but that was not what I
indicated.
    Q.  What did you indicate?
    A.   I indicated that I wanted the physical therapist
to review this with this physical therapist again
because physical therapy is done in-house and
occupational therapy is done at a local hospital. It
would need to be done two or three days a week for
several days. And when I have gone to the executive
committee meetings we had had, it was presented to me
that we had some patients that had been sent out for
occupational therapy that were high risk for escape
and that had also meant that they had to make
arrangements for van trips to take the inmates several
days a week. It wasn't like going to a specialist once
every two to three months and they had requested that
we treat these, any of these patients in-house if
possible.

(Sept. 17, 2018 Tr. at 143:15-144:15 (emphasis added).)

55

personnel, here Dr. Wolf, willfully denying Mr. Medina effective pain treatment – this time a non-medication treatment.

In early November, Mr. Medina was returned to Wende for a court date in the Western District of New York before the Honorable Francis J. Geraci. Mr. Medina was very concerned that his headaches would interfere with the trial. (Medina Decl. at ¶ 52.) In order to get Mr. Medina effective medication for his headaches, Judge Geraci sent a letter to Superintendent Stewart Eckert of Wende, along with the 2017 Order. (Exhibit 102 to Agnew Decl. ("Agnew Decl. Ex. 102") [dkt. no. 295-103].) In response, Dr. Levitt prescribed Mr. Medina Esgic, which Dr. Wolf had discontinued because it was only for migraines, and Lidoderm patches. (Exhibit 104 to Agnew Decl. [dkt. no. 295-105]; Exhibit 107 to Agnew Decl. [dkt. no. 295-108]; Sept. 17, 2018 Tr. at 72:6-16.) Both Judge Geraci's order and Mr. Medina's insistence on Tramadol for the court appearances were ignored. (Exhibit 105 to Agnew Decl. [dkt. no. 295-106]; Exhibit 106 to Agnew Decl. [dkt. no. 295-107]; see generally Agnew Decl. Ex. 102 (Judge Geraci's order).)[30] Again, Dr. Levitt willfully

---

[30] "For court I was merely given more Esgic, and not [Tramadol] or an alternative that could relieve my headaches once they started. I suffered greatly after several hours on November 6, 2017, and ended up vomiting several times. I was incredibly upset that officers would not take me to the hospital, as I believed I would at least get some real treatment there." (Medina Decl. at ¶ 52.)

denied Mr. Medina effective pain treatment for his court appearance.

Not only did Mr. Medina not get effective pain management for the trial, but when he was faced with disciplinary tickets for banging his head against the van window, (Sept. 17, 2018 Tr. at 102:18-103:6), Doctor Wolf testified in the disciplinary hearing that Mr. Medina only took two Esgic pills and thus could not have had a reaction, (Exhibit 160 to Agnew Decl. [dkt. no. 295-161], at 10-11). However, Dr. Levitt wrote a contemporaneous note that Mr. Medina had "7 pills x 4d" (seven pills for four days), and Mr. Medina testified credibly that he indeed had that quantity and that he took fifteen to sixteen pills. (Exhibit 108 to Agnew Decl. [dkt. no. 295-109]; Sept. 17, 2018 Tr. at 74:7-75:23, 100:22-101:22.) He also testified credibly that the Esgic did not help his pain and that he eventually vomited. (Sept. 17, 2018 Tr. at 76:5-12.) Again, Mr. Medina did not have effective medication for his eye pain and headaches and was very sick in court. (Affirmation of Donald W. O'Brien, Jr., Esq., dated June 21, 2018 [dkt. no. 287], at ¶¶ 7-18.) By Mr. Medina's own admission, the next day he was able to get Tramadol from someone other than a staff member at DOCCS and was able to make it through the day. (Exhibit 161 to Agnew Decl. [dkt. no. 295-162], at 2:20-3:5.)

Back at Sullivan in mid-November, the Toradol, which caused bleeding, was re-prescribed, and Topamax, yet another medication to which Mr. Medina had a history of adverse reaction, was added. (Medina Decl. at ¶¶ 54-55; Exhibit 111 to Agnew Decl. [dkt. no. 295-112]; Exhibit 112 to Agnew Decl. [dkt. no. 295-113]; Exhibit 117 to Agnew Decl. [dkt. no. 295-118]; Meds Spreadsheet at 18-20.) Mr. Medina confirmed that he still suffered neuropathic pain during this period. (Sept. 17, 2018 Tr. at 77:23-25.) Again, DOCCS medical personnel failed to prescribe effective pain medication and continued to prescribe medications that Mr. Medina previously had adverse reactions to.

During this period, Mr. Medina refused ineffective medications (e.g., Esgic) and medications that caused side effects (e.g., Lamictal), (see Meds Spreadsheet at 16-21),[31] and wrote more letters. For example, on November 11, Mr. Medina wrote Deputy Superintendent Williams, informing him that "a nurse tried to give [him] Topamax and Tylenol to combat [his] eye pain and headaches," that "[he] had a negative reaction to Topamax and it was discontinued and the Tylenol [was]

---

[31] (See also Exhibit 113 to Agnew Decl. [dkt. no. 295-114] (medical treatment refusal form indicating Mr. Medina refused Topamax, citing previous adverse reaction); Exhibit 115 to Agnew Decl. [dkt. no. 295-116] (same); Exhibit 116 to Agnew Decl. [dkt. no. 295-117] (provider notes indicating Mr. Medina refused medication); Exhibit 118 to Agnew Decl. ("Agnew Decl. Ex. 118") [dkt. no. 295-119] (same).)

ineffective," and asking to "have [him] put on an effective pain medication and have the doctors stop recycling the medications that have proven ineffective." (Exhibit 26 to Medina Decl. [dkt. no. 293-26].) Mr. Medina also wrote to Dr. Wolf on November 13 informing her that he was still without effective pain relief. (Exhibit 27 to Medina Decl. [dkt. no. 293-27]; see also Medina Decl. Ex. 29.) On a few occasions, Mr. Medina was forced to take Toradol, despite the risk of bleeding, due to his severe pain. (Medina Decl. at ¶ 58; Exhibit 119 to Agnew Decl. [dkt. no. 295-120]; Exhibit 120 to Agnew Decl. [dkt. no. 295-121]; Exhibit 121 to Agnew Decl. [dkt. no. 295-122]; Exhibit 122 to Agnew Decl. [dkt. no. 295-123]; Exhibit 123 to Agnew Decl. [dkt. no. 295-124]; Exhibit 125 to Agnew Decl. [dkt. no. 295-126].) Again, DOCCS medical personnel willfully denied Mr. Medina effective pain medication.

On November 14, 2017, Mr. Medina's follow-up EMG was finally performed. The EMG showed progress on Mr. Medina's right side, but it also demonstrated that Mr. Medina was still suffering neuropathic arm pain. (Exhibit 114 to Agnew Decl. [dkt. no. 295-115]; Medina Decl. at ¶ 57; see Dyskin Decl. at ¶¶ 18-20.) Ms. Arlotti, the technician who conducted the EMG, (Sept. 17, 2018 Tr. at 79:9-15), told Mr. Medina that there was no reason he should not be on neuroanalgesics until the nerves healed, (Medina Decl. at ¶ 57). Dr. Dyskin, the surgeon who

performed Mr. Medina's surgeries, agreed. (Dyskin Decl. at
¶¶ 19-20 ("[I]n my medical judgment there is no reason not to
treat Mr. Medina's residual neurological pain with Gabapentin
until it is fully healed.").) Again, DOCCS medical personnel
willfully refused to prescribe effective pain medications for
Mr. Medina – despite the opinions of outside medical providers.
(Medina Decl. at ¶¶ 59-63; Exhibit 28 to Medina Decl. ("Medina
Decl. Ex. 28") [dkt. no. 293-28]; Medina Decl. Ex. 29; Exhibit
30 to Medina Decl. [dkt. no. 293-30]; Agnew Decl. at ¶¶ 121-132;
Agnew Decl. Exs. 114-117, 119-123; Exhibit 118 to Agnew Decl.
[dkt. no. 293-119]; Exhibit 126 to Agnew Decl. ("Agnew Decl. Ex.
126") [dkt. no. 295-127]; Exhibit 127 to Agnew Decl. [dkt. no.
295-128].)

On November 29, 2017, Dr. Jeffrey Arliss, another
orthopedist, examined Mr. Medina and made the same finding –
that neuroanalgesic medication was appropriate treatment for Mr.
Medina while his nerves continued to heal. (Exhibit 11 to
Dyskin Decl. ("Dyskin Decl. Ex. 11") [dkt. no. 286-11].) Dr.
Arliss wrote, "I do not disagree [with] restarting the
Gabapentin." (Id.; Sept. 17, 2018 Tr. at 145:19-146:7; Pl. Ex.
129.) Indeed, Dr. Dyskin wrote, "I have reviewed the reports
and found that . . . Dr. Arliss . . . believed use of
neuromodulating medications by Mr. Medina while his nerves
healed would be beneficial. . . . I also have no reason to

believe Mr. Medina is malingering about residual neuropathic pain." (Dyskin Decl. at ¶ 20 (citing Dyskin Decl. Ex. 11).) Despite the recommendation of these specialists and Mr. Medina's assertions of pain, Dr. Wolf determined that "no action" was necessary and refused to restart Gabapentin. (Medina Decl. at ¶¶ 63-64; Exhibit 31 to Medina Decl. ("Medina Decl. Ex. 31") [dkt. no. 293-31], at 5-6; Agnew Decl. Ex. 126; Exhibit 129 to Agnew Decl. [dkt. no. 295-130].)

Instead, in response to the specialists' recommendations, Dr. Wolf wrote to her colleagues, indicating that "[she] may have a problem." (Sept. 17, 2018 Tr. at 146:15-147:16 (quoting Pl. Ex. 215).) The problem, she admitted at the hearing, was that she and the RMD did not want Mr. Medina back on Gabapentin. (Sept. 17, 2018 Tr. at 147:17-149:1.)[32] Disregarding

---

[32]

> Q.  Isn't it true, Dr. Wolf, you write:
>      Good afternoon. You are writing Doctors Dinello, Bozer and Mueller and you've CCed Dr. Levitt and also RMD John Hammer and you say:
>      Good afternoon. I may have a problem. Medina was seen by ORD Dr. Arliss today for follow-up on right carpal and ulnar tunnel releases done on 8/2017. He had a recent EMG with improved findings consistent with post release and significant axonal changes, and wrote should do physical therapy and could utilize neuro-modulating pain medication? I saw him yesterday and told him he is to start physical therapy and does not [Gabapentin] at this time as per my exam.
>      Today, Dr. Arliss wrote in his plan: Have therapy. I do not disagree with restarting Gabapentin and follow-up PRIN. I have a call-in to Dr. Arliss (continued)

(continued)

which he will hopefully return to me tomorrow. But any suggestions on how to approach this?

Is that the sum of your e-mail? That's the entire e-mail.

A. What's your question? Did I go write that e-mail? Yes.

Q. What was your problem with Dr. Arliss's notes?

A. I did not and RMD did not feel that he started it back on [Gabapentin] at this time, if possible. And I have two notes that suggest that he can be considered for neuro-modulator.

Q. Aren't those two notes? Weren't those two notes from specialists, the MG specialist and the orthopedist, Dr. Arliss?

A. Yes.

Q. So we've already established he didn't get to start physical therapy. Physical therapist didn't want to do it and you denied the [Gabapentin]; is that correct?

A. He was evaluated for physical therapy and I put in for occupational therapy and I did not restart the [Gabapentin] at that time.

Q. Am I misunderstanding your testimony? I thought you did not put in for occupational therapy and he and I just assumed he might be one of these flight risks?

A. I apologize. I thought I said to you I then put an end to occupational therapy.

Q. That may be correct. What was the denouement of this whole situation? Dr. Arliss and the EMG --

A. I am sorry, what did you say?

THE COURT: How did it end up?

MS. AGNEW: Thank you, your Honor.

A. OK. How did it end up? Go on.

Q. What ended up happening to help Mr. Medina with his neuropathy in his right arm in November?

A. He was given Voltaren. He is put on Lidoderm path. He was on Depakote and he was going to be starting occupational therapy as soon as he was with us for a long enough period of time that it could be accepted and started. Once somebody goes to a different location and they, whatever is requested it put on hold. So that was a problem with getting his physical therapy/occupational therapy started to begin with. That's why it took until November for him to see

(continued)

specialists' recommendations are not the responses of medical personnel diligently trying to obey a court order.

Dr. Wolf admitted that Mr. Medina was the only patient she treated with a federal court order regarding his healthcare, (Sept. 17, 2018 Tr. at 149:2-4), and conceded that the various doctors wrote among themselves about his care, (Sept. 17, 2018 Tr. at 149:5-8). Upon being asked why Mr. Medina's care could not be coordinated, even when he is transferred to a different facility, Dr. Wolf gave an evasive answer which boiled down to DOCCS medical personnel's not wanting to prescribe Gabapentin. (Sept. 17, 2018 Tr. at 149:2-150:20.)[33]  Again, DOCCS medical

---

(continued)
a physical therapist because he was going back and forth for multiple locations.

(Sept. 17, 2018 Tr. at 146:23-149:1 (emphasis added).)

[33]
Q.  Let me ask you how many patients do you have with the federal court order regarding their healthcare?
A.  He is my only one.
Q.  OK. And it is true that you and the other doctors who are taking care of Mr. Medina are writing each other e-mails back and forth about his care; isn't that true?
A.  Yes.
Q.  So why is it that this group of doctors could not coordinate to make sure that when Mr. Medina gets transferred, if he needs something like occupational therapy it's not lined up when he gets to the next place?
A.  It would be helpful to have been given direct information to tell me or whoever the next provider is he should be starting physical therapy.
Q.  And if you knew or another doctor knew that you
(continued)

63

personnel willfully failed to treat Mr. Medina's pain because of the general concerns about addictive drugs without regard to his medical history.

---

(continued)
could not arrange that occupational therapy, why not
give him the medication to deaden his pain until such
a time as he can get that occupational therapy?
A.    I examined Mr. Medina at that point on two or
three occasions. And on each occasion I evaluated his
right arm and along with his left arm and he showed
that he had significant muscle coordination, no
atrophy to the muscle in his left arm. Excuse me --
his right arm -- and was able to move his arm freely
and easily. The [Gabapentin] was a suggestion. The
bigger suggestion to me was the physical therapy. And
we needed to see if the Voltaren gel and the Lidoderm
would be sufficient as the EMG did state that he had
progressed significantly and that physical therapy
will help to bring the rest of his nerves back in line
on his right arm.
        Also, [Gabapentin] has been shown to be used in
inmates or actually the general public as a medication
to use it illicitly to get a high and it also promotes
other illicit medications to get a bigger high. I did
not feel at that point in time that he needed to be on
the [Gabapentin]. I was very careful to evaluate him
in detail each time that I saw him.
        THE COURT:  What's the answer to counsel's
question? You just said the bigger suggestion from the
specialists was PT. We all agree he's not getting PT.
They also suggested [Gabapentin]. Why not
[Gabapentin]?
        THE WITNESS:  Because in DOCCS we try to avoid
using [Gabapentin]. And I wasn't trying to not give
him medications that he would benefit from. I felt I
had other alternatives and that's why I wrote to those
doctors to see if they had other suggestions on what
we could do at that point in time.

(Sept. 17, 2018 Tr. at 149:2-150:20 (emphasis added).)

Finally, with an emergency contempt hearing looming, on December 4, 2017, Dr. Wolf, under the direction of Dr. Koenigsmann, prescribed Gabapentin to address Mr. Medina's neuropathic pain. (Exhibit 132 to Agnew Decl. [dkt. no. 295-133]; Exhibit 133 to Agnew Decl. [dkt. no. 295-134]; Exhibit 134 to Agnew Decl. [dkt. no. 295-135]; Exhibit 135 to Agnew Decl. ("Agnew Decl. Ex. 135") [dkt. no. 295-136].) The MWAP form lists medicines that have failed to treat Mr. Medina's pain management issues., including, but not limited to, Celebrex, Topamax and Lamictal. Dr. Wolf wrote: "[Medina] has been on [L]amictal, [C]ymbalta, [M]obic, [T]rileptal [C]elebrex, [T]opamax, [M]otrin all with non-toerable [sic] side effects or no relief." (Exhibit 180 to Agnew Reply Decl. ("Agnew Reply Decl. Ex. 180") [dkt. no. 356-19].) Dr. Koenigsmann approved the MWAP. (Agnew Decl. Ex. 135, at 2.) At the hearing on September 18, 2017, counsel asked Dr. Koenigsmann what changed his mind to prescribe Gabapentin after he and the RMDs under his supervision refused to do so until that point in time; he answered, "I have no idea." (Sept. 18, 2018 Tr. at 196:4-8.) Dr. Dinello professed himself to be "disappointed" that Gabapentin was re-prescribed.[34] (Exhibit 140 to Agnew Decl.

---

[34] On or about December 27, Dr. Dinello wrote to Dr. Mueller, copying Dr. Wolf and Dr. Bozer:

> Welcome back Susan. I trust you had a terrific Christmas holiday. I've been contacted by (continued)

[dkt. no. 295-141], at 1.) Again, this is not the reaction of a physician diligently trying to comply with a court order.

It was Dr. Dinello's testimony that he intended to wean Mr. Medina off the medication after surgery and that Mr. Medina agreed with that course of treatment. (Sept. 18, 2018 Tr. at 210:1-18.) He also denied that Mr. Medina told him that he was still having pain in his right arm and that he had requested that the Gabapentin be reinstated. (Sept. 18, 2018 Tr. at 210:19-211:5.) In light of the written complaints of pain by Mr. Medina in the record, (e.g., Medina Decl. Exs. 28, 31; Exhibit 33 to Medina Decl. [dkt. no. 293-33]), the Court finds Dr. Dinello's denial to be less than honest.

Dr. Dinello went to see Mr. Medina on January 4, 2018, and while Dr. Dinello agreed to discontinue many of the failed medications, he failed to implement any other changes to Mr. Medina's treatment, even when coaxed by the Court on a call. (Agnew Decl. Ex. 143.) Finally, after that Court call, in a January 22, 2018, email to Dr. Wolf, Dr. Dinello went through

---

(continued) Dr. Wolf, Friedman, and DOCCS' counsel. I'm a little disappointed that the Gabapentin was reinstated, especially since he is receiving Pamelor, Depakote, Lidocaine patches, and Toradol IM PRN. He agreed to coming off the medication once he had the surgery to his left elbow and wrist.

(Sept. 18, 2018 Tr. at 209:14-20 (quoting Pl. Ex. 140) (emphasis added).)

Mr. Medina's ailments and suggested increasing the Gabapentin prescription to the "correct dos[e]" and giving him one to two tablets (50-100mg) of Tramadol when Mr. Medina might be exposed to light for more than two hours. (Agnew Decl. Ex. 145.)

However, these recommended treatments were never implemented — again denying Mr. Medina effective pain medication. Dr. Dinello then wrote: "Since Dr. Koenigsman[n] approved the Gabapentin, I might just be sending him the MWAP request forms." (Sept. 18, 2018 Tr. at 212:11-12 (quoting Pl. Ex. 140).) After struggling at the hearing to find a benign explanation for that email (and denying that he was being petulant in his response), Dr. Dinello then launched into a condescending, patronizing soliloquy about how Mr. Medina was "getting kind of a bad rap."[35] Dr. Dinello's testimony about his concerns for Mr. Medina was not credible.

---

[35]
      Q. So going back to 140, though, don't you say to your colleagues, "Since Dr. Koenigsmann approved the Gabapentin, I might just be sending him the MWAP request forms"? What did you mean by that?
      A. That he could review it, and if he wanted to approve it, that would be fine for him to approve.
      Q. Were you indicating you would not approve it?
      A. Well, he wasn't in my hub at that time, I don't think. He was in Sullivan, so I wouldn't be approving those anyway.
      Q. So when he's at Wende, weren't you approving him?
      A. If Dr. Bozer, the other regional medical director, was away, I would fill in for her. There was some
(continued)

(continued)
discrepancy at that time, after talking to the Court, that they were trying to make me his overall treating physician, and it's very difficult. Dr. Koenigsmann didn't want that to happen. But despite that, I still tried to correlate and coordinate care with my colleagues throughout the entire state, which he's moved around, so he had some type of comprehensive treatment plan. So I may or may not have written for an MWAP out at Wende when Dr. Bozer was off, or at Sullivan if Dr. Mueller was off, or Downstate, and those areas which he had never gone to if Dr. Hammer was off.

Q. But if we take this statement in the context of the email, aren't you being petulant, "Since Dr. Koenigsmann approved the Gabapentin, I might just be sending him the MWAP request forms"?

A. No ma'am, I don't believe I'm petulant ever. You can ask my wife, she may disagree.

Q. So you continue in this email, "He's already asking for an increased dose"; is that correct?

A. Yes, it is.

Q. And what were you suggesting by saying that?

A. Can I clarify something?

Q. Sure.

A. Because I think Mr. Medina, Anthony, was getting kind of a bad rap yesterday. I am not categorizing him as a drug addict. I don't really like that term. My focus is these medications. These medications are extremely dangerous. It doesn't matter if you took them, I took them, Anthony took them, or anybody here. These are what these medications do. They will increase your desire to get more. So I just want to keep that in mind, that it's not — I don't want to characterize Anthony as a drug addict, okay. It's what these medications do. So, of course, these medications, if you're on 500 three times a day or twice a day, you're going to want — by nature of the drug, not because Anthony is drug-seeking, is you're going to want more and more. That's why these medications are dangerous, and that's why they're on the MWAP list. So I just want to clarify that because I don't want to give Anthony a bad rap because him and I had a good rapport, and I want him to continue to think good thoughts when we had our time together
(continued)

Then, a month later, Dr. Dinello increased the dosage of
Gabapentin to three times per day, writing: "Since we are
ordered to treat his neuropathic pain and have him on
Gabapentin, it can be increased to 500 milligrams TID instead of
BID. That's the [correct] dosing regimen anyway." (Sept. 18,
2018 Tr. at 215:1-5 (quoting Pl. Ex. 145).) After counsel noted
at the hearing Dr. Dinello's reluctance a month earlier to
increase Mr. Medina's dosage, Dr. Dinello testified that he
"felt compelled by the court order" to do so but then testified
that he did not feel compelled to treat Mr. Medina's headaches
with Tramadol, which had been shown to be effective. (Sept. 18,
2018 Tr. at 215:7-216:4.) When asked the basis for that view,
he retreated to the general risk factors without addressing Mr.
Medina's specific medical history.[36] Again, there is no doubt
that Dr. Dinello was well aware of Mr. Medina's headache pain:

---

(continued)
since he's leaving soon. I was always out for his best
interests, and I just wanted to make sure I've set
that straight.

(Sept. 18, 2018 Tr. at 212:10-216:16.)
[36]
Q. But isn't it true a month later, in Exhibit 145,
you say to your colleagues, "[s]ince we are ordered to
treat his neuropathic pain and have him on Gabapentin,
it can be increased to 500 milligrams TID instead of
BID. That's the [correct] dosing regimen anyway"?
A. The TID dose, yes.
Q. So why was it such a bad thing that he was asking
for a higher dose a month before?
(continued)

(continued)

A. Because I think it was hurting him, not helping him.

Q. But then you agree a month later, we need to increase the dose?

A. I felt compelled by the court order, the federal - whatever that decree was. It was kind of impeding all of our judgments at the time. It still is, actually, our medical decisions.

Q. So you felt compelled by the court order to give him [Gabapentin] and to increase it; is that correct?

A. Yes, ma'am.

Q. Why weren't you compelled by the court order to treat his headaches?

A. I feel compelled by the court order to treat his headaches as well.

Q. If we have medical records that indicate [Tramadol] was an effective treatment for him for his headaches, why, while all of this is going on, don't you give him the [Tramadol]?

A. Because that is more dangerous than Gabapentin.

Q. What does that have to do with treating his pain?

A. Because the risk-benefit ratio for Mr. Medina was not acceptable, in my opinion. It still isn't.

Q. Based on what?

A. Based on Mr. Medina's medical history of personal substance abuse and addiction issues, a family history of substance abuse and addiction issues, a psychiatric history that is very vulnerable to the effects of controlled substances, his prior history of self-harm and self-mutilation, and there was really no medical indication for these medications. There was insufficient medical justification to be on these medications. That's my personal opinion as his treating physician and as an addiction specialist, somebody who cares about Mr. Medina.

Q. Okay. Sir, first you have not been qualified as an addiction specialist. Second, didn't Mr. Medina convey to you multiple times that he suffered from severe eye pain and headaches when he was exposed to light?

A. He has expressed that, yes.

Q. And didn't you, in fact, on some occasions move him into the infirmary to limit his exposure to light?

A. Yes, I did.

Q. And over the course of the year and a half this
(continued)

70

Q. Isn't it true that Mr. Medina told you he suffers from extreme eye pain that progresses into a very bad headache, and he gets vertigo, dizziness, and he sometimes vomits?

A. Yes.

Q. Isn't that true?

A. Yes.

Q. Did you have any reason to believe that wasn't true?

A. No, I do not.

---

(continued)
injunction has been in place, Mr. Medina, isn't it true, has tried some alternative medications? Yes or no.
A. Yes.
Q. And isn't it true, whether or not you agree, that he has had adverse reactions to many of these medications?
A. So do I agree whether he had adverse reactions to the medications?
Q. Yes.
A. At least two that I'm aware of, he had adverse reactions, yes.
Q. But isn't there a medical record for Mr. Medina which says he does well on [Tramadol], and it does treat his pain?
A. I'm sure there is.
Q. So why not, while there's a federal court injunction in place, don't you give him the medication that you know treats his pain?
A. Because the risk-benefit ratio was unacceptable.
Q. But what about the risk-benefit ratio for the four years he was on [Tramadol] before?
A. Unacceptable then as well.
Q. What was the risk?
A. The risk of that medication – medications like Tramadol don't do anything for the underlying pathophysiology, okay. They just mask the symptoms.

(Sept. 18, 2018 Tr. at 215:1-217:22.)

(Sept. 18, 2018 Tr. at 220:12-19.)  By refusing to treat Mr. Medina's headache pain, Dr. Dinello willfully failed to obey the 2017 Order.

Dr. Dinello also acknowledged the recommendation of the ophthalmologist, Dr. Robert Eden, from January 31, 2018, that Mr. Medina was "stable long term on Tramadol – recommend restarting oral med."  (Sept. 18, 2018 Tr. at 222:3-16; Exhibit 3 to Eden Decl.[37] [dkt. no. 285-3].)  Yet again, Dr. Dinello willfully denied Mr. Medina effective pain medication recommended by an outside specialist.

On January 24, 2018, Mr. Medina wrote a "letter to Deputy Superintendent Williams informing him that [he] was not receiving any medication for [his] eye pain and resulting headaches."  (Medina Decl. at ¶72; Exhibit 36 to Medina Decl. [dkt. no. 293-36].)  On February 20, 2018, Mr. Medina's eyes became so irritated while working on a desktop CCTV that Dr. Wolf had to treat him over three days.  (See Agnew Decl. at ¶ 161; Exhibit 153 to Agnew Decl. [dkt. no. 295-154].)  On March 13, 2018, Mr. Medina vomited at his deposition due to light exposure.  (Agnew Decl. at ¶¶ 163-168; Medina Decl. at ¶ 82; Exhibit 41 to Medina Decl. ("Medina Decl. Ex. 41"), dated June

---

[37] (Declaration of Dr. Robert Eden in Support of Motion for Contempt ("Eden Decl."), dated January 31, 2018 [dkt. no. 285].)

25, 2018 [dkt. no. 293-41]; Sept. 17, 2018 Tr. at 87:15-17.)
Again, DOCCS medical personnel willfully failed to provide Mr.
Medina with effective pain medication over this period.

Thereafter, Mr. Medina grieved the lack of pain medication
for his headaches as well as the MWAP policy as applied to him.
(Medina Decl. at ¶¶ 84-85, Exhibit 42 to Medina Decl. [dkt. no.
293-42]; Exhibit 43 to Medina Decl. [dkt. no. 293-43].)  In
early June, Mr. Medina attended a trial via video conference
and, once again, suffered from headaches. (Medina Decl. at
¶ 86.)  After two more "documented" episodes in June 2018 and
with the contempt hearing looming, Dr. Dinello and Mr. Medina
discussed releasing Mr. Medina into general population if Mr.
Medina would drop all his lawsuits.  (Sept. 18, 2018 Tr. at
223:21-227:24; Pl. Ex. 204.)  When asked why he did this, Dr.
Dinello responded, "I felt compelled by the federal court order
to do so."  (Sept. 18, 2018 Tr. at 227:17-21.)  Dr. Dinello also
testified that he removed the medical problem codes from Mr.
Medina's Medical Problem List to "destress" him.  (Sept. 18,
2018 Tr. at 229:21-231:8.)

On July 10, 2018, Dr. Dinello wrote the prescription of
Tramadol for "Q12 PRN," meaning Mr. Medina could have one 50mg
pill every 12 hours, and the medication was received July 18.
(Dinello Decl. at ¶ 39; Exhibit 199 to Agnew Reply Decl. [dkt.

no. 356-38] (last entry); Meds Spreadsheet at 29; Sept. 17, 2018

Tr. at 175:8-12.)  Mr. Medina took one dose on July 18, one dose

on July 19, one dose on July 20, none on July 21, one dose on

July 22, none on July 23, two on July 24, and one on July 25,

(see Meds Spreadsheet at 29-30) - not "every day for a week" as

Defendants assert in their brief, (Defendants' Memorandum of Law

in Opposition to Plaintiff's Motion for Contempt, dated Aug. 3,

2018 [dkt. no. 341], at 26).  Mr. Medina took seven out of

sixteen available doses in accordance with his prescription.

While Dr. Dinello characterized Mr. Medina as "exhibiting

addictive or drug seeking behavior," (Dinello Decl. at ¶ 39), in

fact, Mr. Medina had never taken a dose above or even at the

prescription level, (Sept. 17, 2018 Tr. at 125:18-25).  It was

the same dose Mr. Medina took consistently February 6, 2017, to

March 7, 2017, and less than the dose prescribed from March 8,

2017, to June 1, 2017.  While admitting that he had no idea how

many doses Plaintiff had taken or when he had taken them, Dr.

Dinello discontinued Mr. Medina's medication on July 26, 2018,

because Mr. Medina had been rude to a nurse when he was in pain

and did not receive medication for over four hours.  (Sept. 18,

2018 Tr. 246:5-248:14; Sept. 17, 2018 Tr. at 90:17-91:7, 115:4-

117:5, 127:1-8.)  Again, this is not the reaction of a physician

trying diligently to comply with a Court order.

### 3. Post-2017 Order Window Tinting

The Court has reviewed in detail the evidence and testimony with respect to window tinting. There were certainly occasions when DOCCS was not in compliance with the 2017 Order. For example, following the issuance of the 2017 Order, Mr. Medina was housed in Cell B-11-7 at Wende which, according to Deputy Superintendent for Security Kevin Brown, "does not have any windows inside the cell" or "directly face a window." (Declaration of Deputy Superintendet [sic] Kevin Brown in Opposition to Plaintiff's Motion for Contempt, dated Aug. 1, 2018 [dkt. no. 328], at ¶ 3.) While that might technically be true, the photographs clearly showed windows across from the cell at a slight diagonal with light streaming in and no tinting. (Exhibit 209 to Agnew Reply Decl. [dkt. no. 356-48].)

On March 2, 2017, Mr. Medina filed a grievance, stating: "I was in the Tri-ICP mental health program in B-Block. My cell faced a wall but also part of a window; and the other window allowed sunlight to directly enter my cell. Thus, I requested that the windows be tinted. In response, Ms. [Katherine] Bergamasco [, Instructor of the Blind,] stated, 'we are not tinting the windows.'" (Exhibit 2 to Medina Decl. ("Medina Decl. Ex. 2") [dkt. no. 293-2]). The superintendent cited to Ms. Bergamasco's report dated March 17, 2017, and later stated

on March 27, 2017, that there "[were] currently no cells available" and that Mr. Medina "ha[d] been offered both fit-over lenses and sleeping masks for use in his cell; however, he refuse[d] them both." (Medina Decl. Ex. 2.) "We are not tinting the windows" is not the reaction of an administrator diligently trying to comply with a court order.

On October 25, Mr. Medina filed a grievance at Sullivan due to a lack of tint on the windows in his cell. (Exhibit 24 to Medina Decl. ("Medina Decl. Ex. 24") [dkt. no. 293-24].) In the Grievance Report from Sgt. L. Brown to Superintendent E. Burnett, DOCCS stated that "Inmate Medina did not provide evidence of a federal court order to have his cell windows tinted," but the report then noted that Sgt. Brown "f[ou]nd a portion of th[e] grievance with merit as the court order has warranted Inmate Medina to have tint on his window. Upon his arrival back to Sullivan Correctional Facility the window will be tinted." (Medina Decl. Ex. 24.)

Then, on January 24, 2018, Mr. Medina wrote a letter to Deputy Superintendent Burnett informing him that he "was currently without any pain medication" and that his "cell [was] bright with sunshine" because the tint had not yet been installed. (Exhibit 35 to Medina Decl. [dkt. no. 293-35].).

This continued for at least four days. (Sept. 18, 2018 Tr. 47:2-22.)

On the other hand, there was much evidence of compliance. For example, when Mr. Medina arrived at Five Points on June 1, 2017, tinting was ordered for the fixed window in his cell. (Declaration of Amy Lamanna in Opposition ("Lamanna Decl."), dated Aug. 3, 2018 [dkt. no. 332], at ¶¶ 2-5.) Furthermore, on June 5, Tricia Miller, Deputy Superintendent for Administration, emailed Lt. Edward Rizzo and others, saying, "Following conversation with DSP, it has been determined that the overhead light in [Medina's] cell should be turned off since we are unable to dim it. Maintenance/MVO is working on getting the window tinting." (E-mail from Tricia M. Miller to Edward J. Rizzo and Maurice J. Bouvia (June 5, 2017, 1:43 PM) (on file at MEDINA006582).)

Moreover, on June 14, Mr. Medina was dissatisfied with the 35% tint on his window, he created a disturbance, ripped the tinting from the window, and replaced it with manila folders and yellow paper. "Five Points Security staff allowed the paper to remain in place temporarily since Plaintiff spent much of the following two months, July 15, 2017, through August 31, 2017 in the Infirmary"

77

before being transferred to Wende on September 5. (Lamanna
Decl. at ¶ 8.) Mr. Medina testified that he was placed in
his own room in the infirmary, exposed to the same amount
if light in the infirmary as in B Block cell, and didn't
complain about the window because he "put paper in the
window." (Exhibit A to Turkle Decl.[38] [dkt. no. 342-1], at
70:1-22.)

Then, in late October of 2017, Mr. Medina returned to
Sullivan where he was placed in a cell, and the window
across from his cell was not tinted. Mr. Medina grieved
the lack of tint, and requested that the window be tinted
and that DOCCS allow him to sleep with his head away from
the window. (Medina Decl. Ex. 24, at 5.) The grievance
report stated: "the grievant is entitled to have his cell
window tinted per court order. When the grievant arrived
to [Sullivan] the material needed to tint the grievant's
window was not available, but is currently on order." (Id.
at 1.) Additionally, Mr. Medina spent substantial periods
of time in cells with some degree or other of window tint.

---

[38] (Declaration of Bruce J. Turkle in Opposition to Plaintiff's
Motion for Contempt ("Turkle Decl."), dated Aug. 3 2018 [dkt.
no. 342].)

## II. **LEGAL STANDARD**

### A. Standard for Contempt

When a party fails to comply with a court order, he or she may be held in civil contempt if "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 655 (2d Cir. 2004) (citing King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995)). It is not necessary to "establish[] that the violation was willful." Paramedics Electromedicina, 369 F.3d at 655 (citing Donovan v. Sovereign Sec. Ltd., 726 F.2d 55, 59 (2d Cir. 1984)).

An order is clear and unambiguous when it "leaves no uncertainty in the minds of those to whom it is addressed" and instead allows them "to ascertain from the four corners of the order precisely what acts are forbidden." King, 65 F.3d at 1058; see also Chao v. Gotham Registry, Inc., 514 F.3d 280, 292 (2d Cir. 2008) ("[T]he decree underlying contempt must be sufficiently clear to allow the party to whom it is addressed to ascertain precisely what it can and cannot do."). The proper analysis focuses on "whether [the order] unambiguously proscribes the challenged conduct," not whether it is "clear in

some general sense." Chao, 514 F.3d at 292.

The purpose for which the relief was granted is also relevant to "deciding whether an injunction has been violated," as "the spirit of the injunction" may have been violated "even though its strict letter may not have been disregarded." John B. Stetson Co. v. Stephen L. Stetson Co., 128 F.2d 981, 983 (2d Cir. 1942).

A plaintiff must also clearly and convincingly demonstrate that "defendants did not . . . comply with the order." Latino Officers Ass'n City of N.Y., Inc. v. City of N.Y., 558 F.3d 159, 164 (2d Cir. 2009). For civil contempt, this clear and convincing standard requires "proof adequate to demonstrate a reasonable certainty that a violation occurred." BeautyBank, Inc. v. Harvey Prince LLP, 811 F. Supp. 2d 949, 956 (S.D.N.Y. 2011) (internal quotation omitted).

Finally, the court must determine "whether defendants have been reasonably diligent and energetic in attempting to accomplish what was ordered." Powell v. Ward, 487 F. Supp. 917, 933 (S.D.N.Y. 1980), aff'd and modified, 643 F.2d 924 (2d Cir. 1981) (quoting Aspira of N.Y. v. Board of Education of City of N. Y., 423 F. Supp. 647, 653-54 (S.D.N.Y. 1976)). When a defendant acts based on what appears to be "'a good faith and reasonable interpretation of (the court's order),' he should not

be held in contempt." Vertex Distrib., Inc. v. Falcon Foam

Plastics, Inc., 689 F.2d 885, 889 (9th Cir. 1982) (alteration in

original) (quoting Rinehart v. Brewer, 483 F. Supp. 165, 171

(S.D. Iowa 1980) (cited with approval by Schmitz v. St. Regis

Paper Co., 758 F. Supp. 922, 927 (S.D.N.Y. 1991)).  However, a

defendant is "not reasonably diligent" when he or she ignores

the order or takes only superficial actions that "strain both

the language and intent of the order."  Powell, 487 F. Supp. at

933-34.  It is even more troubling when a defendant takes

actions "that contravene the provisions of the order."  Id. at

934.

### B. Standard for Attorney's Fees and Fines

As the Court of Appeals held in Weitzman v. Stein, "the

sanctions for civil contempt serve two purposes: to coerce

future compliance and to remedy any harm past noncompliance

caused the other party."  98 F.3d 717, 719 (2d Cir. 1996)

(citing United States v. United Mine Workers of America, 330

U.S. 258, 302-04 (1947)).  A district judge "is vested with wide

discretion in fashioning a remedy" to encourage future

compliance.  Id. (citing Vuitton et Fils S.A. v. Carousel

Handbags, 592 F.2d 126, 130 (2d Cir. 1979)).  However, "[t]he

compensatory goal . . . can only be met by awarding to the

plaintiff any proven damages."  Id.  Regardless of the relief

granted, the district court "may award appropriate attorney fees and costs to a victim of contempt." Id.

The Court of Appeals has found that "the willfulness of the contemnor's misconduct" can support a decision to award fees. Id.; Vuitton et Fils, 592 F.2d at 130 ("[I]t is appropriate for the court . . . to award the reasonable costs of prosecuting the contempt, including attorney's fees, if the violation of the decree is found to have been willful."). It remains an open question whether a finding of willfulness is required to award fees. Jacobs v. Citibank, N.A., 318 F. App'x 3, 5 n.3 (2d Cir. 2008). However while it "may not necessarily be a prerequisite to an award of fees and costs, a finding of willfulness strongly supports granting them." Weitzman, 98 F.3d at 719. To survive review after finding willfulness, a district court "would need to articulate persuasive grounds for any denial of compensation for the reasonable legal costs of the victim of contempt." Id.

The court may also answer civil contempt with "a remedial fine, which compensates the party who won the injunction for the effects of his opponent's noncompliance." Hutto v. Finney, 437 U.S. 678, 691 (1978). When the plaintiff proves harm caused by the violation, "compensatory damages are appropriate." Vuitton et Fils, 592 F.2d at 130. The purpose of these sanctions is "not to vindicate the court's authority but to make reparation

to the injured party and restore the parties to the position they would have held had the injunction been obeyed." Id. Once damages are established, "[t]he district court is not free to exercise its discretion and withhold an order in civil contempt awarding [them]." Id.; Weitzman, 98 F.3d at 720 ("It is error to withhold damages that are supported by the record.").

## III. DISCUSSION

### A. Pain Medication

There is no question on this record that the 2017 Order was clear and unambiguous. First, Defendants neither appealed that immediately appealable preliminary injunction nor requested clarification. Second, the record is littered with emails where DOCCS medical personnel discuss among themselves the need to treat Mr. Medina with Tramadol or an equally effective pain medication. For example, Deputy Superintendent Lamanna wrote to Tricia Miller, saying, "I was correct in my assumption that the Judge can't order a specific medicine be prescribed only that this pain needs to be addressed appropriately." (Exhibit 40 to Agnew Decl. ("Agnew Decl. Ex. 40") [dkt. no. 295-40]; see also, e.g., Exhibit 52 to Agnew Decl. [dkt. no. 295-52]; Agnew Decl. Exs. 62, 75-76, 140.) Similarly, Dr. Levitt wrote her colleagues regarding Mr. Medina's return to Wende:

> I/M returned to Wende late last week, on [Gabapentin]
> 600mg tid. As you may recall, he has a court order for
> [Tramadol] "or an alternative", which the previous
> facility (5 Points) interpreted as [Gabapentin].
> Unfortunately, his chart is missing so I have filled
> out the MWRAP (or whatever) as best I can, however
> time is running out and if he doesn't get the
> [Gabapentin] we will be in violation of the court
> order. I say "we", including me, you, Dinello,
> Koenigsman[n], Neal, etc. etc.

(Agnew Decl. Ex. 75 (emphasis added).)

These emails, as well as the other communications, remove all doubt that the 2017 Order left "no uncertainty in the minds of those to whom it [was] addressed" as to what conduct was proscribed. King, 65 F.3d at 1058 (internal quotation marks omitted) (quoting Hess v. N.J. Trans Rail Operations, Inc., 846 F.3d 114, 116 (2d Cir. 1988)); see also Chao, 514 F.3d at 292. "Both the Order and the prior opinions in this case make it clear that the central concern was" to ensure Mr. Medina's pain was treated with medication at least as effective as Tramadol. Powell, 643 F.2d at 932. Thus, the first requirement for a finding of contempt is met.

Proof of non-compliance is clear and convincing. First, there is no question that from October 23 through December 9, 2017, Mr. Medina received no Tramadol (for his headaches) and no Gabapentin (for his neuropathic pain), but only a few doses of Esgic (established on this record to be for migraines which Mr. Medina does not suffer from), Topamax and Toradol (to which he

had previously suffered adverse reactions), and Pamelor (which was ineffective). There is also no question that Mr. Medina suffered pain throughout this time.

Second, the written record establishes clearly and convincingly that Mr. Medina's pain treatment over the post-2017 Order period was generally ineffective. His and his counsel's scores of communications with DOCCS personnel clearly document his pain complaints. The outside experts, Drs. Dyskin and Arliss, saw no reason to believe he was not in pain or that he was malingering. (Dyskin Decl. at ¶ 9; Dyskin Decl. Ex. 11.) Even Dr. Dinello believed that Mr. Medina was in pain. (Sept. 17, 2018 Tr. at 169:4-12.) There is also no question that Mr. Medina vomited after a court appearance before Judge Geraci and at a deposition. (Sept. 17, 2018 Tr. at 76:5-12; Agnew Decl. at ¶ 166; Medina Decl. at ¶ 53; Medina Decl. Ex. 41.) And, as noted above, the Court credited Mr. Medina's testimony that he was in pain. Mr. Medina's continued pain, combined with DOCCS' provision of medications that either did not address his health issues, were dangerous for him to take, or were otherwise ineffective, are more than adequate "to demonstrate a reasonable certainty" that "defendants did not . . . comply with the order" requiring them to treat Mr. Medina's pain with Tramadol or an equally effective medication. Latino Officers Ass'n, 558 F.3d

at 164; BeautyBank, 811 F. Supp. 2d at 956. Thus, the second requirement for a finding of contempt is met.

Third, the Court finds that DOCCS personnel did not diligently attempt to comply with the 2017 Order. In fact, as set out at length above, the evidence establishes clearly and convincingly that DOCCS medical personnel energetically worked NOT to comply with the 2017 Order. On numerous occasions, they ignored Mr. Medina's complaints of pain and, in an effort to avoid prescribing Tramadol or Gabapentin, repeatedly prescribed medications he had previously suffered an adverse reaction to. AND they did so in the face of Mr. Medina's telling them of the adverse reactions and even his writing facility superintendents to the same effect. Most charitably, such actions suggest "superficial changes" that "cut off consideration of the necessity . . . to comply with the letter and spirit of the order." Powell, 487 F. Supp. at 934. More likely, and more troublingly, these actions indicate that defendants knowingly and directly "contravene[d] the provisions of the order." Id. Regardless, asserting that such actions represent a reasonably diligent attempt to comply would "strain both the language and intent of the order." Id.

The record also establishes that, while the dangers of opioid medications were known to DOCCS medical personnel at

least by 2003, they ignored Mr. Medina's effective pain
treatment with such medications (without incident) by DOCCS
personnel for many years and worked hard to avoid prescribing
these medications based only on the most general counter-
indications. (See, e.g., Sept. 17, 2018 Tr. at 159:25-162:9,
167:18-22; Sept. 18, 2018 Tr. at 215:1-217:22; Pl. Ex. 232, at
Ex. 5; Agnew Decl. Exs. 17, 40, 62; Medina Decl. at ¶¶ 34, 49;
Medina Decl. Exs. 16, 23.) Indeed, Mr. Medina testified that
Dr. Dinello told him that, in his opinion, "outside of cancer,
no condition should be treated with opioids." (Sept. 17, 2018
Tr. at 95:16-96:6.) This was particularly egregious in light of
the lecture given by DOCCS' expert, Dr. Argoff, to the effect
that for some patients, opioid therapy is "effective and safe"
and that the medical community "must maintain the availability
of . . .analgesics to meet the specific and personalized needs
of the people [they] treat." (Sept. 18, 2018 Tr. at 319:23-
320:11.) Defendants ignored Mr. Medina's complaints of pain and
failed to consider Mr. Medina's particular medical needs. This
clearly "violated their obligations under the [2017 Order] by
failures of diligence . . . and steadfast purpose to effectuate
the prescribed goals" of effectively treating Mr. Medina's pain.
Powell, 487 F. Supp. at 933 (citation omitted); Aspira, 423 F.
Supp. at 654. Thus, the third and final requirement for a
finding of contempt is satisfied.

## B. Window Tinting

The 2017 Order might not have been clear and unambiguous with respect to the window tinting because it did not specify the level of tint required.

Although there were instances of non-compliance, one or two of which might even be clear and convincing evidence of non-compliance, e.g., after Mr. Medina requested window tinting, Ms. Bergamasco responded "we are not tinting the windows," (Medina Decl. Ex. 2, at 3), the evidence overall not does support a finding of clear and convincing non-compliance.

Finally, the evidence overall demonstrates efforts to comply with the spirit of the order, particularly the occasions when DOCCS personnel permitted Mr. Medina to cover his windows with manila envelopes or to hang a blanket in front of the window. See Chao, 514 F.3d at 293 (concluding that it was reasonable not to impose sanctions for contempt "under a decree that did not, at the relevant time, unambiguously proscribe [defendant's] actions and . . . with which the [defendant] attempted to comply in a reasonable manner"). Accordingly, the Civil Contempt Motion with respect to window tinting is denied.

## C. Attorney's Fees and Fines

Having found DOCCS medical personnel in contempt for
failing to comply with the effective pain treatment portion of
the 2017 Order, the Court now considers appropriate sanctions.
As noted above, the Court of Appeals held in Weitzman, 98 F.3d
at 719 (citing United Mine Workers, 330 U.S. at 302-04), "the
sanctions for civil contempt serve two purposes: to coerce
future compliance and to remedy any harm past noncompliance
caused the other part."  Because Mr. Medina has been released
from custody, see Inmate Population Information Search, N.Y. STATE
DEP'T OF CORR. & CMTY. SUPERVISION, http://nysdoccslookup.doccs.ny.
gov/GCA00P00/WIQ3/WINQ130 (last visited Feb. 12, 2019) (enter
"Medina" into the "Last Name" field, enter "Anthony" into the
"First Name" field, enter "99-A-2999" into the "DIN" field, then
click "Submit"), coercive sanctions are no longer appropriate.[39]

As the district court held in Powell, judges must "consider
the character and magnitude of the harm."  487 F. Supp. at 935
(quoting United Mine Workers, 330 U.S. at 304).  As in Powell,
Mr. Medina suffered "irreparable harm" due to the "continu[ed]
deprivation of [his] constitutional rights," id., here suffering
severe pain and other discomfort needlessly.  Because of this,

---

[39] In addition, that portion of Plaintiff's Civil Contempt Motion
seeking private supervision of his health care is denied as
moot.

the Court "conclude[s] that a fine is necessary to demonstrate to the defendants the seriousness with which [the Court] view[s] their . . . non-compliance." Id.

Because Mr. Medina has clearly and convincingly proved that he suffered serious pain and other discomfort as a result of DOCCS medical personnel's failure to comply with the effective pain treatment portion of the 2017 Order, the Court will award compensation to him to remedy the harm caused by non-compliance. In Parker v. United States, 153 F.2d 66 (1st Cir. 1946),

> Judge Magruder analogized the imposition of a
> compensatory fine in civil contempt to a tort judgment
> for damages caused by wrongful conduct. The sanction
> is employed not to vindicate the court's authority but
> to make reparation to the injured party and restore
> the parties to the position they would have held had
> the injunction been obeyed.

Vuitton et Fils, 592 F.2d at 130 (citing Parker, 153 F.2d at 70). The sanction awarded, therefore, must be sufficient to compensate Mr. Medina for his pain and other discomfort.

The Court acknowledges that although willfulness "may not necessarily be a prerequisite to an award of fees and costs, a finding of willfulness strongly supports granting them." Weitzman, 98 F.3d at 719. Here, the Court has found that DOCCS medical personnel's failure to treat Mr. Medina's pain was willful. Accordingly, the Court will award to Plaintiff's

counsel the reasonable costs of prosecuting the contempt, including attorney's fees. Vuitton et Fils, 592 F.2d at 130.

As a result of the hundreds of docket entries since Plaintiff's counsel's initial letter raising the issue of contempt and the mountains of evidence submitted on the Civil Contempt Motion, the Court is very familiar with the quality and quantity of work performed by Ms. Agnew. Obtaining documents was difficult, and the numerous types of documents, e.g., medication records, Ambulatory Health Records, Grievance files, transcripts, etc., only exacerbated the situation. Ambulatory Health Records were generally in handwriting, so deciphering them was particularly difficult. Counsel also undertook tedious but very helpful work in preparing the Meds Spreadsheet. In addition, Plaintiff's expert, Dr. Carinci, and his report were impressive. Most importantly, Ms. Agnew was a tireless advocate for Mr. Medina. She communicated frequently with DOCCS medical personnel and DOCCS counsel in service of her client. Such advocacy is to be commended and compensated.

The above shall constitute the Court's findings of fact and conclusions of law.

## IV. CONCLUSION

Plaintiff Medina's Civil Contempt Motion [dkt. no. 284] against DOCCS personnel for failing to comply with the effective

pain treatment portion of the 2017 Order is granted.  The portions of the Civil Contempt Motion addressed to tinted windows is denied, and the portion addressed to CCTV use was withdrawn.  (See Sept. 17, 2018 Tr. at 6:14-18.)

In order to remedy the non-compliance, Mr. Medina will be awarded compensation for the pain and other discomfort he suffered as a result of the non-compliance.  His attorney will also be awarded the fees and costs of prosecuting the Civil Contempt Motion.

Counsel shall confer as to the amount of damages to be awarded for pain and suffering and the amount of attorney's fees and costs to be awarded and shall inform the Court by letter no later than February 27, 2019 as to the status of such discussions.

SO ORDERED.


Dated:    New York, New York
          February 13 , 2019


                         _Loretta A. Preska_
                         LORETTA A. PRESKA
                         Senior United States District Judge